**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

———————————————————————— :
:
IN RE: AVANDIA MARKETING, SALES           :
PRACTICES AND PRODUCTS LIABILITY          :        **MDL No. 1871**
LITIGATION                                :        **07-md-01871-CMR**
———————————————————————— :
:
THIS DOCUMENT RELATES TO ALL              :
ACTIONS                                   :
———————————————————————— :

————————————————————————————————

**SEVENTH REPORT AND RECOMMENDATION OF**
**THE SPECIAL MASTER AS TO ATTORNEY-CLIENT PRIVILEGE**
**AND WORK-PRODUCT DOCTRINE GUIDELINES**

————————————————————————————————

Pretrial Order No. 28 sets forth the procedures regarding discovery disputes and directs the parties first to present discovery disputes to the Special Master for informal mediation efforts. Over the past few months, the Special Master and the parties have attempted to resolve a dispute over GSK's assertion of attorney-client privilege or work-product protection for more than 30,000 documents and have worked cooperatively to develop a process to begin narrowing and eventually resolving this dispute. However, the Special Master believes, for the reasons set forth below, that resolution of the parties' dispute can be substantially advanced by a ruling from the Court on the matters set forth in this Report and Recommendation.

The need to resolve the issue of privileged documents was brought into sharp focus by the *Vioxx* case, *In re Vioxx Products Liability Litigation*, 501 F. Supp. 2d 789 (E.D. La. 2007). In *Vioxx*, defendant Merck & Co. produced over two million documents. *Id.* at 789. Privilege was claimed initially for 30,000 documents and, by the time of the special master's review in that case, for 60,000. *Id.* at 802 & n.21. The cost incurred by the special master and special counsel exceeded

$400,000, for review of only 2,500 representative documents (about 4% of the total).  *Id.* at 815 n.35.
The Special Master believes that the morass encountered in the *Vioxx* case can be tempered
considerably by establishing Guidelines, approved by the Court, for evaluating the claims of
attorney-client privilege or work-product protection in this case.  Therefore, the Special Master
prepared Guidelines for evaluating privilege or work-product claims, and submits this Report and
Recommendation proposing adoption of those Guidelines by the Court.

**Background**

At an April 16, 2009, conference with the parties, the Special Master asked the PSC
to identify approximately 120 documents from GSK's privilege log, in ten categories reflecting the
PSC's various objections to GSK's assertions of privilege, for review by the Special Master.  After
the PSC identified these sample documents from the privilege log, GSK submitted the documents to
the Special Master for *in camera* review in order to determine whether these sample documents were
properly withheld or should be produced (or, in some cases, redacted and then produced).  In order
to more fully understand the basis for assertion of the privilege, the Special Master met with GSK's
counsel to discuss the withheld documents and also accepted a supplemental *ex parte* submission
from GSK that explained, on a document-by-document basis, the grounds for asserting the privilege
in each case.  Both sides submitted multiple briefs addressing the issue, both before and after the
Special Master's initial review of the sample documents.

Following these steps, the Special Master met with the parties on May 12, 2009, and
distributed a chart of the 120 sample documents, identifying the Special Master's tentative rulings
regarding the privileged nature of each document.  In making these initial rulings, the Special Master
accepted to some extent GSK's argument that documents distributed to multidisciplinary teams
within GSK that included a lawyer were protected by the attorney-client privilege.  However, after

engaging in further review of the relevant case law and developing a set of Guidelines based on the case law to ensure consistent rulings on the privilege and work-product issues, the Special Master has revised a substantial number of his initial rulings.

After the Special Master's development of the Guidelines, he met with the parties again, on May 22, 2009, and distributed the Guidelines.  In addition, concurrently with the filing of this Report and Recommendation, the Special Master is providing the parties with copies of his revised rulings.

If the Court adopts the Guidelines used by the Special Master without substantial amendments, it will not be necessary for him to reconsider his revised rulings.  If the Court makes substantial amendments to the Guidelines, the Special Master will reconsider his rulings in light of the Guidelines adopted by the Court and then distribute those new rulings to the parties.  In either case, the Court's resolution of the dispute over the Guidelines to be applied to the review of withheld documents will aid the Special Master and the parties in developing an efficient procedure for reviewing the remaining thousands of withheld documents.

**Overview of Guidelines**

Among other things, the Guidelines set forth two principles that impacted the Special Master's further review of many of the documents.  First, under the Guidelines, a communication is not privileged if its *primary purpose* is not seeking or giving legal advice.  Hence, where a client solicits advice from many individuals, most of whom are non-lawyers, the primary purpose of the communication typically will not be the seeking of legal advice and the communication will not be privileged.  Second, an attorney's involvement in a collaborative process with non-lawyers in drafting a non-legal document is usually an insufficient basis to render the draft

document protected by the attorney-client privilege. These principles are supported by a substantial number of cases and are fairly well accepted in the recent jurisprudence.

However, the Special Master notes two factors for the Court to consider. First, the parties do not dispute that Pennsylvania law controls the privilege issues in this case, and no Pennsylvania Supreme Court case expressly adopts the "primary purpose" test that is at the heart of these Guidelines. Second, in *Kelly v. Ford Motor Co. (In re Ford Motor Co.)*, 110 F.3d 954 (3d Cir. 1997), the Third Circuit held that certain corporate meeting minutes were protected by the attorney-client privilege because, even if the corporate decision reflected in the minutes "was driven . . . principally by profit and loss, economics, marketing, public relations, or the like, it was also infused with legal concerns, and was reached only after securing legal advice." *Id.* at 966. Arguably, this sentence could be viewed as adopting a rule that a document may be privileged even if its primary purpose is non-legal, so long as the document was "infused with legal concerns." As set forth shortly, the Special Master does not believe that this was the holding of the court in *Ford* and does not believe that such a holding would be a proper interpretation of Pennsylvania law.

In *Ford*, the Third Circuit dealt specifically with documents including "minutes of a meeting attended by top-level executives of Ford Motor Company regarding the Bronco II," a vehicle eventually subject to product defect claims. The court held that the minutes were protected by the attorney-client privilege because "the recorded communications were for the purpose of obtaining legal advice." *Id.* at 956. The bulk of the *Ford* opinion was concerned with the court's jurisdiction under mandamus or the collateral order doctrine, with the court eventually concluding that it had jurisdiction under the latter doctrine. *Id.* at 957-64. When the court reached the issue of the meeting minutes, it noted that it was uncertain whether Pennsylvania or Michigan law applied,

but it did not need to resolve this issue "because the law as to attorney-client privilege in

Pennsylvania does not differ in any significant way from that in Michigan." *Id.* at 965.

        In particular, "the two states agree in the respect most relevant to our case: for a

communication to be privileged, it must have been made for the purpose of securing legal advice."

*Id.*  In making this statement, the court cited its prior decision in *Rhone-Poulenc Rorer v. Home Indemnity

Co.*, 32 F.3d 851 (3d Cir. 1994), in which, applying Pennsylvania law, the court had held that, for the

privilege to apply, a communication must have been made "for the purpose of securing *primarily*

either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding."  *Id.* at

862 (emphasis added).  The court in *Ford* then concluded that the documents were privileged:

> Our review of the final minutes, the draft minutes, the report Nolte
> summarized at the meeting, and relevant affidavits, leads us to conclude that
> the communications in the meeting were made for the purpose of securing
> legal advice.  Ford clearly had concerns about the Bronco II; this is not
> surprising given that the product was in the early stages of its development.
> *Nolte examined the legal implications of some of those concerns and proposed a particular
> course of action*, contained in his report to the Policy and Strategy Committee,
> to address them.  The Policy and Strategy Committee meeting itself was
> called in part to discuss Nolte's proposal.  The discussion at the meeting,
> then, was intended to secure Nolte's legal advice.

*Ford*, 110 F.3d at 966 (emphasis added).

        In explaining why it disagreed with the trial court's conclusion that the documents

were not privileged because they memorialized business and safety decisions, the court noted:

> Certainly, the ultimate decision reached by the Policy and Strategy
> Committee could be characterized as a business decision, but the Committee
> reached that decision only after examining the legal implications of doing so.
> Even if the decision was driven, as the district court seemed to assume,
> principally by profit and loss, economics, marketing, public relations, or the
> like, it was also infused with legal concerns, and was reached only after

securing legal advice.  At all events, disclosure of the documents would reveal that legal advice.

*Id.*

As noted above, the Special Master does not view the court's discussion in the last quoted excerpt as adopting a rule that a communication may be privileged even when its primary purpose is something other than obtaining legal advice.  Indeed, the court in *Ford* cited its prior decision in *Rhone* specifically for the relevant Pennsylvania law regarding the required purpose of the communication and that prior decision explained that the communication must be made *primarily* for the purpose of obtaining legal advice.  Moreover, the court in *Ford* expressly found, after *in camera* review of the documents at issue, that the purpose of the communications memorialized in those documents was examination of the legal implications of concerns about the company's product and a lawyer's recommended course of action regarding those concerns.

Thus, the Special Master believes that the language at issue in *Ford* simply stands for the proposition that privileged communications that were made for the purpose of obtaining legal advice do not lose their protected status when the ultimate goal of obtaining that advice is the making of a business decision.  Of course, in the corporate context, *all* decisions ultimately are business decisions, even those made after receiving legal advice.  Even decisions regarding litigation, a plainly legal matter, are ultimately made with the corporate bottom-line in mind.  In *Ford*, the communications in question — made at a meeting led by a lawyer, who was discussing the legal implications of certain business concerns and then recommending a course of action — ultimately served a business purpose but, as the court reasonably concluded, that did not alter their core legal nature.  *Ford* is thus not inconsistent with the great majority of the case law holding that a communication is not privileged unless its primary purpose is obtaining or giving legal advice.

**The Parties' Dispute**

At the May 22, 2009 conference at which the Special Master distributed the Guidelines, both parties expressed disagreement with at least some aspect of the Guidelines.  The PSC's only objection at that time was that, under Guideline No. 11, the Special Master found that the attorney-client privilege or work-product protection was not waived when GSK shared otherwise protected communications with third party consultants if those consultants were the functional equivalent of a GSK employee or the consultants' assistance was necessary in order for GSK's counsel to render legal advice.

GSK raised a number of objections to the Guidelines, primarily that (1) under Guideline Nos. 3 and 4, documents such as e-mails that were simultaneously sent to numerous GSK employees, including counsel, generally were not found to be privileged because the primary purpose of the communications was not to obtain or give legal advice; (2) under Guideline No. 12, drafts of documents were not found to be privileged when the documents did not reflect legal advice or confidential client information transmitted to an attorney for the purpose of obtaining legal advice, despite GSK's contention that a collaborative team, including counsel, prepared the draft document; and (3) under Guideline No. 14, the same draft documents were not found to be protected by the work-product doctrine when they were not prepared *because* of pending or anticipated litigation.

Stated briefly, the key dispute between the parties (similar to the dispute in *Vioxx*) is whether a document addressed to a team consisting of doctors, researchers, pharmaceutical personnel, marketing people, and also lawyers, asking for the team's advice or opinion on an issue or an attached document, can be a privileged document.  PSC contends that the primary purpose of such mass communications to team members cannot be obtaining legal advice and thus the

communications are not privileged.  GSK argues that such a collaborative effort in major

corporations, particularly those in heavily regulated industries such as the pharmaceutical industry, is

necessary, and corporations that use such a method of internal communication should not forfeit

the attorney-client privilege that might otherwise apply.*

GSK may be correct regarding the necessity of operating in this manner in a large

corporate setting (we express no opinion on that issue), but GSK's approach is not the law in

Pennsylvania at present.  Nor, as far as we can tell, is it the law yet anywhere.  As the court noted in

*Vioxx*:

> This problem of determining the type of services being rendered by
> in-house counsel has been exacerbated by the advent of e-mail that has made
> it so convenient to copy legal counsel on every communication that might be
> seen as having some legal significance at some time, regardless of whether it
> is ripe for legal analysis.  As a consequence, counsel is brought into business
> communications at a much earlier stage than she was in the past when
> communications were through hard-copy memoranda.  This, of course, has
> been beneficial for corporations because the lawyers are some of the most
> intelligent and informed people within corporations. . . .  The benefit from
> this expanded use of lawyers, however, comes at a cost.  This cost is in the
> form of differentiating between the lawyers' legal and business work when
> the attorney-client privilege is asserted for their communications within the
> corporate structure.  The privilege is only designed to protect
> communications seeking and rendering legal services.
>
> . . . .
>
> The structure of Merck's enterprise, with its legal department having
> such broad powers, and the manner in which it circulates documents, has
> consequences that Merck must live with relative to its burden of persuasion
> when privilege is asserted.  When, for example, Merck simultaneously sends
> communications to both lawyers and non-lawyers, it usually cannot claim

---

* The Special Master notes that both parties asserted their positions in good faith.  Therefore, he views with disfavor comments by the PSC that his rulings on the 120 sample documents demonstrate that GSK acted in bad faith in invoking the privilege.

> that the primary purpose of the communication was for legal advice or
> assistance because the communication served both business and legal
> purposes.

*Vioxx*, 501 F. Supp. 2d at 798, 805 (footnote omitted).

Because of the importance of this issue and the need for a quick resolution to avoid delaying discovery and the progress of this matter, the Special Master is submitting this Report and Recommendation outlining the Guidelines he used in making his rulings regarding the privileged nature of the documents withheld by GSK and challenged by the PSC.  In order to aid the Court in its evaluation of the proposed Guidelines, the Special Master is submitting, for the Court's *in camera* review, twelve representative documents from the 120 sample documents reviewed by the Special Master, along with an indication whether the Special Master found that the document was protected by the attorney-client privilege or work-product doctrine.

**<u>Special Master's Recommended Guidelines</u>**

1.      Under Pennsylvania law, the attorney-client privilege applies to confidential communications made for the purpose of obtaining or giving legal advice or assistance.[1]

2.      Under the Federal Rules of Civil Procedure, the work product doctrine protects documents prepared by a party or its representative, including its attorney, in anticipation of litigation.[2]

---

[1]      The law of attorney-client privilege in Pennsylvania is similar to that in most jurisdictions in the United States.  *See, e.g.*, *Commonwealth v. Chmiel*, 889 A.2d 501, 531-32 (Pa. 2005); *Kelly v. Ford Motor Co. (In re Ford Motor Co.)*, 110 F.3d 954, 965 & n.9 (3d Cir. 1997) (applying Pennsylvania and Michigan law); *cf. Teleglobe Communs. Corp. v. BCE, Inc. (In re Teleglobe Communs. Corp.)*, 493 F.3d 345, 359-60 (3d Cir. 2007) (citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68 (2000)).

[2]      *See* FED. R. CIV. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495, 510-13 (1943).

3.      Communications from a client to a lawyer, even confidential ones, are not protected unless the primary purpose of the communication is a request for (or the giving of) legal advice.  Thus, where the primary purpose of a communication with or from an attorney is the seeking or giving of *business* (or marketing or technical or some other non-legal) advice, the communication is not protected.[3]

4.      Communications addressed to both lawyers and non-lawyers for review, comment, or approval are not protected by the privilege unless the party asserting the privilege can demonstrate that the primary purpose of the communication is the requesting of legal advice.  While the same communication might be privileged if addressed solely to a lawyer, a corporation's choice to seek legal advice through mass communication to both lawyers and non-lawyers strongly suggests that the *primary* purpose of the communication is not a request for legal advice.[4]

---

[3]     *See, e.g., Rhone-Poulenc Rorer v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994) (applying Pennsylvania law and holding that, for the privilege to apply, a communication must have been made "for the purpose of securing *primarily* either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding") (emphasis added); *SEPTA v. CaremarkPCS Health, L.P.*, 254 F.R.D. 253, 258 (E.D. Pa. 2008) (Restrepo, M.J.) ("The 'primary purpose' of the communication at issue must be to gain or provide legal assistance for the privilege to apply . . . .") (applying Pennsylvania law); *cf.* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 72, cmt. c (2000) ("A client must consult the lawyer for the purpose of obtaining legal assistance and not predominantly for another purpose.").

[4]     *See, e.g., In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 805 (E.D. La. 2007) (Fallon, J.) ("When, for example, Merck simultaneously sends communications to both lawyers and non-lawyers, it usually cannot claim that the primary purpose of the communication was for legal advice or assistance because the communication served both business and legal purposes."); *id.* at 809 ("When e-mail messages were addressed to both lawyers and non-lawyers for review, comment, and approval, we concluded that the primary purpose of such communications was not to obtain legal assistance since the same was being sought from all."); *In re Buspirone Antitrust Litig.*, 211 F.R.D. 249, 253 (S.D.N.Y. 2002) (Gorenstein, M.J.) ("Where non-legal personnel are asked to provide a response to a matter raised in a document, it cannot be said that the 'primary' purpose of the document is to seek legal

*…Continued*

5.      Merely copying a lawyer on a communication (or even including a lawyer in a long list of recipients) does not, by itself, make the communication privileged.  The party asserting the privilege still must demonstrate that the primary purpose of the communication was the seeking of legal advice.  The fact that a corporation expects its attorneys to offer legal advice on the subject matter of (or an attachment to) a communication when they are copied on such a communication is insufficient to demonstrate that the primary purpose of the communication is a request for legal advice.[5]

6.      Where it is not clear on the face of a communication that it constitutes a request for legal advice or the giving of legal advice, the party asserting the privilege must demonstrate that this is the primary purpose of the communication.  In most cases, doing so will require some evidentiary support, such as an affidavit.  Statements in affidavits contending that all communications of this type constitute a request for legal advice or that legal advice was always sought for decisions of this type are conclusory and will not suffice to meet the party's burden of proving that the privilege applies.[6]

---

*Continued from previous page*

advice.  This is because the response by non-legal personnel by definition cannot be 'legal' and thus the purpose of the request cannot be primarily legal in nature.").

[5]      *See, e.g.*, *In re Human Tissue Prods. Liab. Litig.*, 255 F.R.D. 151, 164 (D.N.J. 2008) (Falk, M.J.) ("merely copying a lawyer on an e-mail does not, by itself, make the e-mail privileged"); *SEPTA*, 254 F.R.D. at 259.

[6]      *See, e.g.*, *Ford*, 110 F.3d at 966 n.12 ("There is no indication in the record that the relevant 1988 meeting at which the agendas were discussed involved the kind of communications the privilege protects.  Ford's assertions to the contrary and the affidavits supporting them are nothing more than conclusory"); *Georgine v. Amchem Prods., Inc.*, 160 F.R.D. 478, 485 n.3 (E.D. Pa. 1995) (Reed, J.) ("if an attorney sought protection from the attorney-client

*…Continued*

7.      Where a communication to both lawyers and non-lawyers is not privileged because the primary purpose of the communication is not a request for legal advice, a lawyer's response to that communication that contains legal advice may nonetheless be privileged.  However, in that case, the lawyer's advice does not convert prior non-privileged communications into privileged communications.  Similarly, if the lawyer's advice is provided in the form of comments on a non-privileged document, the lawyer's advice does not convert the non-privileged document into a privileged one.  In these cases, the party asserting the privilege is permitted to redact the privileged portion of the communication or document before producing the non-privileged communication or document.[7]

8.      Communications among non-attorneys may in some cases be protected by the attorney-client privilege if the purpose of the communication is to gather information necessary for the obtaining of legal advice or to convey such legal advice.  As always, the burden is on the party asserting the privilege to demonstrate that this is the purpose of the communication.  That burden will be difficult to meet in most cases in which an attorney is not the sender or a recipient of a communication.[8]

---

*Continued from previous page*

privilege, that attorney was ordered to file the . . . communication under seal and to submit an affidavit establishing that each element of the attorney-client privilege was met").

[7]      *See, e.g.*, *Vioxx*, 501 F. Supp. 2d at 810-11.

[8]      *See, e.g.*, *Smithkline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 477 (E.D. Pa. 2005) (Surrick, J.) ("A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds.  In the case of a corporate client, privileged communications may be shared by non-attorney employees in order to relay information requested by attorneys.  Moreover, documents subject to the privilege may be transmitted

*…Continued*

9.      Communications may contain both privileged and non-privileged components.  This is particularly true with e-mail strings that contain multiple e-mails, some of which may be privileged and others of which are not.  Where this is the case, the party asserting the privilege must redact the privileged portions of the communication and produce the redacted document.  However, an entire e-mail string may be privileged if the primary purpose of the final e-mail (chronologically) in the string is to request legal advice and the final e-mail incorporates the prior e-mails into its request for legal advice.  Of course, those prior e-mails likely will exist in a separate form that does not include the final privileged e-mail and, in that form, they must be produced.[9]

10.      Communications that are shared with third parties (whether by copying those parties on the communication, including the third parties as recipients, or forwarding the communication to the third parties) generally are not protected by the attorney-client privilege.[10]

11.      Consultants and independent contractors hired by a corporation may be considered the functional equivalent of employees and sharing communications with these non-

---

between non-attorneys so that the corporation may be properly informed of legal advice and act appropriately.") (citations and internal quotation omitted).

[9]      *See, e.g.*, *Vioxx*, 501 F. Supp. 2d at 812-13 ("the entirety of the [e-mail] threads were found to be privileged when they were subsequently integrated into privileged communications solely to attorneys for legal advice"); *Rhoads Indus., Inc. v. Building Materials Corp. of Am.*, 254 F.R.D. 238, 240-41 (E.D. Pa. 2008) (Baylson, J.) ("A situation may arise where a number of email messages, by themselves not privileged, but eventually sent to an attorney for the purpose of securing legal advice, become privileged.").

[10]      *See, e.g.*, *Carbis Walker, LLC v. Hill, Barth & King, LLC*, 930 A.2d 573, 579 (Pa. Super. 2007); *cf. Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1424 (3d Cir. 1991).

employees will not necessarily destroy the privilege. An outside consultant may be the functional

equivalent of an employee if he or she has primary responsibility for a key corporate job; has a close

working relationship with the company's principals on litigation matters or matters requiring legal

advice; and is likely to possess information not possessed by anyone else at the company. In

addition, where consultation with non-employees is necessary to the giving or obtaining of legal

advice and the communications with these non-employees are clearly intended to remain

confidential, the privilege may apply.[11]

      12.     The fact that an attorney was involved in the drafting process that resulted in

the creation of a non-privileged document does not necessarily render drafts of that document

privileged. Rather, only if the drafts reflect the attorney's legal advice (or confidential client

information provided to the attorney for the purpose of giving such advice) will the drafts or the

portions of them reflecting such legal advice be found to be privileged.[12]

---

[11]    *See, e.g.*, *In re Bieter Co.*, 16 F.3d 929, 936-40 (8th Cir. 1994) ("when applying the attorney-client privilege to a corporation or partnership, it is inappropriate to distinguish between those on the client's payroll and those who are instead, and for whatever reason, employed as independent contractors"); *In re Bristol-Myers Squibb Secs. Litig.*, No. 00-1990, 2003 U.S. Dist. LEXIS 26985, at *9-*15 (D.N.J. June 25, 2003) (Chesler, J.) ("The key to deciding if a consultant should be protected under the 'functional equivalent' exception is if the consultant acts for the corporation and possesses the information needed by attorneys in rendering legal advice."); *Apotex Corp.*, 232 F.R.D. at 476-77 ("Presence of a third-party, such as a consultant, does not destroy the attorney-client privilege where that party is the client's agent or possesses a commonality of interest with the client.") (internal quotation omitted).

[12]    *See, e.g.*, *Apotex Corp.*, 232 F.R.D. at 477-78 ("In general, attorney-client privilege does not shield documents merely because they were transferred to or routed through an attorney.") (internal quotation omitted); *Applied Telematics, Inc. v. Sprint Communs. Co.*, No. 94-4603, 1996 U.S. Dist. LEXIS 13782, at *19 (E.D. Pa. Sept. 18, 1996) (Rueter, M.J.) (draft application sent to lawyer as attachment to privileged letter was not protected by attorney-client privilege because the draft "is not fundamentally a legal analysis or opinion, or a request for legal advice"); *Allegheny Ludlum Corp. v. Nippon Steel Corp.*, No. 89-5940, 1991 U.S. Dist. LEXIS

                                          *…Continued*

13.     Communications to or from attorneys that do not reveal the substance of the client's communication or the attorney's advice are not privileged.  Thus, for example, an e-mail to an attorney, asking her to "Please review the attached" is not privileged, although the attachment may be.[13]

14.     Communications among executives and other key employees within a corporation that is involved in (or threatened with) litigation are not necessarily protected by the work product doctrine.  Similarly, communications involving in-house or outside counsel for a corporation that is involved in (or threatened with) litigation are not necessarily protected by the work product doctrine.  Rather, only such documents that directly relate to the pending or threatened litigation are protected from disclosure.[14]

---

*Continued from previous page*

5173, at *8 (E.D. Pa. Apr. 15, 1991) (Naythons, M.J.) ("Courts have remained firm in denying privileged status to documents that contain essentially technical or business data and are not primarily legal in nature.").

[13]     *See, e.g., Vioxx*, 501 F. Supp. 2d at 812 ("With regard to e-mails that were either to or from an attorney but did not reveal the substance of what either the client was communicating (for example attaching a study, report, article, etc.) or the attorney was advising (because the comments appeared on the attachment), the privilege claim was denied for the e-mail messages, regardless of what the disposition was on the attachments.").

[14]     *See, e.g., Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260-61 (3d Cir. 1993) ("the test should be whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation") (quoting *Wright & Miller*) (emphasis added); *National Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992) ("The document must be prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation.") (emphasis in original); *Faloney v. Wachovia Bank, N.A.*, 254 F.R.D. 204, 214-16 (E.D. Pa. 2008) (Rice, M.J.) ("not every document prepared when a party finds itself in a situation that may lead to litigation is covered by the work product doctrine"; finding doctrine applied to e-mail summarizing conference call because "the telephone

*…Continued*

15.      Communications occurring during litigation (or when litigation is threatened) that were not prepared because of that litigation are not protected by the work product doctrine.[15]

16.      The party asserting that communications are protected by the attorney-client privilege has the burden of proving that all elements of the privilege are present and that the

---

*Continued from previous page*

      conference's purpose was to discuss a potential policy to allow Wachovia to avoid similar civil and criminal liability issues in the future, and the call was [prompted] by the numerous inquiries and subpoenas sent by the United States government suggesting Wachovia's policy had exposed the bank to criminal and civil liability"); *Kramer v. Raymond Corp.*, No. 90-5026, 1992 U.S. Dist. LEXIS 7418, at *7 (E.D. Pa. May 26, 1992) (Pollak, J.) ("The mere fact that a party finds itself in circumstances that may lead to litigation, however, does not render all documents prepared with regard to those circumstances protected work product. . . .  A company's concern with the safety of its products and a desire to avoid potential liability, however laudable, are insufficient to extend immunity to all documents generated by that concern."); *cf. United States v. Rockwell Int'l*, 897 F.2d 1255, 1266 (3d Cir. 1990) (referring to Fifth Circuit's standard — "the primary motivating purpose behind the creation of the document [must be] to aid in possible future litigation" — as "analogous" to the Third Circuit's "because of" standard).

[15]    *See, e.g., Martin*, 983 F.2d at 1260-61; *Faloney*, 254 F.R.D. at 214-16; *Kramer*, 1992 U.S. Dist. LEXIS 7418, at *7; *see also In re Grand Jury Subpoena*, 220 F.R.D. 130, 162 (D. Mass. 2004) (Young, C.J.) (attorney's notes prepared during conference call with corporation's executives and FDA officials to discuss possible product defects and product recall not protected by work-product doctrine; notes were prepared not because of possible litigation but as part of corporation's efforts to ensure compliance with federal law and maintain good public image for its products); *cf.* FED. R. CIV. P. 26(b)(3), adv. comm. note (1970) ("Materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision."); *Nevada v. United States Dep't of Energy*, 517 F. Supp. 2d 1245, 1260-62 (D. Nev. 2007) (Reed, J.) ("Whether administrative proceedings can be considered 'litigation,' thus triggering the work product privilege, depends upon whether the proceedings are adversarial.").

privilege applies.  Similarly, the party claiming work-product protection bears the burden of proving that the doctrine applies.[16]

* * * *

A proposed Order reflecting the Special Master's recommendations accompanies this Report and Recommendation.  Pursuant to PTO Nos. 8 and 28, any party seeking to prevent this Report and Recommendation from taking effect must file with the Court an appeal in the form of a motion with the Court within ten (10) calendar days from the date this Report and Recommendation is filed with the Court, setting forth the relief requested.  If no appeal is filed with the Court within the ten (10) day period, this Report and Recommendation will be deemed to be accepted by all parties and the Court will enter an Order accordingly.

Dated:  June 1, 2009               /s/ Jerome J. Shestack
                                   Jerome J. Shestack, Special Master

---

[16]    *See, e.g.*, *In re Grand Jury Investigation*, 918 F.2d 374, 385 n.15 (3d Cir. 1990) ("With respect to the question of which party carries the burden of proof in establishing the privilege's applicability, it is clear, in this Circuit, that a party who asserts a privilege has the burden of proving its existence and applicability."); *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000) ("A party claiming work-product immunity bears the burden of showing that the materials in question were prepared in the course of preparation for possible litigation.") (internal quotation omitted).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| | : | |
| **IN RE: AVANDIA MARKETING, SALES** | : | |
| **PRACTICES AND PRODUCTS LIABILITY** | : | **MDL No. 1871** |
| **LITIGATION** | : | **07-md-01871-CMR** |
| _____ | : | |
| | : | |
| **THIS DOCUMENT RELATES TO ALL** | : | |
| **ACTIONS** | : | |
| _____ | : | |

## CERTIFICATE OF SERVICE

I, Bruce P. Merenstein, hereby certify that on June 1, 2009, I caused to be

electronically filed the foregoing **Seventh Report and Recommendation of the Special Master**

**As to Attorney-Client Privilege and Work-Product Doctrine Guidelines**.  Through the Court's

ECF system, this document is available for viewing and downloading.


/s/ Bruce P. Merenstein
Bruce P. Merenstein