## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————————————————————— :
:
IN RE: AVANDIA MARKETING, SALES : 
PRACTICES AND PRODUCTS :      MDL No. 1871
LIABILITY LITIGATION :      07-md-01871
———————————————————————— :
:
THIS DOCUMENT APPLIES TO: :
ALL ACTIONS :
———————————————————————— :


## THE AVANDIA FEE COMMITTEE'S PETITION FOR
## <u>AN AWARD OF COMMON BENEFIT ATTORNEYS' FEES</u>

The Avandia Fee Committee hereby moves this Honorable Court:

- for a common benefit fee award in the amount of up to $143,750,000 million (6.25% of the value of the estimated settlements in this case) to be paid from the PTO 70 common fund;

- to set aside up to $17.25 million (0.75% of the value of the estimated settlements in this case) from the common fund for expenses already approved and paid (in excess of $7.2 million has been approved and paid to date), future expenses, and administrative expenses; and

- to establish a schedule for filing objections to this petition and responses to objections and set a hearing date.

The reasons in support of this petition are set forth in the accompanying brief, which is incorporated by reference as though fully set forth herein.

Dated:  August 7, 2012

Respectfully submitted,

/s/ Dianne M. Nast
Dianne M. Nast, Esq.
Joseph F. Roda, Esq.
Jennifer S. Snyder
RodaNast, P.C.
801 Estelle Drive
Lancaster, Pennsylvania  17601
(717) 892-3000

Vance R. Andrus, Esq.
Andrus, Hood & Wagstaff, PC
1999 Broadway, Suite 4150
Denver, Colorado  80202
(303) 376-6360

Bryan F. Aylstock, Esq.
Aylstock, Witkin, Kreis & Overholtz
PLLC
17 East Main Street, Suite 200
Pensacola, Florida  32502
(850) 916-7450

Paul R. Kiesel, Esq.
Kiesel Boucher Larson LLP
8648 Wilshire Blvd.
Beverly Hills, California  90211
(310) 854-4444

Thomas P. Cartmell, Esq.
Wagstaff & Cartmell LLP
4740 Grand Avenue, Suite 300
Kansas City, Missouri  64112
(816) 701-1102

Bill Robins III, Esq.
Heard Robins Cloud & Black LLP
300 Paseo de Peralta, Suite 200
Santa Fe, New Mexico 87501
(505) 986-0600

Stephen A. Corr, Esq.
The Corr Law Firm
509 Starflower Street
Warrington, Pennsylvania 18976
(215) 450-5320

Joseph J. Zonies, Esq.
Reilly Pozner LLP
1900 Sixteenth Street, Ste. 1700
Denver, Colorado  80202
(303) 893-6100

*Plaintiffs' Fee Committee*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                        :
IN RE: AVANDIA MARKETING, SALES    :
PRACTICES AND PRODUCTS             :        MDL No. 1871
LIABILITY LITIGATION               :        07-md-01871
_____ :
                                        :
THIS DOCUMENT APPLIES TO:          :
ALL ACTIONS                        :
_____ :


## MEMORANDUM IN SUPPORT OF
## THE AVANDIA FEE COMMITTEE'S PETITION FOR
## <u>AN AWARD OF COMMON BENEFIT ATTORNEYS' FEES</u>


August 7, 2012

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION ................................................................................................. 1

FACTS ................................................................................................................... 3

    I.     Overview ................................................................................................. 3

    II.    Detailed Chronological History ......................................................... 6

          A.     Pre-PSC Appointment ............................................................ 6

          B.     Spring / Summer 2008 ............................................................ 8

          C.     Fall / Winter 2008 ................................................................. 13

          D.     Early 2009 .............................................................................. 19

          E.     Late Spring / Summer 2009 ................................................. 25

          F.     Autumn / Winter 2009 .......................................................... 27

          G.     The 2010 Focus on Science and Experts .............................. 28

          H.     The FDA Advisory Committee ............................................. 33

          I.     Trial Pool and Bellwether Case Selection .......................... 34

          J.     *Daubert* ................................................................................. 34

          K.     *Lone Pine* ............................................................................. 37

          L.     January 2011 ......................................................................... 39

          M.     The Reconstituted PSC ......................................................... 40

i

N.     CHF Motion for Summary Judgment .......................................... 41

O.     Spring 2011 ..................................................................... 42

P.     PSC Work Product Used in State Court and PSC Members' State Court Activities ................................................................ 43

Q.     Statute of Limitations Battles ................................................. 43

R.     *Lone Pine* II .................................................................... 44

S.     The Court Mediation Plan ...................................................... 46

T.     PSC State Court Assistance and Trial Activities ....................... 47

III.    The Avandia MDL Settlements ..................................................... 52

A.     The Avandia Common Benefit Fund .......................................... 52

B.     The Value of the Settlement ................................................... 52

APPLICABLE LAW ......................................................................... 53

I.    This Court Has Substantial Discretion in Awarding Fees ................... 53

II.    The Common Benefit Fee Award Now Requested is Appropriate Under All of the Potential Governing Standards ........................................... 53

A.     Traditional Common Fund Cases ............................................. 53

B.     This Avandia MDL ............................................................... 56

1.     The Common Benefit Doctrine ........................................ 60

a.     Common Benefit ................................................... 60

b.     Proportionality ...................................................... 63

ii

2. The Managerial Powers Doctrine ...................................... 64

3. Judge Bartle's Modified *Gunter* Analysis ........................ 64

    a. The Benefits Conferred .......................................... 64

    b. The Risks Faced at Inception ................................ 64

    c. The Skill of the Attorneys Involved....................... 65

    d. The Size of the Fund Created ................................ 68

    e. Assessments in Similar Cases .............................. 69

4. The *Gunter* and *Prudential* Factors ................................ 71

    a. The Complexity and Duration of the Litigation ... 72

    b. The Amount of Time Devoted to the Case by Counsel Who Performed Common Benefit Work.. 73

    c. Fee Awards in Similar Cases................................. 75

    d. The Presence or Absence of Substantial Objections to the Requested Fees ............................................. 77

    e. Innovative Terms of Settlement ............................ 77

    f. The Percentage Fee that Would Have Been Privately Negotiated ............................................. 77

III. A Lodestar Cross-check Confirms the Reasonableness of the Requested Fee ................................................................................. 78

IV. Requested Schedule .................................................................. 84

CONCLUSION .................................................................................. 84

## TABLE OF AUTHORITIES

### Cases

*Boeing Co. v. Van Gemert,*
      444 U.S. 472 (1980) ......................................................................... 54

*Boone v. City of Philadelphia,*
      668 F. Supp. 2d 693 (E.D. Pa. 2009)....................................... 77-78

*Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.),*
      513 F. Supp. 2d 322 (E.D. Pa. 2007)............................................... 67

*Chakejian v. Equifax Info. Services, LLC,*
      275 F.R.D. 201 (E.D. Pa. 2011)....................................................... 82

*Deloach v. Philip Morris Cos.,*
      No. 1:00CV01235, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003)............. 73, 80

*E. Aaron Enters., Inc. v. Carolina Classified.com,*
      CIV. A 10-1087, 2010 WL 2991739 (E.D. Pa. July 27, 2010) ......................... 83

*Flickering v. C.I. Planning Corp.,*
      646 F. Supp. 622 (E.D. Pa. 1986)..................................................... 54

*Gunter v. Ridgewood Energy Corp.,*
      223 F.3d 190 (3d Cir. 2000) .................................................. 53, 55, 72

*Hensley v. Eckerhart,*
      461 U.S. 424 (1983) .................................................................. 53, 56

*In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972,*
      549 F.2d 1006 (5th Cir. 1977) ......................................................... 58

*In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.,*
      263 F.R.D. 226 (E.D. Pa. 2009)................................................... 67, 77

*In re AOL Time Warner, Inc. Sec. Litig.,*
      MDL 1500, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006)................. 73, 75-76, 80

*In re AT&T Corp. Sec. Litig.,*
      455 F.3d 160 (3d Cir. 2006) ...................................... 54-56, 63, 81

*In re Auto. Refinishing Paint Antitrust Litig.*,
   MDL No. 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) ............................... 77

*In re Baycol Prods. Litig.*,
   MDL 1431, 2002 WL 32155266 (D. Minn. June 14, 2002) ........................... 71

*In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*,
   MDL 1699, PTO No. 8A (Amended) (N.D. Cal. July 7, 2008) ........................ 71

*In re Budeprion XL Mktg. & Sales Litig.*,
   MDL 2107, 2012 WL 2527021 (E.D. Pa. July 2, 2012 .................................... 82

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ....................................................................... 56-57

*In re Corel Corp. Inc. Sec. Litig.*,
   293 F. Supp. 2d 484 (E.D. Pa. 2003).................................................... 67-68, 77

*In re DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig.*,
   MDL 2197, CMO 13, II(B)(2) (N.D. Ohio, Nov. 28, 2011)................................ 70

*In re Diet Drugs Prods. Liab. Litig.*,
   582 F.3d 524 (3d Cir. 2009) ..................................................... 57-61, 64, 79-80

*In re Diet Drugs Prods. Liab. Litig.*,
   MDL 1203, 2011 WL 2174611 (E.D. Pa. June 2, 2011) ................................. 59

*In re Diet Drugs Prods. Liab. Litig.*,
   MDL 1203, 2010 WL 3292787 (E.D. Pa. Aug. 19, 2010)................................ 59

*In re Diet Drugs Prods. Liab. Litig.*,
   553 F. Supp. 2d 442 (E.D. Pa. 2008).................. 54, 56-59, 64, 68, 71-72, 76, 79

*In re Diet Drugs Prods Liab. Litig.*,
   MDL 1203, 2003 WL 21641958 (E.D. Pa. May 15, 2003) ........................... 82-83

*In re Fosamax Prods. Liab. Litig.*,
   MDL 1789, CMO 17 ¶ 3(f)(3), (S.D.N.Y. Apr. 28, 2011) ................................. 70

*In re Genetically Modified Rice Litig.*,
   MDL No. 06-1811, 2010 WL 716190 (E.D. Mo. Feb. 24, 2010) ................ 58, 70

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000)..................................................................66, 77

*In re Ins. Brokerage Antitrust Litig.*,
579 F.3d 241, 248, 280, 283 (3d Cir. 2009).......................................................54

*In re Latex Gloves Prods. Liab. Litig.*,
MDL 1148, 2003 U.S. Dist. LEXIS 18118 (E.D. Pa. Sept. 5, 2003) ...............71

*In re Linerboard Antitrust Litig.*,
MDL 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ............................67, 77

*In re NASDAQ Market–Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ......................................................72, 74, 76, 80

*In re Oil Spill by the Oil Rig DEEPWATER HORIZON*
*in the Gulf of Mexico, on April 20, 2010,*
MDL 2179, 2012 WL 161194 (E.D. La. Jan. 18, 2012) ...................................69

*In re Oil Spill by the Oil Rig DEEPWATER HORIZON*
*in the Gulf of Mexico, on April 20, 2010,*
MDL 2179, 2012 WL 37373 (E.D. La. Jan. 4, 2012) .......................................69

*In re Oil Spill by the Oil Rig DEEPWATER HORIZON*
*in the Gulf of Mexico, on April 20, 2010,*
MDL 2179, 2011 WL 6817982 (E.D. La. Dec. 28, 2011) .................................69

*In re Oral Sodium Phosphate Solution-Based Products Liab. Action*,
MDL 2066, Order Regarding Common Benefit Fees and Expenses
(N.D. Ohio Aug. 2, 2010) ..................................................................................70

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
MDL 1014, 2000 WL 1622741 (E.D. Pa. Oct. 23, 2000) .................................57

*In re Phenylpropanolamine Products Liab. Litig.*,
MDL 1407, 2009 U.S. Dist. LEXIS 126729 (W.D. Wash. Sept. 18, 2009).......70

*In re Propulsid Prods. Liab. Litig.*,
MDL 1355, PTO No. 16 (E.D. La. Dec. 26, 2001)............................................71

*In re Protegen Sling and Vesica Sys. Prods. Liab. Litig.*,
MDL 1387, 2002 WL 31834446 (D. Md. April 12, 2002) ................................71

*In re Prudential Ins. Co. of Am. Sales Practice Litig.,*
148 F.3d 283 (3d Cir. 1998) ................................................ 54-56, 69, 72, 78-80

*In re Rezulin Prods. Liab. Litig.,*
No. 00 CIV. 2843(LAK), 2002 WL 441342 (S.D.N.Y. March 20, 2002) .......... 71

*In re Rite Aid Corp. Sec. Litig.,*
396 F.3d 294 (3d Cir. 2005) .................................................... 53-54, 56, 78-79

*In re Royal Ahold N.V. Sec. & ERISA Litig.,*
461 F. Supp. 2d 383 (D. Md. 2006) ........................................... 75-76, 80

*In re St. Jude Medical, Inc.,*
MDL 1396, 2002 WL 1774232 (D. Minn. Aug. 1, 2002) ................................. 71

*In re Sterling Fin. Corp. Sec. Class Action,*
MDL 1879, 2009 WL 2914363 (E.D. Pa. Sept. 10, 2009) ............................... 77

*In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.,*
268 F. Supp. 2d 907 (N.D. Ohio 2003) ............................... 72, 75-76, 80

*In re Tyco Int'l, Ltd.,*
535 F. Supp. 2d 249 (D. N.H. 2007) ....................................... 76, 80

*In re Vioxx Products Liab. Litig.,*
MDL 1657, 2012 U.S. Dist. LEXIS 58262 (E.D. La. Apr. 25, 2012) ............... 69

*In re Vioxx Prods. Liab. Litig.,*
802 F. Supp. 2d 740 (E.D. La. 2011) ........................................... 58

*In re Vioxx Prods. Liab. Litig.,*
760 F. Supp. 2d 640 (E.D. La. 2010) ...................................... 76, 81

*In re Vioxx Products Liab. Litig.,*
MDL 1657, PTO 19 (E.D. La. Aug. 8, 2005) .................................... 69

*In re Visa Check/Mastermoney Antitrust Litig.,*
297 F. Supp. 2d 503 (E.D.N.Y. 2003) ................................ 72, 76, 80

*In re WorldCom, Inc. Sec. Litig.,*
388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................ 73, 76, 80

vii

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,*
    MDL 2011, 2010 U.S. Dist. LEXIS 22361, 9-10 (S.D. Ill. Mar. 8, 2010) ......... 70

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,*
    426 F.3d 694 (3d Cir. 2005) ............................................................... 82

*Jama v. Esmor Corr. Services, Inc.,*
    577 F.3d 169 (3d Cir. 2009) ............................................................... 82

*McDonough v. Toys "R" Us, Inc.,*
    834 F. Supp. 2d 329 (E.D. Pa. 2011) ............................................... 67, 77

*Meijer, Inc. v. 3M,*
    Civ. A. 04-5871, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) ........................ 66

*Polonski v. Trump Taj Mahal Associates,*
    137 F.3d 139 (3d Cir. 1998) ............................................................... 58

*Ripley v. Sunoco, Inc.,*
    CIV.A. 10-1194, 2012 WL 2402632 (E.D. Pa. June 26, 2012) ........................ 82

*Serrano v. Sterling Testing Sys., Inc.,*
    711 F. Supp. 2d 402 (E.D. Pa. 2010) ............................................... 82

*Shaw v. Toshiba Am. Info. Sys., Inc.,*
    91 F. Supp. 2d 942 (E.D. Tex. 2000) ............................................... 72, 76

*Sullivan v. DB Investments, Inc.,*
    667 F.3d 273 (3d Cir. 2011) ............................................................... 53

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,*
    195 Fed. Appx. 93 (3d Cir. 2006) ....................................................... 82

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ....................................................................... 3, 65

## **Statutes**

28 U.S.C.A. § 1407 ................................................................... 58, 66-67

viii

## <u>Other Authority</u>

Report of the Third Circuit Task Force, *Court Awarded Attorney Fees,*
    108 F.R.D. 237 (1985) ........................................................................ 56

Report of the Third Circuit Task Force, *Selection of Class Counsel,*
    208 F.R.D. 340 (2002) ........................................................................ 56

Herbert Newberg & Alba Conte, *Newberg on Class Actions* (3d ed. 1992) .............. 80

**MEMORANDUM IN SUPPORT OF
THE AVANDIA FEE COMMITTEE'S PETITION FOR
<u>AN AWARD OF COMMON BENEFIT ATTORNEYS' FEES</u>**

## <u>INTRODUCTION</u>

Some cases are different.  This is clearly one.  This case resulted from a small band of lawyers, who, after reading one study, launched a crusade to learn all that could be learned about Avandia and its unintended side effects.  This campaign was fought by scores and scores of lawyers over more than four years and involved over 134,000 hours of difficult, tedious, demanding, and creative work.

Now, approaching five years later, and after more than 134,000 hours devoted by committed attorneys and their staffs to the common benefit of all Avandia plaintiffs and claimants, a substantial settlement has been achieved, involving many thousands of cases.  That accomplishment is the direct result of the enormous efforts of this Court and the common benefit work done by MDL 1871 attorneys.

At the core of this case is a group of attorneys (the "Common Benefit Counsel" or "CBC") who quite literally "made the case."  The CBC handled the massive organizational work that this case required.  The CBC fought the battles that made the difference, on both substantive issues and discovery.  (A listing of PTO's and significant pleadings and other Court Orders is attached as Exhibit 1.)  The CBC reviewed and coded the 30 million pages of documents that the CBC's discovery efforts produced.  The CBC took or defended 220 liability and case-specific

1

depositions.  (A list of those depositions, taken in 2008 through 2012, is attached hereto as Exhibit 2, and a timeline of depositions, excerpts, and other milestones is attached hereto as Exhibit 3.)

In recognition of Common Benefit Counsel's efforts, the Avandia Fee Committee requests a common benefit fee award in the amount of up to $143,750,000 million (6.25% of the value of the estimated settlements in this case) to be paid from the PTO 70 common fund, and setting aside up to $17.25 million (0.75% of the value of the estimated settlements in this case) from the common fund for expenses already approved and paid (in excess of $7.2 million has been approved and paid to date), future expenses, and administrative expenses.[1]  The fee request is well within the range of common benefit fees that have been awarded in other large cases; is appropriate under all of the governing law on such fees in the Third Circuit; and is fair and reasonable given the complexities of this case, the massive amount of time that CBC devoted to it, the risks the CBC undertook, the results the CBC achieved, and the benefits that those results have conferred on Avandia plaintiffs.  This fee request also comes only after a careful, multifaceted evaluation by the Fee Committee, and the independent evaluation by a neutral, third-party, Court-appointed certified public accountant, Mr. Alan Winikur of Zelnick, Mann and Winikur, PC.

---

[1]  To provide for all of the common benefit work and expenses, this Court on August 26, 2009, entered Pretrial Order ("PTO") No. 70, establishing a 7% common benefit fund to compensate and reimburse attorneys in this case for services performed and expenses incurred for MDL administration and common benefit.

2

**FACTS**

**I.      Overview**

On May 21, 2007, the New England Journal of Medicine published Dr. Steven Nissen's study, *Effect of Rosiglitazone on the Risk of Myocardial Infarction and Death from Cardiovascular Causes*, 356 New Eng. J. Med. 2457 (2007).  This meta-analysis was the first published scientific study that revealed that Avandia increased the risk of cardiovascular events.

Although the study was well done, it was the subject of a vigorous attack by GlaxoSmithKline ("GSK").  For many attorneys, this was only one reason that cautioned against getting involved in large-scale litigation related to the drug.  For example, during the early development of the case, the United States Supreme Court was considering what would eventually become *Wyeth v. Levine*, 555 U.S. 555 (2009).  An adverse ruling on the preemption issue in that case had the potential to effectively put an end to all pharmaceutical product liability litigation.

In addition, the Avandia case itself was potentially very difficult from a science perspective.  While the Nissen study demonstrated an increased risk of heart attacks among diabetics taking Avandia, this same patient population was already at high risk for cardiovascular disease.  It was recognized that proving the drug caused a particular heart attack, stroke, or congestive heart failure in some cases could be difficult.

3

Furthermore, because Avandia was a blockbuster product for GSK, it was well recognized by the plaintiff bar that GSK would fight long and hard to protect its multi-billion dollar drug.

In June 2007, however, a small group of attorneys from across the country who believed in the case began to work cooperatively to investigate and prosecute claims.  In July 2007, the group held the first nationwide conference in Chicago to discuss the litigation, and in August 2007, Vance Andrus, Esquire chaired the first organizational meeting of attorneys from around the country.  Approximately 30 law firms attended this conference to determine whether there was interest in moving forward.  Many of these attorneys determined that the risks were too high, but others committed to forming a working group to begin prosecution of the case.

In October 2007, the JPML created MDL 1871.  Between 2007 and early 2012, a remarkable legal battle unfolded.  During these four years, the Court-appointed Plaintiffs' Steering Committee ("PSC") directed more than 50 law firms and 120 Common Benefit Counsel in the litigation.  As of February 14, 2012, the PSC, other CBC, and their staffs had dedicated over 134,000 hours to the prosecution of this MDL.

The CBC fought numerous discovery disputes involving the scope, extent, method, and applicability of discovery.  These included disputes over interrogatories, requests for production, the length and number of depositions, and document production.  The CBC also litigated appeals that were taken from some of the Special Master's 17 Reports and Recommendations.

4

The CBC negotiated, briefed, litigated, and argued numerous critical legal issues, including tolling of claims, assertions of attorney-client privilege, *Lone Pine* motions, motions for summary judgment, and motions to dismiss on statute of limitations grounds. The CBC reviewed and coded tens of millions of pages of documents using some of the most advanced electronic data and linguistic analysis systems ever applied in a mass tort case.

The CBC attended the Court's monthly Status Conferences and more than 30 discovery hearings held by the Special Master. These efforts resulted in more than 160 PTO's plus scores of minute orders, with the CBC playing an instrumental role in negotiating many of those with GSK. The CBC also retained and worked with more than 20 experts in numerous fields, including general and case-specific experts, culminating in a two-day joint *Daubert/Frye* general causation hearing and a specific causation hearing.

The CBC prepared two bellwether cases for trial in the MDL. The CBC also cooperated with the Pennsylvania State Court Mass Tort Program ("MTP") and, indeed, PSC members were to serve as trial counsel in the first two bellwether cases set in that Court. PSC members also were to serve as trial counsel at the first bellwether cases set for trial in New Mexico and California State Courts, argued all pretrial motions there, and set the stage for settlement of cases in California, New Mexico, and elsewhere.

The activities of the CBC were funded first by litigation assessments of the PSC and other CBC. In addition, the CBC carried common benefit costs. As of

5

February 2012, the total litigation assessments and advances from the common benefit fund exceeded $4 million and the total held costs also exceeded $4 million.

Based upon publicly available documents, all injured plaintiffs, numbering in the many thousands, have had the opportunity through a Court-implemented program to resolve their Avandia claims as a consequence of the PSC's and Common Benefit Counsel's litigation efforts.  In addition, Avandia has effectively been removed from the market as it is now accepted that the risks of taking the drug far outweigh any perceived benefits.

By all estimates, the Avandia MDL resolved more claims than any other single pharmaceutical MDL in the history of United States MDL litigation.

## II.    Detailed Chronological History

### A.    Pre-PSC Appointment

On October 16, 2007, the JPML created this MDL.  As noted above, a group of attorneys who were committed to pursue the Avandia litigation—the "Working Group"—informally coordinated their efforts.  Over the next six months, the Working Group organized and prepared to lead the litigation.  Even at this early stage, the Working Group began drafting what would later be submitted as the Plaintiffs' Position Paper.  The Working Group also identified, met with, and engaged potential expert witnesses and began to develop the science that would later be critical in advancing the case.

In November 2007, the Working Group coordinated and held a conference with GSK's counsel, Pepper Hamilton, in Philadelphia.  There, counsel began initial

discussions on seminal working documents that would later become the framework for the MDL.

During the first quarter of 2008, members of the Working Group, in coordination with defense counsel, continued or began negotiating and drafting numerous pivotal documents, including the proposed protective order, initial case management orders ("CMO's"), tolling agreements, and the plaintiff fact sheet ("PFS").  In addition, the Working Group provided GSK's counsel with a draft of proposed discovery requests.

On February 11, 2008, the Working Group traveled to Philadelphia and met with opposing counsel to continue negotiations of the pivotal documents and discuss procedures regarding preservation of electronic and other information.  During this time, the Working Group also coordinated efforts with attorneys who were prosecuting Avandia cases in other venues across the country, including State Courts in Pennsylvania, California, and New Mexico.

On March 24, 2008, the Working Group again traveled to Philadelphia to meet with opposing counsel on issues regarding the status of personal injury class actions, finalizing a proposed protective order and other joint filings with the Court, including CMO 2.  On March 26, 2008, the Working Group, on behalf of all plaintiffs, submitted to the Court their Position Paper outlining the scope and focus of the litigation.

In early April, the Working Group, in an effort to continue national coordination, hosted a meeting in Philadelphia, open to all plaintiffs' counsel, to

inform them of progress to date.  The full-day meeting provided attorneys with in-depth analysis of the state of the case and its strengths and weaknesses.  The Working Group wanted to ensure that those attorneys who were truly dedicated to pursuing the case knew they were invited to invest their time, skills, and resources into the case.

All of this coordinated work occurred before the appointment of the PSC.

On April 8, 2008, the Court held its Initial Case Management Conference. More than 30 attorneys who had applied for membership on the PSC introduced themselves to the Court.  On April 9, 2008, the Court issued PTO 1, appointing 14 members to the first PSC.  The Court also entered PTO 2 regarding general matters, including agreements between the parties concerning coordination of State actions, master complaints and answers, and discovery.  The Court also entered PTO 3, establishing provisional rules to govern electronic discovery ("E-discovery").

**B.    Spring / Summer 2008**

Upon appointment, the PSC immediately began its efforts to formalize the organizational structure of plaintiffs' counsel.  The first formal PSC meeting was held in Denver, Colorado.  There, PSC members and other CBC created the working committees and assigned chairs and attorneys to those committees based upon skill, experience, and commitment to the work.  Committees included those to address: privilege and redaction issues, document production tools and a depository, science development, sales and marketing strategy, preemption briefing, tolling agreements, class action issues, E-discovery and document preservation, and other

8

administrative procedures.  In addition, PSC members and other CBC were called upon to pay the first of their litigation assessments.

By the end of April, the parties prepared for the first Court Status Conference with the PSC formally in charge.  The parties finalized and submitted a Joint Report on the numerous issues upon which they had reached agreement or that were then outstanding.  Prior to the hearing, the PSC held a working meeting in Philadelphia.

On May 9, 2008, the Court held its first Status Conference where the parties and the Court discussed discovery issues, the appointment of a Discovery Special Master, an E-Discovery Special Master, and a proposed Protective Order to govern confidentiality of documents.  The Court also lifted the stay on discovery.  The substance of the Status Conference was memorialized in PTO 6, issued May 21, 2008.

Also at the Status Conference, the Court heard argument on the propriety of permitting multi-plaintiff complaints.  On May 14, 2008, the Court entered PTO 4, which allowed consolidated filings of cases for plaintiffs sharing the same domicile. This Order led to enhanced negotiations regarding tolling agreements.  The PSC also discussed the potential dismissal of personal injury class action suits related to the need for tolling.  This included legal research regarding the enforceability of tolling agreements under Louisiana law.

Throughout May, the various PSC committees continued their work in earnest.  The PSC formally served its First Sets of Interrogatories, Requests for

9

Production, and Requests for Admissions on GSK.  In addition, the PSC was actively involved in negotiations to secure the review of the hundreds of boxes of documents that made up Avandia's IND-NDA – materials provided to the FDA.

The PSC leadership created and circulated the guidelines and procedures to account for common benefit time and expenses.  The Discovery Committee identified and engaged a vendor for document storage and analysis.  The Science Committee continued to develop the scientific proof in the case.  PSC members also met and made their recommendations on the appointment of a Discovery Special Master, ultimately endorsing Jerome Shestack, Esquire.

In June 2008, the Court entered a number of significant PTO's.  On June 9, 2008, the Court entered PTO 7 governing PFS's.  This PTO was the result of months of negotiations between the PSC and GSK's counsel.  On June 10, 2008, after seeking input from the parties, in PTO 8, the Court formally appointed Jerome Shestack, Esquire as the Discovery Special Master.  Also on June 10, 2008, the Court entered PTO 9, approving the Master Short Form Answer and Affirmative Defenses.  Finally, on June 11, 2008, the Court entered PTO 10, the Protective Order governing the disclosure of confidential materials.  This latter Order followed months of intense negotiations between the PSC and GSK's counsel regarding the scope of the Order and the mechanics of its implementation.  It also would later become the primary focus of the hard-fought battles regarding the propriety of GSK's confidential designations.

On June 20, 2008, the PSC traveled to Philadelphia for the second Status Conference with the Court.  During this Conference, the Court and parties discussed the discovery plan, the briefing schedule for remand motions, and the potential severance of multi-party complaints.  After the hearing, on June 24, 2008, the Court issued PTO 11 setting forth its conclusions regarding those issues and expressly referring the discovery plan to the Special Master for resolution.  At the end of June, the PSC sent a discovery team to Philadelphia to make an initial review of the Avandia IND-NDA.  The documents were presented in hard copy in hundreds of boxes.  The team spent a number of days categorizing and indexing the documents and ultimately chose which documents needed to be produced in an electronic format.

On July 10, 2008, the parties held their first discovery hearing with Special Master Shestack.  The issues included the discovery plan, document production, E-discovery and 30(b)(6) depositions.  After the hearing, at the request of the Special Master, the parties submitted a joint proposed discovery plan.

On July 15, 2008, GSK served its responses to the PSC's first round of written discovery.  This immediately led to numerous meet-and-confer sessions with GSK's counsel regarding the insufficiency of the responses.  Ultimately, the disputes would be brought before the Special Master for resolution.

Representatives of the PSC attended the American Association for Justice ("AAJ") conference in Philadelphia to inform members of the plaintiff bar about the activities of the MDL.

11

On July 17, 2008, the Court entered PTO 14, setting forth the briefing schedule for remand motions and establishing a date for oral argument.  The PSC continued its research on preemption matters and created a Trial Package Committee.  Negotiations were held with a medical records retrieval company, and ultimately an agreement was reached between the PSC and GSK to use that company for PFS medical record inquiries.

Additional activities in July 2008 included further revisions to the Science Position Paper, meetings of the Science Committee, discussions of preemption mechanics, *Daubert* research, work on the GSK Clinical Trials Registry, review of recent medical literature publications, review of Avandia warnings history, research on the Accord Study, research on the impropriety of defense *ex parte* contacts with treating physicians, and reviewing and negotiating with GSK on a potential Master Short Form Answer.  Alleged PFS deficiencies continued to be an issue, and members of the PSC traveled to Philadelphia to meet and confer with GSK on several occasions, ultimately resulting in amendments to the PFS process.

The PSC also continued intensive negotiations with GSK regarding multi-party complaint issues as they related to tolling.  Ultimately, on July 21, 2008, the Court issued an Order holding that the filing of multi-party complaints involving unrelated personal injury plaintiffs would not be not allowed unless GSK mass-terminated a law firm's tolling agreements.  The Order was followed by PTO 15 severing multi-party complaints.

12

### C.      Fall / Winter 2008

In August 2008, PSC members continued their work on identifying the discovery pool cases, an E-discovery protocol, and analysis of various injuries sustained by Avandia users.  The Trial Pool Selection Committee continued negotiations, and the Science Team continued its work with experts.  Inasmuch as the PSC ultimately selected two ESI vendors, much work was done to integrate their processes and to supervise document review by CBC.  More work was done to create a PSC summit meeting, and the drafting of PTO 70 commenced.

Remand motions continued to require attention, and research was done on the Australian "black box" warning.   Administrative tasks continued involving PSC and common benefit assessments and billing, as well as on vetting the Trial Pool cases, and GSK continued to object to remands to State Court.  PSC and CBC continued to train on the document review platforms of Inventus and Arête (later, Crivella West).

Discovery disputes continued on the Rule 30(b)(6) depositions, and the Special Master issued another Report and Recommendation.  Many negotiations occurred as to PTO 19 and discovery of the names and production of custodial files. GSK made the first of what were to be many rolling document productions, in response to numerous PSC discovery requests and meet-and-confer sessions. Members of the PSC traveled to Philadelphia to continue the process of reviewing the IND-NDA.

13

In September 2008, the PSC filed Joint Report No. 3 with the Court, as well as motions to compel production of discovery responses. PTO 23, the first scheduling order, was issued, as was PTO 28, ordering that all discovery disputes be presented to the Special Master for resolution, with the right to appeal *de novo* to the MDL Court.

By this point, the litigation was at full stride, a pace that continued from then through today. Multiple PSC committees and teams were engaged simultaneously in production, discovery, and privilege battles. Using documents generated by the ESI vendors and document review teams, PSC members serving on deposition teams began taking extensive custodial depositions.

Concurrently, the Law and Briefing Teams battled numerous motions, while members of the Science Committee and Stroke Committee continued their efforts to build the scientific and medical case necessary to support the PSC efforts. Because most active PSC members held multiple roles, a delicate ballet of apportioning personnel and carrying out substantive tasks was required to respond to GSK's defensive maneuvers while advancing the plaintiffs' litigation. The activities in August through December 2008 show the multi-faceted quality and exhaustive quantity of these battles.

Early in September 2008, the PSC took its first appeal from a Special Master ruling, and engaged in several dozen telephone conferences among its members, dealing with all of the litigation matters then in play. The Motion to Remand was fully briefed by non-PSC members, but was reviewed by the PSC. The PSC

14

conducted training sessions on document review for additional Common Benefit Counsel, PSC members continued to meet with experts, and the PSC continued to work on versions of what was to become PTO 70.  The PSC also responded to requests from non-PSC lawyers for information on case filing options, and members of the PSC drafted a Common Benefit Fee Assessment Motion.

Disputes continued to be heard before the Special Master on Rule 30(b)(6) matters, on which the parties continued to meet and confer.  Work continued on an order prohibiting *ex parte* contact with claimants' physicians, as did work with the ESI providers on linguistic and emotive searching.  Training exercises continued throughout this month and, indeed, over the next year, on creating master searches of discovery documents.  PSC members traveled to Las Vegas to meet with Arête (Crivella West) to discuss compensation issues and theme development, and the PSC received further master recommendations.

The privilege log battle continued between the PSC and GSK, and PSC members traveled to Philadelphia for meetings with the medical records providers and in anticipation of an upcoming Court hearing.  All of this occurred before the month of September 2008 was half over.

Other tasks during September 2008 included coordinating document production and searching by Inventus, legal research into the legal test for causation in Pennsylvania, and tracking GSK's document production. Communications also continued with GSK and the Special Master on discovery issues, and contact between the PSC and experts accelerated.  The Science

Committee focused on the standard for proof of causation, as well as mechanisms of action, and on researching and analyzing scientific articles.  It also received information from the California Consolidated Proceedings ("JCCP") and filed a discovery motion on 30(b)(6) witnesses.  The PSC also attended a hearing on the 30(b)(6) matters and obtained a ruling from Special Master Shestack.

Members of the PSC then traveled to Philadelphia for another Status Conference and engaged in extensive preparations for the Conference and the matters to be discussed there.  The Sales and Marketing Team began its 30(b)(6) efforts, and the PSC continued its efforts to vet the Discovery Pool cases.  It also reached out to all attorneys with cases in the potential Discovery Pool to obtain information on their clients, filed Motions to Compel Answers to Interrogatories and Requests for Admissions, engaged in a meet and confer on sales and marketing issues, served Requests for Production for certain witnesses, and began negotiations on deposition protocols.

October 2008 saw the PSC take its first discovery deposition, a 30(b)(6) deposition of Daniel Regard, a highly regarded ESI outside expert employed by GSK.  The PSC also conducted a science meeting, continued to work with experts on medicine, causation, and science, continued its efforts to hold a 30(b)(6) deposition on sales and marketing, and continued negotiations on Discovery Pool cases.

A PSC team also began discovery efforts on third-party vendors, including conferring with GSK and issuing subpoenas and notices of deposition for multiple third-party providers.  The PSC also demanded additional custodial files from GSK

16

and started a proactive fight over the timing, number, and types of custodial files that would be produced.  It generated a memo on scientific causation theories and one on potential sales and marketing witnesses.

The PSC also continued to engage GSK on privilege and redaction log issues and exchanged extensive correspondence with the Special Master and GSK on discovery issues.  PSC leadership engaged GSK in negotiations over the need for, and the selection of, an E-Discovery Master.

Common Benefit Counsel continued work on privilege log and redaction issues, including working with the ESI vendors to attempt to identify high-value targets for the discovery dispute.  A team of those lawyers also engaged in an exhaustive review and coding of potential objections to both the redaction logs and the privilege logs.  The PSC held a number of privilege log conference calls to assign tasks and coordinate efforts.

The PSC also held a Science Team meeting in San Diego to instruct and direct members of the Science Committee.  Subjects requiring the attention of the PSC leadership included negotiations with GSK regarding discovery matters, particularly those involved in resolving disputes over the manner and pace of producing custodial files, GSK databases, and the sales and marketing 30(b)(6) issues.

During October 2008, the PSC ultimately reached a deal for amendments to the document rollout and production of custodial files, prepared Joint Report No. 4,

17

created an exemplar privilege log, worked on a 30(b)(6) deposition for pharmacological safety, and dealt with the FIFO issue on the first 100 cases.

During November 2008, the PSC took the depositions of William Collier and Judy Stewart.  It continued to respond as necessary to filings in Federal Court, which by this time were in excess of 300, and the leadership then continued to receive and send hundreds of e-mails to its members on all these matters.

The PSC engaged in a meet and confer on databases and continued preparations for sales and marketing depositions.  Members of the PSC traveled to Philadelphia for a Status Conference and for meetings on strategy and tactics concerning the Status Conference and discovery disputes.  At the Court's request, PSC members worked on the development of an MDL website.

After extensive negotiations between the parties and with the aid of the Special Master, the parties reached agreement on a protocol for the taking of depositions.  On November 11, 2008, the Court entered PTO 38, setting forth the Deposition Protocol.

In December 2008, the PSC concluded its vetting of Discovery Pool cases and received numerous items of correspondence from the Special Master and GSK.  GSK continued with its production of documents, and PSC and Common Benefit Counsel continued reviewing those documents.  The PSC submitted input to the Court on a potential State Court Liaison Counsel.  It also negotiated with GSK on database production timing.

During December, and on numerous occasions thereafter, PSC members attended State Court conferences in the Pennsylvania MTP proceedings in order to coordinate those with the MDL.  The PSC also agreed with GSK on an E-Discovery Master recommendation.  It continued to have Science Committee calls and scheduled an extensive February Science Committee conference.  It reviewed reports on bone fractures, as well as supplemental remand motions against GSK. The redaction log fight continued, and the Discovery Team scheduled a meeting in New Orleans in connection with an AAJ conference.  A Science Committee meeting was also held in New Orleans.

Disputes continued with respect to the IND-NDA and the timing and production of witnesses for depositions.  The PSC additionally began inquiries on patient-level data used in the various safety studies and the potential effect that might have on the results reported in prior studies.  Third-party production continued during the month of December, and a dispute concerning third-party subpoenas was brought before the Special Master.

### D.    Early 2009

By late 2008 and into early 2009, the MDL litigation and discovery efforts were moving on multiple fronts.  After a number of contentious sessions, the Special Master recognized the validity of many of the PSC's complaints about GSK's discovery responses, as well as its wholesale designation of documents as "Privileged," and the Special Master started to take decisive action to force GSK to honor its discovery obligations.  These rulings, combined with a number of very

substantial depositions of GSK employees and third parties, dramatically increased the litigation pressure on GSK.

At the end of January 2009, Special Master Shestack held a pivotal hearing at which each side presented its complaints.  For its part, GSK complained of three major issues:  first, the PSC's re-ordering and expanding the custodial file list to then include 56 custodians; second, its perception that certain firms with cases in Discovery Pool One had made inadequate production of plaintiffs' medical records and incomplete PFS's; and third, that the discovery demands made by the PSC were burdensome and excessive.  For its part, the PSC demanded immediate action on a rollout schedule for additional custodial files, a deadline to meet and confer on the IND-NDA issues, and a resolution of privilege log and redaction issues.

After a difficult hearing, the Special Master:

- approved of the PSC's re-ordering and expanding the custodial file list;

- ordered GSK to commit to a custodial file rollout schedule for the next four months and deliver within that time 14-18 new custodial files to the PSC;

- agreed with the PSC and set a deadline for GSK to meet and confer on the IND-NDA issues;

- ordered the parties to adopt a PFS deficiency process, to streamline the process of objecting to perceived inadequacies;

- set the stage for a serious fight should any of GSK's productions be deemed incomplete;

20

- resolved the issues of document placeholders; and

- obtained commitments of database production from GSK.

The PSC continued its work on the proposed PFS deficiency order, third-party subpoenas, database issues, preparation of experts, and potential trial themes. At that time, the PSC was also preparing for the Osei, Caponi, McClafferty, and Cochetto depositions, and was also heavily involved in what ultimately proved to be unfruitful negotiations over privilege log issues.

Throughout February and the succeeding months, GSK sporadically rolled out discovery documents, including custodial files for various, specifically identified employees, as well as the IND-NDA. The plaintiffs engaged in the first of what would ultimately be over 200 depositions taken by the plaintiffs or GSK.

In particular, the plaintiffs set 30(b)(6) depositions on pharmacovigilance and regulatory matters. PSC members prepared and served Requests for Production of documents and databases, while others worked on Freedom of Information Act ("FOIA") subpoenas for the FDA and obtained copies of the Senate sub-committee investigation into GSK.

On February 25, 2009, the Court issued its Order on the pending Motions to Remand, remanding numerous cases.

Also in early 2009, PSC members worked on HIPAA notices and started the push on third-party subpoenas. Members prepared for and attended a hearing before the Special Master on document production, deposition, and privilege log issues. Additionally, the PSC held a series of meetings in New Orleans to begin the

21

focus group process, including the creation of "trial themes" and the vetting of potential Discovery Pool and Trial Pool cases.

PSC meetings were open to attendance by any plaintiff's lawyer who signed PTO 10 and/or 70, and at every such meeting, the PSC led open and frank discussions of strategy, tactics, status of the litigation, and documents discovered to date. Further, upon request, the PSC always shared any discovery taken with other plaintiff's lawyers who had covered cases in the MDL, provided they had signed PTO 10 and/or 70.

On March 17, 2009, the Court issued PTO 53, appointing John Carroll as E-Master. The Court-appointed, PSC E-Discovery Chair held numerous sessions with him and representatives of GSK dealing with ESI matters.

A Plenary Session of all Common Benefit Counsel was held in the spring of 2009, and was very successful in allocating resources and assigning individuals to various tasks. At this time, the PSC finished negotiations on the defendant fact sheet ("DFS") and worked on the production of sales call notes from both the treating and prescribing physicians. This involved a complicated sampling process, which was negotiated by the PSC, resulting in GSK electronically transmitting only samples of the call notes. Working with Crivella West (formerly Arête) and plaintiff law firm volunteers, the PSC developed a protocol for the electronic analysis of those, and its leaders negotiated with GSK for a PFS Deficiency Order and a revised tolling agreement.

In April 2009, the PSC and CBC were completely engaged with GSK, litigating on numerous fronts, and by this time, specifically defined committees were hard at work, including Sales and Marketing, Discovery, Science, Briefing, and others.  Deposition team leaders and first chairs had been appointed for all of the then-scheduled and anticipated depositions.  A team of leaders reviewed and analyzed thousands of "hot" documents, which were generated from the two database systems.  Numerous PSC members and Common Benefit Counsel labored on document discovery.  Plaintiffs took the two-day deposition of David Cochetto and the deposition of Stephen Hobbinger.  These depositions proved to be instrumental in establishing the liability case against GSK.  Shortly thereafter, the leadership finished negotiations on the revised tolling agreement and Rules and Procedures Regarding Medical Releases.  The Court then issued PTO's 55 and 56 approving the amended tolling agreement and procedures regarding medical releases.

A general meeting was held on May 9, 2009 and was attended by more than 50 Common Benefit Counsel.  Presentations were made by the leadership, at which time the entire battle plan, including strategy and tactics, progress to date, and future plans were discussed.  As an accommodation to the State Court litigants, and at the request of the MDL Court, the PSC invited Tom Kline, one of the leaders of the Pennsylvania MTP, and Tom Girardi and Lowell Finson, leaders of the California JCCP, to attend and participate, all of whom did.  Topics included not only reviewing the "hot" documents identified to date, but also the

23

interrelationships of people and documents, updating the attendees on the status of

discovery and ESI issues, and updating them on the state of the science, including

potential injuries and mechanisms of action.  After the presentations, an extensive

"Q & A" session followed, and the PSC's Co-Leads made multiple work assignments.

An invitation-only meeting was held on May 12, 2009, led by the PSC's Co-

Leads, to solidify litigation tactics and strategy.  In the interim, the PSC completed

negotiations on the revised tolling agreement and started a battle on production

from foreign entities, as well as case-specific production.

In late May 2009, the OCEANS database fight intensified and included an

appeal to the Special Master, which ultimately concluded with the PSC accepting

MEDRA terms in exchange for relinquishing its fight for the raw OCEANS data.

PSC members handled the negotiations and appeals.

Another very contentious issue came to a head at this time, this one dealing

with privilege log issues.  GSK ultimately denominated approximately 100,000

documents as "Privileged," and a PSC team mounted a vigorous attack.  After

several hearings and exhaustive briefing, the Special Master offered the PSC the

opportunity to select for his personal review 100 documents from the list, and with

the assistance of Crivella West, the documents were selected and submitted.  The

Special Master then ordered the release of certain documents and instructed GSK to

re-review the entire privilege log in accord with his instructions, which ultimately

led to the voluntary release by GSK of approximately 80,000 documents—80% of

those it had initially withheld.

24

### E.     Late Spring / Summer 2009

At this time, and at the urging of the PSC, Judge Rufe added Tom Cartmell

Esquire to the PSC and appointed PSC member Dianne M. Nast, Esquire as

State/Federal Court Liaison.  Thereafter, 15 Federal/State Liaison Reports were

submitted to the Court.  The PSC then agreed to a focus group and themes meeting

in Houston.

A team of PSC lawyers completed the Fifth Set of Requests for Production

and the Second Set of Interrogatories, the PSC continued its work on timelines, and

members continued work on third-party document discovery and review, while one

member continued Rule 30(b)(6) deposition efforts on the PASSPORT database.

During the course of the litigation, the PSC created, funded and conducted a

number of jury studies, focus groups, and summary jury trials, all of which were

very beneficial in planning strategy and tactics, and in preparing for the proposed

bellwether trials.

Among the tasks of the PSC was to update all of its members and Common

Benefit Counsel on the status of the litigation, to confer with the leaders of the State

Court litigation in Pennsylvania and California, and to hold training sessions for

those interested in attending or defending prescriber and treating physician

depositions.

Throughout the summer of 2009, the PSC deposed GSK custodians, the Sales

and Marketing Team finalized its list of witnesses, and the PSC continued its work

on various liability points and themes.  At the same time, GSK released the

RECORD study and argued that it crushed the plaintiffs' case.  The PSC and its experts, however, ultimately showed that the RECORD study was fatally flawed and heavily biased in favor of GSK.

During June 2009, critical State and Federal Court hearings were held in Philadelphia, during which the Trial and Discovery Pools were restructured and reduced in size, and the PSC continued to negotiate with GSK on the Discovery Pools.

Issues that arose in late summer 2009 included the following:

1.     Disputes over patient-level data in the studies.

2.     Continued research into the IND-NDA.

3.     Acquisition of GSK marketing materials.

4.     Case-specific call notes.

5.     Disputes over custodial files for sales representatives and TV commercials.

6.     Third-party production issues.

7.     Promo Net database, Field Reporting Sales Call Notes, and CARDS disputes over production and scope.

8.     MEDRA terms production.

9.     Reconvening a Rule 30(b)(6) deposition on Standard Operating Procedures on pharmacovigilance.

10.    Continuing work on depositions.

Additionally, deposition team leaders met to coordinate deposition schedules; confirm custodial production; roll out and assign review tasks; exchange

26

information, insights, ideas, and strategies for upcoming depositions; and formulate plans for foreign depositions.

Cash demands on the PSC and its members for litigation activities continued throughout 2009, and PSC members ultimately contributed more than $4 million to fund litigation activities, and held in their own respective law firms more than $4 million dollars in additional costs incurred for the common benefit of all plaintiffs.

### F.    Autumn / Winter 2009

By autumn 2009, the PSC's efforts on discovery depositions continued with special emphasis on revealing custodial documents, science databases, and general and case-specific call notes.  The battle to obtain custodial production extended well into 2010.  Ultimately, more than 30 million pages of documents were produced by GSK, which required massive efforts from the PSC member firms and certain CBC firms to analyze and review.  The PSC used the most modern techniques for electronic analysis of documents ever used in mass tort litigation.  The PSC's willingness to undertake the risk of applying this new cutting-edge technology, coupled with its commitment to the financial burdens associated with its use, allowed the PSC to make extraordinary discoveries from GSK involving science, causation, and liability.

The summer and fall of 2009 were also busy for the Science and Expert Committee.  To prepare for the January 2010 deadline to identify experts (and to produce their reports), Committee members contacted or met with more than 40 experts in multiple specialties.

27

Specifically, because the Committee anticipated that there would be multiple trial settings in State and Federal Courts, the Committee sought to retain and work with experts in cardiology, diabetology, lipidology, epidemiology, neurology, biostatistics, pharmaceutical marketing, and regulatory matters.  Committee members did extensive work to review and gather hundreds of science articles and more than a thousand documents for the potential experts to review, and followed up with conference calls and meetings to discuss the experts' opinions.  Ultimately, committee members traveled to Portland, San Francisco, Los Angeles, Phoenix, Houston, Albuquerque, Salt Lake City, Kansas City, New Haven, Boston, New York City, Orlando, Philadelphia, Montreal, and London to vet the experts and discuss their opinions.  By late fall 2009, the Committee had chosen its experts and was working closely with eighteen remaining general and case-specific experts to finalize their opinions and to work with them on their reports.

In November 2009, the PSC learned that six cases had been picked for the initial Trial Pool.  The Report and Recommendation of Special Master Shestack dated November 19, 2009 established discovery deadlines in early 2010 for these cases.  PSC members and the trial teams in these cases worked diligently starting in early 2010 to complete the depositions of the plaintiffs, treating physicians, and sales representatives.

G.    The 2010 Focus on Science and Experts

In early 2010, the PSC continued its focus on expert witnesses and expert reports.  The first weeks of January saw members of the Expert Team travel to

28

Montreal to meet with an expert in cardiology; to Washington D.C. to meet with a regulatory expert; to Boston to meet with a cardiologist; to San Francisco to meet with a biostatistician; and to Portland, Oregon for meetings with epidemiologists. This work was done to prepare for identifying and producing reports for ten general causation experts on January 18, 2010 and several case-specific experts a few days later. Members of the Science and Expert Team also continued their in-depth analysis of the patient-level data from many of the Avandia studies during early 2010. This included managing, analyzing, and reporting on volumes of data from the pivotal clinical trials performed by GSK for drug approval, as well as an analysis of the 42 studies that made up GSK's meta-analysis.

On January 18, 2010, the PSC identified ten general causation experts and produced reports for each. The experts included the following:[2]

| | |
|---|---|
| Epidemiology/Biostatistics: | Dr. Nicholas Jewell |
| Cardiology: | Dr. Allan Sniderman |
| Endocrinology: | Dr. Eliot Brinton |
| Cardiology: | Dr. Brian Swirsky |
| Epidemiology: | Dr. Donald Austin, MD, MPH |
| Cardiology: | Dr. Joshua Septimus |
| Regulatory: | Dr. Suzanne Parisian |
| Regulatory: | Dr. John Gueriguian |

---

[2] Expert reports were completed for a few additional retained experts, but the committee decided not to identify the experts in the *Burford* case.

| | | |
|---|---|---|
| Endocrinology: | | Dr. Stephen Lippman |
| Marketing: | | Dr. Peter Rost |

On January 22, 2010, case-specific experts were identified and expert reports were issued in the following cases:

| | | |
|---|---|---|
| *Burford:* | Cardiology | Dr. Nicholas DePace |
| *Burford:* | Pathology | Dr. Judy Melinek |
| *Arezzi:* | Cardiology | Dr. Mark Furman |
| *Buford:* | Cardiology | Dr. Nicholas DePace |

After producing the expert reports, the Science and Expert Committee immediately went to work preparing the experts for depositions.

On January 15, 2010, the PSC took the second day of the deposition of GSK's Director of Worldwide Safety, Dr. Jeffrey Freid, after which the PSC's document reviewers and the Discovery Committee focused on preparing for the depositions of Clare Kahn, GSK's VP of Regulatory Affairs, and Mark Heise, GSK's statistician involved with several key Avandia studies. The PSC also continued its work on privilege log issues and the massive document review in preparation for upcoming depositions, including review of documents from the following custodians: Brand, Quinn-Robinson, Cobitz, Heise, and Jones. The review of documents obtained from third-party entities, including Common Health Ferguson, Bristol Myers Squibb, Regan Campbell & Ward, and Wolters Kluwer, among others, also continued apace.

Production of the PSC's experts began on March 10, 2010 with the deposition of Dr. Nicholas Jewell. Thereafter, members of the Science and Expert Committee

produced at least one of the PSC's experts every week during March and April, and during one week in April, the PSC produced four different experts.  These preparation meetings and depositions occurred in the experts' home cities all over the country and involved the review of hundreds of scientific articles and thousands of pages of GSK documents and data.

Pursuant to Court order, GSK was required to identify its experts before the depositions of the PSC's experts were completed, and GSK identified twelve experts, including case-specific experts.  Starting on March 22, 2010, GSK also produced extensive reports for each expert, as well as massive bibliographies and materials that each expert reviewed.  Since many Science and Expert Committee members were busy producing the PSC's experts at this time, other members of the Committee worked exhaustively to research the defense experts, including review of their prior testimony, and the documents and other materials produced by the defense experts, to help prepare for their upcoming depositions.  Because the members of the Committee who were producing the PSC's experts were the same lawyers who were tasked with deposing GSK's experts, those lawyers literally worked almost around the clock to prepare for the depositions of GSK's experts.

The PSC produced nearly every one of its general causation experts by the end of April 2010.[3]  Although the schedule allowed for a few weeks of down time

---

[3] Dr. Suzanne Parisian's deposition was not completed until September 2, 2010 because the parties agreed that it could be taken out of order.  The depositions of specific causation experts also continued into the summer.

before starting to depose GSK's experts, the PSC took advantage of this time by deposing Dr. Steven Haffner, one of GSK's key opinion leaders, Siobhan Quinn-Robinson, GSK's Director of Global Commercial Strategy, and Dr. Rosemary Johann-Liang, one of the former FDA Medical Officers involved in the review of the safety of Avandia.  These depositions were all essential to plaintiffs' liability case and needed to be taken before the upcoming trial setting, which the PSC believed would be in late 2010.

On April 21, 2010, the PSC hosted another national conference for attorneys from across the country, to keep them up to date on the litigation's progress, and on insights into the strategy and tactics then being employed in the litigation.

Along with the above-mentioned depositions, the PSC's work in May focused heavily on the continued preparation for GSK's experts' depositions.  The PSC's own experts proved to be very helpful with this preparation and, thus, multiple meetings and phone conferences ensued.  The PSC began deposing GSK's experts on May 27, 2010, and depositions of GSK's experts continued throughout June and early July. The teams assigned to each of these depositions met throughout June to prepare for the depositions and, ultimately, the teams traveled to New York City, Atlanta, Boston, Nashville, Philadelphia, Chapel Hill, Boca Raton, and San Diego for the various depositions.

May of 2010 also brought changes to the PSC, when in late May, several PSC members announced the settlement of their cases.  When two cases in the initial

Trial Pool, *Arezzi* and *Miller*, settled, the Court invited new applications for the

PSC, and the first reconstitution of the PSC occurred in June.

In the beginning of July, the PSC prepared for and hosted a common benefit

meeting in Vancouver, Canada during the summer AAJ meeting.  The PSC

leadership made presentations to the attendees about the status of the case,

settlements, and future work and assignments.  The meeting included a special

"Closed Session" at which only those attorneys who had signed PTO 10 and/or 70

could attend.  Topics included frank and extensive discussions of the very heart of

the PSC case against GSK.

### H.    The FDA Advisory Committee

On July 13, 2010, the FDA hosted a two-day Advisory Committee Hearing in

Washington, D.C. to reconsider the cardiovascular safety of Avandia.  Several PSC

members and Common Benefit Counsel attended in person or by video conference.

The hearing included two days of evidence related to recently concluded Avandia

safety studies, as well as statements from the authors of such studies and members

of the Advisory Committee on the safety of Avandia.  Ultimately, the majority of the

Advisory Committee voted that the new data was sufficient to raise significant

safety concerns.

In light of this new information related to Avandia's safety and the Advisory

Committee's findings, the Court allowed both GSK and the PSC to supplement their

expert reports.  As such, the Science and Expert Committee spent a substantial

amount of time in July and August reviewing the Advisory Committee's briefs and

33

data, as well as working with the PSC's multiple experts on their supplemental reports. On August 2, 2010, the PSC served GSK with the supplemental reports of Dr. Sniderman, Dr. Gueriguian, Dr. Septimus, Dr. Brinton, Dr. Swirsky, Dr. Parisian, and Dr. Nicholas Jewell.

### I.    Trial Pool and Bellwether Case Selection

In late July 2010, the PSC learned that it was going to have a very busy fall and winter. Specifically, the Court ordered on July 26 (in PTO 107) that the first Trial Pool would commence in October 2010, that *Daubert* motions and dispositive motions were due on August 9, and that the *Daubert* hearing would start on September 20, 2010.

In addition, a team of PSC members prepared for and took depositions on August 4 through 6, 2010 of three key GSK witnesses in London, England: Jasna Knezevic, GSK's Safety Director, Nigel Jones, GSK's Director of Clinical Development, and Robin Buckingham, GSK's former Associate Director of Clinical Development/Medical Affairs. The preparation for these depositions included reviewing thousands of GSK documents by the teams assigned to these depositions. Shortly after returning from London, the PSC prepared for and completed the deposition of Monsif Slaoui, GSK's Head of Research and Development.

### J.    *Daubert*

Members of the Science and Expert Committee and the *Daubert* Committee remained busy in July, August, and September 2010, not only with depositions of the case-specific witnesses and experts in *Burford, Buford,* and *Snyder* throughout

34

August and September, but also with preparations for the *Daubert* briefing and hearing (scheduled to begin on September 20, 2010).

The *Daubert* Committee worked diligently to file two separate *Daubert* motions on August 9, 2010, the Court's deadline for filing *Daubert* motions. One of these motions explained in great detail the flaws in the RECORD study and asked the Court not to allow GSK's experts to rely on it as a measure of Avandia's safety. The other motion addressed proposed testimony by several of GSK's experts that Plaintiffs asked to be held inadmissible for a variety of reasons.

The same day, GSK filed 10 separate motions in the MDL seeking to exclude the testimony of each and every one of the PSC's expert witnesses.

Ten similar motions were filed in the *Buford* case in the Court of Common Pleas in Philadelphia County, seeking to exclude the same experts pursuant to the *Frye* standard.[4] On top of these individual motions, GSK also filed a general motion to exclude all of the Plaintiffs' experts in both courts, each one covering close to 50 pages. GSK also filed a motion for summary judgment in both the *Buford* State Court case and the *Burford* Federal Court case on August 9, 2010. Several other motions to exclude the testimony of case-specific experts were filed in September, in both State and Federal Court, bringing to 25 the total number of motions filed by GSK in August and September.

_____

[4] Defendant GlaxoSmithKline LLC's Motion to Exclude the Testimony of Plaintiff Steering Committee's Expert Witness Suzanne Parisian, M.D. was later filed in State and Federal Court after Dr. Parisian's deposition was completed in early September 2010.

Immediately after receiving these motions, the *Daubert* Committee and the Law and Briefing Committee turned to preparing the necessary responses. Responses to the motions filed on August 9, 2010 were due on August 30, and the Committee members worked exhaustively on these over the next three weeks. A substantial amount of time was spent consulting with the experts to aid in responding to many of GSK's arguments. After three intense weeks of work, the PSC filed responses to all twenty motions by midnight on August 30, 2010. The PSC's extensive brief writing continued throughout September on reply briefs in favor of the PSC's *Daubert* motions and on responses to the *Daubert* and *Frye* briefs filed against Dr. Parisian and the case-specific experts in *Burford* and *Buford*.

Once all of the PSC's *Daubert* briefs and the PSC's briefs in opposition to GSK's 25 motions were filed, the *Daubert* Committee turned its attention and focus to preparing for the three-day *Daubert* hearing to begin on September 20, 2010. This preparation included meeting extensively with the PSC's three experts who were scheduled to testify live at the hearing—Dr. Eliot Brinton, Dr. Nicholas Jewell, and Dr. Alan Sniderman—to prepare exhibits for the hearing and the experts' testimony.

The hearing started on the morning of September 20, 2010, and was attended, at the invitation of the Honorable Cynthia M. Rufe, by the Honorable Sandra Mazer Moss of the Philadelphia Court of Common Pleas. Accordingly, both plaintiffs and GSK presented evidence relevant to the *Frye* standard, as well as the *Daubert* standard. The hearing began with extensive openings by counsel for each

36

party, followed by live direct and cross-examinations of the PSC's three experts—

Dr. Jewell, Dr. Brinton, and Dr. Sniderman.  Although the schedule allowed for

GSK to call its own experts, GSK decided not to do so.  The hearing concluded on the

morning of September 22, after the Court advised the parties that it was taking the

motions under advisement and asked the parties to submit findings of fact and

conclusions of law, which the PSC filed on October 18, 2010.

After the *Daubert* hearing, the *Burford* and *Buford* trial teams were in full

blown "trial mode."  In November 2010, the *Buford* and *Burford* trial teams

continued work on evidentiary issues, preparation of exhibits, and preparation of

witnesses and witness examinations.

Trial preparation in November and December also included extensive review

of the depositions of GSK witnesses to prepare deposition cuts for use at trial, the

review and culling of thousands of "hot" documents for use at trial, the preparation

of extensive witness and exhibit lists, research on Pennsylvania jury instructions

and law (*Buford*), research on North Carolina jury instructions and law (*Burford*),

locating and subpoenaing multiple witnesses, extensive review of GSK's exhibits,

and dozens of preparation meetings and conference calls with witnesses and

experts.

### K.     *Lone Pine*

In an effort to compel settlement of the cases before the upcoming trial

setting, in November 2010, GSK filed a Motion for Entry of *Lone Pine* Order, which

asked the Court to require each plaintiff with a filed or tolled case to produce an

expert report supporting specific causation in each case.  The PSC fought this motion vigorously, and after extensive briefing and argument, the Court ordered plaintiffs to file a much less onerous "physician certification" confirming that plaintiffs had taken Avandia and had an injury.  This Order became known as the "*Lone Pine* I" Order.

The Law and Briefing Committee was extremely busy again in November and December 2010.  The PSC responded to GSK's summary judgment motions in both *Buford* and *Burford* during this time and filed 12 motions *in limine* on December 17, 2010, the Court's deadline for such motions.  That same day, GSK filed 14 motions *in limine* in the *Burford* case and 15 motions *in limine* in the *Buford* case.  These motions covered topics including the admissibility of adverse event reports, foreign regulatory materials, FDA reports, Congressional reports, promotional materials, media reports, and ghostwriting documents. The Law and Briefing Committee worked exhaustively to prepare responses to these 29 motions.

Starting in late December, the *Burford* trial team began intense preparations for the case-specific *Daubert* hearing, which took place on January 4, 2011, and at which the co-leads of the trial team made presentations and arguments against GSK's motions to exclude Dr. Melinek and Dr. DePace, plaintiffs' case-specific expert witnesses.  The hearing included exhibits and testimony in support of the experts' testimony, and lasted a full day.  On that same day, the Court issued its detailed Order denying GSK's *Daubert* Motions seeking to exclude the PSC's general causation experts, Drs. Jewell, Brinton, and Sniderman.

38

The trial teams in both the *Burford* and *Buford* cases attended several settlement conferences in December and January, but the negotiations were unsuccessful.  As the January 24 trial in *Burford* and the January 31 in *Buford* approached, the trial teams completed their trial preparation, including the deposition of Dr. Steven Nissen, the author of the science paper that first uncovered the association between Avandia and heart attacks.  The trial teams in both cases arrived in Philadelphia on January 16 and continued their intense, around-the-clock, preparations.  The co-leads, along with other members of the trial teams, also prepared extensively for the pretrial hearings in *Burford* on January 18 and *Buford* on January 20.  The *Burford* pretrial hearing involved several arguments on the multiple pending motions *in limine*.  The week a jury was to be selected, GSK and co-lead trial counsel, with extensive aid from the Court, resolved their cases.

## L.    January 2011

GSK then made the determination to settle with virtually all members of the PSC who had personal injury inventories, except one, and also settled most of the cases that had been filed in the Philadelphia MTP.  After that round of settlements, however, GSK continued to refuse to entertain any discussion of a global resolution of the remaining claimants' cases, which at that time exceeded 30,000, and began drastically reducing its settlement offers, while engaging in tactics seemingly aimed at pressuring plaintiffs into settling cases for the substantially lower values than previously offered by GSK.

To reverse this trend, and to obtain reasonable settlement terms for the remaining claimants, the firms still in the litigation had to reorganize themselves and develop an effective counter-attack.  This recognition led to an "all-hands" organizational meeting in Los Angeles on February 17, 2011, attended by many of the firms with remaining cases.

Around this same time, the Court advised the parties that it would consider additional applications for the PSC, and on March 2, 2011, the Court reconstituted the PSC to include additional members whom it had determined had the willingness and resources to continue this fight.  *See* PTO 130.  In addition, the Court appointed several PSC members who had settled their cases to serve as an Advisory Committee.

### M.    The Reconstituted PSC

Following the new appointments, the reconstituted PSC promptly developed a plan for:  (1) the selection of proposed leaders; (2) the formation of a Bodily Injury Committee, which would serve as the umbrella structure for coordination of discovery in bodily injury claims pending in the MDL and State Courts; (3) completing the depositions of GSK personnel that had been ordered by Special Master Shestack, but which had not yet been completed, together with coordination of document reviewers for documents relevant to these depositions; (4) taking GSK marketing depositions that had been ordered by New Mexico District Judge Raymond Ortiz in bellwether cases pending in New Mexico, together with coordination of document reviewers for documents relevant to these depositions; (5)

40

further briefing before Special Master Shestack for day-two depositions of Martin Freed and Peter Lammers, which had been the subject of motion to compel briefing in New Mexico, but which Judge Rufe requested instead be addressed by Special Master Shestack; (6) preparation of a response to GSK's motion for summary judgment on the adequacy of congestive heart failure ("CHF") warnings ("CHF Motion for Summary Judgment"); (7) forming a bellwether committee to review the oldest 100 cases filed in the Eastern District of Pennsylvania for the selection of PSC trial picks for a new MDL Trial Pool; and (8) collecting assessments to be paid by PSC members to fund ongoing costs of the litigation.  The PSC and Common Benefit Counsel literally worked almost around the clock to implement this plan, as reflected in Exhibit 4, which identifies significant pleadings, other filings, and rulings that occurred throughout 2011.

## N.     CHF Motion for Summary Judgment

GSK's tactics included, among other things, a demand for an immediate briefing schedule for its previously filed CHF Motion for Summary Judgment, which if granted would have led to the dismissal of approximately one-third of the remaining claims.  On March 30, 2011, the PSC filed its 47-page Response in Opposition to GSK's CHF Motion for Summary Judgment, which ultimately led to the Court's denying GSK's Motion in a 34-page opinion.  The Court agreed with the PSC's argument that the evidence brought forth by the PSC raised genuine issues of material fact on the adequacy of GSK's CHF warnings.  *See* Dkt. 1751, Memorandum and Order dated September 7, 2011.  As a result, many thousands of

41

claimants who had suffered CHF-related injuries were able to continue litigating and ultimately, resolve their cases.

### O.   Spring 2011

In addition, in the spring of 2011, the PSC members and Common Benefit Counsel deposed 12 key GSK witnesses, including former CEO J.P. Garnier, former Chief Medical Officer Ron Krall, former Director of Marketing Peter Letendre, former GSK Senior Director of Development Alexander Cobitz, former Senior Vice-President of Sales and Marketing David Pernock, and Director of Marketing Communications Bernadette Mansi.  PSC members also reviewed and organized more than 100,000 documents for these depositions, which were critical in establishing the admissibility of key documents that supported the plaintiffs' liability and punitive damages claims against GSK.

PSC members also began organizing and reviewing the PFS's and medical records of the oldest 100 cases in the Eastern District of Pennsylvania, to select trial picks.  The Court advised the parties that they should not only select myocardial infarction cases, but also make bellwether selections for stroke and "other myocardial injury" trials.  The parties ultimately agreed that each side would pick six plaintiffs as bellwether trial picks, to be divided evenly between myocardial infarction cases, "other myocardial injury" cases, and stroke cases.  This selection process took several months because GSK settled a number of the oldest 100 cases without disclosing the settlements until after the PSC had made its selections, which forced the PSC to further evaluate additional cases as trial picks.

42

**P.     PSC Work Product Used in State Court and PSC Members'
        State Court Activities**

By late spring 2011, it became apparent that a number of bellwether cases
would likely go simultaneously to trial in late 2011 in State Courts in New Mexico
and California, and in the Philadelphia MTP.  To assure the maximum likelihood of
success for individual plaintiffs, it was critical that there be a unified and
coordinated effort among all plaintiffs' counsel involved in these various bellwether
cases.  It was particularly important that these plaintiffs had access to and the
ability to effectively utilize the work product and trial package that had been
developed by the prior members of the PSC, as well as the ongoing work product of
the PSC.  The Advisory Members of the PSC played significant roles in this process,
by providing orientation and education to the new PSC on the history of the
litigation and the PSC's work product and trial package, and also by providing
ongoing advice to the new PSC and Common Benefit Counsel as the litigation
continued to unfold.  Through this cooperative effort, PSC members and Common
Benefit Counsel became directly involved in preparing bellwether cases for trial in
each of the State Court jurisdictions.  By late summer, the MDL bellwether picks
had also been determined, and the process of preparing these cases for trial began
as well.

**Q.     Statue of Limitations Battles**

In May 2011, GSK filed motions to dismiss in 48 individual cases based on
the statute of limitations, contending that the Nissen article published in May 2007

43

should act as a trigger date for the statute of limitations for all cases. If granted, these generic motions would have resulted in the dismissal of tens of thousands of cases, and GSK filed these motions without notifying the PSC. The PSC only became aware of these motions when it received notice of hearing from the Court.

Because the PSC had discovery that was relevant to these motions, the PSC filed *amici* briefs in response to these motions, as well as similar motions that were later filed by GSK in 13 additional individual cases. This work product, together with the excellent briefing by Plaintiffs' counsel in these individual cases, led to the Court's denial of GSK's motions to dismiss. *See* Dkt. 1739, Memorandum and Order dated September 7, 2011.

Not pleased with this result, GSK filed a motion for reconsideration, in which it changed its argument and claimed that the Court should find that the limitations period had begun at least by November 2007. Again, the Court agreed with the PSC and plaintiffs that this issue should not be decided at the motion to dismiss stage, and denied GSK's motion for reconsideration. *See* Dkt. 1858, Memorandum and Order dated October 14, 2011.

### R. *Lone Pine* II

In June 2011, GSK filed a Motion for *Lone Pine* II Case Management Order ("*Lone Pine* II Motion"), in which GSK asked that the Court require plaintiffs in all cases to produce case-specific expert reports satisfying the requirements of Fed. R. Civ. P. 26. The PSC engaged in an extensive meet-and-confer process with GSK on this motion, which included the active involvement of Special Master Shestack, but

44

this process proved unsuccessful.  The PSC opposed the *Lone Pine* II Motion on a number of grounds, including the substantial cost it would add to the litigation for individual plaintiffs, and the Court's not yet having considered general causation for injuries other than myocardial infarction.

The Court did not rule on the *Lone Pine* II Motion when it was heard in August 2011.  Instead, the Court instructed the PSC and GSK to meet and confer on a deadline for plaintiffs to submit a list of their case inventories to GSK, as well to meet and confer regarding the selection of a proposed mediator.  The Court also instructed the PSC and GSK to meet and confer on a discovery and briefing schedule for *Daubert* motions pertaining to general causation for stroke.  Shortly thereafter, the PSC and GSK agreed upon a schedule, which led the Court to set the stroke *Daubert* hearing in November 2011.  In addition, the parties agreed to recommend the appointment of Patrick Juneau as Mediator.

In June 2011, GSK also filed a motion to show cause as to why the Court should not limit attorneys' fees.  The PSC opposed this motion as well, on the basis that GSK lacked standing to file it.  On August 19, 2011, the Court dismissed this motion without prejudice as premature.  *See* Dkt. 1683, Order dated August 19, 2011.

As summer turned to fall, the PSC turned its attention to preparing for the stroke *Daubert* hearing, as well as preparing the Federal and State bellwether cases for trial.

The stroke *Daubert* schedule required that expert reports, expert depositions, and briefing be completed in less than 90 days, and PSC members and Common Benefit Counsel worked hundreds of hours on this project during a very short time. This work included the production of expert reports by the PSC's experts, Dr. Rohrdorf and Dr. Plunkett; presentation of these experts for depositions; taking the depositions of GSK's experts; and substantively responding to GSK's *Daubert* motions seeking to exclude the testimony of the PSC's experts.

The Court ultimately decided to vacate the stroke *Daubert* hearing to allow the Court's mediation initiative (discussed below) to go forward, but before this occurred, the PSC filed its well-supported responses, which set forth in detail the factual and expert bases for why GSK's *Daubert* motions should be denied.  By credibly opposing GSK's stroke *Daubert* motions; the PSC prevented the summary dismissal of Avandia stroke cases, which comprised approximately 20% of all Avandia cases.

### S.   The Court Mediation Plan

In connection with its continuous efforts to assist in resolving claims, the Court consulted with the parties and, on October 7, 2011, appointed Special Master Patrick Juneau to assist with mediation efforts.  The Court and Special Master Juneau met with groups of parties with cases in both State and Federal Court, and over several exhausting months resolved many of the then-outstanding cases, including those filed in State and Federal Courts, as well as claims based on tolling agreements with GSK and those that were unfiled and untolled.

46

### T.    PSC State Court Assistance and Trial Activities

On the State Court fronts, the PSC and Common Benefit Counsel continued to provide leadership and support in preparing for the trials of the State Court bellwether cases.  This effort was critical in maintaining a coordinated approach throughout the country and allowing the efficient use of the MDL document repository for the common benefit of all.

The PSC and CBC engaged in a wide variety of activities that served to benefit the litigation as a whole.  In connection with the New Mexico and the Philadelphia MTP bellwether trial cases, the PSC and CBC participated in the depositions of plaintiffs, treating physicians, and GSK sales representatives, and worked extensively with specific causation experts in preparing their reports and preparing for depositions.

In New Mexico, the PSC and CBC participated in the development and disclosure of Dr. Plunkett's opinions as a general regulatory expert, and the presentation of her for deposition; the preparation of responses to motions for summary judgment and *Alberico* (*Daubert*-like*)* motions; the preparation of deposition proffers for trial; and the preparation of the Final Trial Exhibit List, which added approximately 1,000 exhibits to the previously prepared MDL exhibit list.

In addition, the PSC and Common Benefit Counsel assisted in responding to 22 motions *in limine*, which included modifications of MDL responses to similar

motions in order to address local law, as well as preparing responses to several motions *in limine* that had not previously been filed in the MDL.

In California, PSC and Common Benefit Counsel assisted and worked cooperatively with the leadership of the California JCCP in preparing the California bellwether cases for trial. This work included the marshaling of PSC work product in support of responses to motions for summary judgment that were filed by GSK in all six California bellwether cases.

In addition, the PSC worked with MDL experts Dr. Parisian, Dr. Brinton, and Dr. Jewell to prepare affidavits in further support of the plaintiffs' responses to these dispositive motions. In connection with the summary judgment motions, the PSC also presented Dr. Parisian and Dr. Brinton for deposition because GSK claimed that some of the opinions in their affidavits had not previously been disclosed in the MDL.

As this effort was unfolding, a new front developed in St. Louis, and PSC and Common Benefit Counsel worked with attorneys there as those cases were prepared for trial.

As the New Mexico/*Garcia* and California/*Johnson* bellwether cases approached their trial dates, Judge Rufe ordered the PSC and GSK to meet and confer on the parameters of a mediation initiative to be administered by mediator Patrick Juneau. On November 7, 2011, the Court entered PTO 146, which set forth the procedures of this initiative. To facilitate mediation, the Court vacated the stroke *Daubert* hearing, and the parties agreed to seek a continuance of the *Garcia*

48

and *Johnson* trials to participate in the Court's mediation initiative, which was scheduled to end after 75 days unless at least 85% of the tolled and filed cases were resolved.  *See* PTO 146.

The *Johnson* case was re-set for trial for January 2012, and while the parties participated in a number of mediation sessions in November and December, they also simultaneously continued to prepare the *Johnson* case for trial, which included argument on GSK's motion for summary judgment; the completion of expert depositions; the preparation of responses to GSK's 25 motions *in limine*, which included modifications of MDL responses to similar motions in order to address local law, as well as preparation of responses to several motions that had not previously been filed in the MDL or in New Mexico; the preparation of responses to GSK's *Frye* motions to exclude Dr. Parisian, Dr. Brinton, and Dr. Charash; the preparation of jury instructions; the preparation of a supplemental exhibit list identifying the first 100 exhibits for ruling; identification of the first 10 deposition offers for ruling; meeting with jury consultants and preparation of *voir dire*; and otherwise preparing for trial.

Shortly before the mediation initiative began, GSK filed a Motion for Summary Judgment in the MDL on the statute of limitations, in which GSK sought an order from the Court declaring a limitations date of November 14, 2007, the date GSK added to its black box warning certain (inadequate) language on the risk of myocardial ischemia.  GSK refused to suspend the briefing schedule on this motion while the mediation initiative continued, and the PSC was forced to prepare a

49

response to GSK's motion.  As with GSK's previously filed Motions to Dismiss, this Motion for Summary Judgment, if it had not been opposed, could potentially have resulted in the dismissal of thousands of Avandia claims.

After obtaining a short extension from the Court, the PSC filed its 48-page response on December 16, 2011, which included 205 exhibits.  The response set forth in detail the factual bases for why GSK was not entitled to a global Motion for Summary Judgment on limitations based on the November 14, 2007 label change. As of early January 2012, the *Johnson* plaintiffs, as well as thousands of additional plaintiffs who had decided to participate in the Court's mediation program, had not been able to resolve their claims with GSK.  During the week of January 9, 2011, the California State Court conducted pre-trial hearings in *Johnson*, and throughout the week denied a number of significant motions filed by GSK, including GSK's *Frye* motions against Dr. Parisian, Dr. Brinton, and Dr. Charash, and GSK's motion *in limine* seeking to exclude GSK's conduct after the date of the plaintiff's injury in 2006.

As jury selection was about to begin in the *Johnson* trial, Judge Rufe ordered a negotiating team of plaintiffs' firms, including a member of the PSC, to Philadelphia in a final effort to determine if a mediated resolution could be reached. With the Court's involvement, as well as the round-the-clock assistance of mediator Patrick Juneau, the parties were able to reach a settlement.

In its hearing on February 14, 2011, the Court declared that the mediation initiative had been a success, and announced in open court that more than 24,000

50

claims had been resolved at that point through this process.  This outcome had been accomplished in less than 90 days.  As a result of these settlements, the Court concluded that the litigation had reached the stage where there was no longer the necessity for a PSC, and the Court disbanded the PSC.

In sum, from February 2011 until January 2012, when the *Johnson* case was about to begin trial, members of the former PSC and Common Benefit Counsel took or defended more than 130 depositions, responded to or filed more than 125 motions, and reviewed and organized hundreds of thousands of pages of documents. Throughout this time, the leadership of the PSC regularly kept lawyers informed about the progress of the litigation, through frequent conference calls, meetings at AAJ and elsewhere, and responses to individual inquiries.  The massive amount of work accomplished by the PSC and Common Benefit Counsel during this time directly contributed to the resolution of tens of thousands of Avandia cases.

The PSC has made the work product and trial package prepared by the PSC available to lawyers who are still litigating Avandia cases and this material is accessible and can be used by any personal injury plaintiff who now faces a trial in an Avandia case.  The continuing value of the PSC's work product is illustrated very clearly by a recent result in California, wherein the plaintiffs' lawyers, through their use of this work product, were able to resolve their claims.

### III.    The Avandia MDL Settlements

#### A.    The Avandia Common Benefit Fund

The MDL 1871 Avandia Common Benefit Fund was established by PTO 70.
*See* Dkt. 495-1.  PTO 70 required GSK to withhold 7% of the Gross Monetary
Recovery paid to a plaintiff whose case was subject to the jurisdiction of MDL 1871.
*Id.* at p.6.  Of that amount, 4% is deducted from the attorney's fees and 3% is
deducted from the client's share of the Gross Monetary Recovery.  *Id.*

#### B.    The Value of the Settlement

As this Court is aware, the amount of individual claimants' settlements in
MDL 1871 is confidential.  Based on an analysis of publicly available data, however,
including published reports and press releases, the aggregate global settlement
fund may be calculated, to a reasonable degree of scientific certainty, as described
in the expert report of Glenda Glover, Ph.D., J.D., C.P.A. dated June 7, 2012.
Because each settlement agreement, including its terms, is confidential, applicant
counsel have submitted Dr. Glover's expert report under seal (Exhibit 5).  Although
the terms of the settlement agreements are confidential, GSK has indicated its
willingness to provide additional information regarding the expected overall gross
amount of the Avandia settlements if requested by the Court.

## APPLICABLE LAW

### I.    This Court Has Substantial Discretion in Awarding Fees.

District courts have substantial discretion in awarding attorneys' fees, and their awards will not be overturned absent an abuse of that discretion (such as a failure to follow the proper legal standard or procedures, basing an award on clearly erroneous facts, or failing to explain the rationale underlying the court's decision). *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 299 (3d Cir. 2005); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 192 (3d Cir. 2000).

Such discretion is afforded in light of the "district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

The fee request that the Fee Committee makes for Common Benefit Counsel is well within the discretion of this Court to make, for the reasons set forth in this memorandum.

### II.   The Common Benefit Fee Award Now Requested Is Appropriate Under All of the Potential Governing Standards.

#### A.    Traditional Common Fund Cases

Petitions for attorneys' fees most commonly arise in two types of cases:  the common fund case and the statutory fee-shifting case.  *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 330 (3d Cir. 2011).  This case is akin to a common fund one, where the efforts of some have conferred benefits on many.  It is not a fee-

shifting case. There is no statute on which the Fee Committee bases its request for a common benefit fee.

Where a common fund has been created for the benefit of a certified class, attorneys' fees are typically awarded as a percentage of that fund, with an abbreviated lodestar cross-check to assess the reasonableness. *See In re Diet Drugs Prods Liab. Litig.*, 553 F. Supp. 2d 442, 466 (E.D. Pa. 2008) (Bartle, J.) (citing *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 333 (3d Cir. 1998); *Rite Aid*, 396 F.3d at 300; *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 164 (3d Cir. 2006)).

The common fund doctrine rests upon the inherent equitable powers of the Federal Courts to "prevent . . . inequity," and to spread fees proportionately among those who have benefited by the suit. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Fees are awarded from the fund to avoid "the unjust enrichment of those who otherwise would benefit from the fund without sharing in the expenses incurred by the successful litigant." *Flickering v. C.I. Planning Corp.*, 646 F. Supp. 622, 632 (E.D. Pa. 1986) (Shapiro, J.) (citation and internal quotation omitted).[5]

---

[5] The Third Circuit has also approved the use of the percentage-of-the-fund analysis to assess the reasonableness of attorneys' fees where a defendant has agreed to pay a set (or maximum) amount of attorneys' fees separately from the funds available for relief to class members. *See, e.g., In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 248, 280, 283 (3d Cir. 2009) (approving the use of the percentage-of-the fund analysis in a case involving a $121,800,000 settlement for the class and a separate fee award of $29,500,000, even though the case did not involve a "typical common fund.").

In determining how much to award in a common fund case, the Third Circuit has historically instructed courts to consider the factors set forth in *Gunter*, which include:

> (1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

223 F.3d at 195 n.1.

In addition, the Third Circuit has held that courts applying the percentage-of-the-fund analysis should consider, where pertinent, the factors set forth in *Prudential*, which include:  (1) the value of benefits accruing to class members attributable to the efforts of class counsel, as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any "innovative" terms of settlement.  *See AT&T Corp.*, 455 F.3d at 165-66 (citing *Prudential*, 148 F.3d at

55

338-40).  If there are additional factors relevant under the particular circumstances of a case, those also should be considered.  *See AT&T Corp.*, 455 F.3d at 166.[6]

### B.    This Avandia MDL

This case is a coordinated, multi-district action in which a massive undertaking by a core group of counsel, not only for their clients, but also for the benefit of all Avandia claimants, has resulted in an aggregate group of individual settlements collectively representing a substantial recovery.  While the individual settlements may have been negotiated independently, they culminated directly and unquestionably from the work of the core group, who advanced the entire Avandia litigation to the posture that made those settlements possible.

A model for the compensation of such common benefit work is the *Diet Drugs* litigation, where Judge Bartle applied a "modified" common fund approach in determining the reasonableness of attorneys' fees awarded from the fund created from those assessments.  *See Diet Drugs*, 553 F. Supp. 2d at 492.  As Judge Bartle explained:

> While no specific rules exist in determining how MDL assessments should be awarded, the court's decision must be fair and reasonable.  *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).   The

---

[6]  For a history of the Third Circuit's approach to awarding attorneys' fees in common fund and statutory fee-shifting cases, including a discussion of the Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237 (1985) ("1985 Task Force Report"), *see In re Cendant Corp. Litig.*, 264 F.3d 201, 255-57 (3d Cir. 2001).  As noted in *Rite Aid*, 396 F.3d at 306 n.16, a second Task Force was convened and issued a follow-up report in 2002.  *See* Report of the Third Circuit Task Force, *Selection of Class Counsel*, 208 F.R.D. 340 (2002).

> *Gunter* factors . . . do not strictly apply to the MDL because we are not dealing with a class settlement fund. Nonetheless, . . . the reasoning and analysis that led to their establishment when the percentage of recovery method gained favor in the Third Circuit applies equally well here due to the size of the MDL fund created and the extent of the benefits conferred.  *See* <u>In re Cendant Corp. Litig., 264 F.3d 201, 255–56 (3d Cir. 2001)</u>; <u>In re Orthopedic Bone Screw Prods. Liab. Litig., MDL 1014, 2000 WL 1622741, at *4–5 (E.D. Pa. Oct. 23, 2000)</u>.  We will thus consider the following modified version of [the] *Gunter* factors when determining what is reasonable and fair:  the benefits conferred by the PMC, including the risks faced at the inception of the litigation and the skill of the attorneys involved; the size of the fund created; and assessments in similar cases.

<u>*Id.*</u>

On appeal, the Third Circuit affirmed Judge Bartle's fee opinion, *see* <u>In re Diet Drugs Prod. Liab. Litig., 582 F.3d 524, 529 (3d Cir. 2009)</u>, but without specifically addressing Judge Bartle's "modified version of the *Prudential/Gunter* Factors." <u>*Diet Drugs*, 553 F. Supp. 2d at 492</u>.  The Third Circuit did, however, note that Judge Bartle had "made numerous findings pertaining to the *Gunter/ Prudential* factors," <u>582 F.3d at 545</u>, including the size of the settlement obtained and the number of persons benefited; the complexity of the litigation and how long it took; the extraordinary amount of time that class counsel devoted to the settlement agreement and the litigation; how the fee award, as a percentage of the

57

recovery, compared to average percentage awards in other super-mega-fund cases;[7] the absence of objections to the fee request; and the innovative features of the settlement agreement.  *Id.*

The Court of Appeals then observed that there were two concepts under which common benefit fees could be awarded, one being the "common benefit doctrine," which looks to the two prongs of "substantial benefit" and "proportionality," *see id.* at 546 (citing *Polonski v. Trump Taj Mahal Associates,* 137 F.3d 139, 145 (3d Cir. 1998)), and the other being the "docket management powers of the federal judiciary," and their corollary "power to fashion some way of compensating the attorneys who provide class-wide services." *Diet Drugs,* 582 F.3d at 546-47 (citing 28 U.S.C. § 1407; *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972,* 549 F.2d 1006 (5th Cir. 1977)).[8]

The Court of Appeals then said that it was "of no real consequence" which of these two approaches, or which "label" was used, for the analysis, and that the ultimate question turned on the issues of "substantial benefit" and how the burden

---

[7] Cases involving valuations larger than one billion dollars are known (at least in the class context) as "super-mega-fund" cases.  *Diet Drugs,* 553 F. Supp. 2d at 478.

[8]  Other MDL courts have similarly drawn on the common benefit doctrine and the managerial authority of MDL courts in awarding fees to attorneys for work that benefited all MDL plaintiffs.  *See, e.g., In re Vioxx Prods. Liab. Litig.,* 802 F. Supp. 2d 740, 770 (E.D. La. 2011); *In re Genetically Modified Rice Litig.,* MDL No. 06-1811, 2010 WL 716190, at *4 (E.D. Mo. Feb. 24, 2010).

of the assessment was spread among those who would bear it.  *Diet Drugs*, 582 F.3d at 547.

Applying these factors, the Third Circuit held that it was "beyond reasonable denial" that the objecting plaintiffs had enjoyed a substantial benefit and better chance of recovery because of the work of the plaintiffs' management committee, and rejected arguments that the assessments imposed a disproportionately heavy burden on the objecting plaintiffs.  *Id.* at 547-52.

In his later opinions in *Diet Drugs*, Judge Bartle applied the Third Circuit's substantial benefit / proportionality analysis in awarding common benefit fees from the assessment payments that had been collected.  *See, e.g., In re Diet Drugs Prod. Liab. Litig.*, MDL 1203, 2010 WL 3292787, at *13-14 (E.D. Pa. Aug. 19, 2010); *In re Diet Drugs Prod. Liab. Litig.*, MDL 1203, 2011 WL 2174611, at *10-11 (E.D. Pa. June 2, 2011).[9]

In this case, the common benefit fee award that the Fee Committee requests passes muster under all of the tests referred to above:  the "common benefit" test

---

[9]  *Diet Drugs* also involved three other sources for paying attorneys' fees in addition to the fund that had been created by common benefit assessments.  *See Diet Drugs*, 582 F.3d at 532-33 (summarizing the sources through which counsel could be compensated).  Because of this, both the Third Circuit and district court opinions in *Diet Drugs* also involve discussions of a traditional percentage-of-the-fund analysis and lodestar cross-check in assessing the reasonableness of the portion of the attorneys' fees drawn from the traditional common fund.  *See id.* at 540-45; *Diet Drugs*, 553 F. Supp. 2d at 466-87; *Diet Drugs*, 2010 WL 3292787, at *7-13; *Diet Drugs*, 2011 WL 2174611, at *4-9.  The Third Circuit thus had, in the backdrop of its opinion awarding fees from the common benefit assessments, the benefit of the traditional common fund analysis, with all of its factors and the lodestar cross-check.

that the Third Circuit used in *Diet Drugs* and the "managerial powers" doctrine that the Third Circuit also cited in the same case; Judge Bartle's "modified" common fund analysis in *Diet Drugs*; and the traditional *Gunter* and *Prudential* analyses.

### 1.    The Common Benefit Doctrine

As noted above, the two elements of this test are:  (1) whether counsel conferred a substantial benefit on those from whom the common benefit fee is requested; and (2) whether the burden is spread proportionally among the beneficiaries.   *Diet Drugs*, 582 F.3d at 546.   The answer to both questions in this case is an unqualified yes.

### a.    Common Benefit

Common Benefit Counsel in the present case conferred the same benefit that the Court of Appeals in *Diet Drugs* found in that case, where counsel had:

> . . . to the benefit of every claimant, helped to administer the MDL by tracking individual cases, distributing court orders, and serving as a repository of information concerning the litigation and settlement. . . . [They had also] obtained a number of favorable discovery and evidentiary rulings that applied on a litigation-wide basis, and . . . enforced a uniform procedure for the production of documents, deposition testimony, and expert disclosures that governed every MDL case against Wyeth.

*Id.* at 548 (footnote omitted).

In addition, the Court of Appeals noted in *Diet Drugs* that all of the litigants in question had:

> benefited from Wyeth's loss of bargaining power due to the PMC's efforts . . . Wyeth had to defend itself against the initial opt-out and PPH claimants knowing that they had access to

60

> pertinent discovery and understanding that they, in turn, knew Wyeth was heavily invested in settling. It stands to reason, then, that those plaintiffs stood a better chance of recovery from Wyeth than they would have absent the PMC's efforts.

*Id.*

The same statement can just as readily be made in this case. Common Benefit Counsel made this case. Common Benefit Counsel brought it to the place from which every litigant benefited. The considerable benefits that the CBC conferred included:

- analyzing and cataloging more than 30 million pages of documents;

- taking or defending 220 depositions;

- finding, retaining, and working with more than 20 expert witnesses, from numerous fields of discipline;

- becoming educated on, and adept at addressing, complex medical and scientific issues;

- researching and defending against motions on a variety of legal issues, including without limitation, privilege, *Daubert, Lone Pine* requests, the statute of limitations and tolling, and numerous discovery disputes, involving scope, extent, method, and applicability;

- preparing for and participating in monthly Status Conferences before the Court;

- preparing for and participating in more than 30 discovery hearings before the Special Master;

61

- negotiating with GSK on issues leading to the Court's issuance of dozens of pretrial orders;

- drafting and lodging written discovery requests;

- preparing several bellwether cases for trial; and

- negotiating the settlement concepts that would apply across the board.

Moreover, the common benefit work performed by counsel did not duplicate efforts of the federal government or any other groups investigating the safety of Avandia. Although the FDA independently conducted its own investigation and ultimately required GSK to implement a black box warning, the FDA's actions did not involve the payment of damages by GSK to injured plaintiffs that only this case has provided.

The FDA took only two actions with respect to Avandia, the first too early in the litigation to materially affect the ultimate outcome of this MDL, and the latter too late to do so. After Dr. Nissen's article was published, the FDA entered into negotiations with GSK for it to propose new language to be included in a black box warning. That warning, which was substantially inadequate, issued in November 2007, before this litigation was substantially underway. Furthermore, GSK continued to deny both general and specific causation by Avandia of heart attacks.

The second action by the FDA was its holding of an Advisory Committee hearing in July 2010. By that time, the MDL PSC and Common Benefit Counsel had done a tremendous amount of the work ultimately performed in this litigation. Liability discovery was essentially complete, more than 100 cases had completed

discovery in the Discovery Pool, millions of pages of documents had been produced, two bellwether cases were teed up for trial, general and case-specific experts' reports for both sides had been completed, and a *Daubert* hearing was scheduled.

The FDA ultimately restricted the use of Avandia in the marketplace, but not even that dissuaded GSK in its defense.  Instead, GSK asserted, *inter alia*, that there should be a bar date established for all claims, that summary judgment and/or a motion to dismiss should be entered against the remaining cases, and other such relief should be granted that would substantially reduce the potential recovery of the remaining claims.  The PSC not only fought against all of those maneuvers, but also got not one, but two, cases up to the morning of trial before GSK relented.

Finally, it should be noted that before the FDA's second action, a substantial number of cases had settled.  Although it continued to fight vigorously, GSK was by then on a settlement track.  It was the litigation pressure of the PSC and other Common Benefit Counsel that forced GSK to settle heart attack, stroke, and other cardiovascular cases, not any regulatory action by the FDA or other governmental entity.  This factor thus also supports the requested fee award.  *See AT&T Corp., 455 F.3d at 173* (where class counsel was not aided by the efforts of any governmental group, this strengthened the district court's conclusion that the fee award was fair and reasonable).

### b.   Proportionality

There is no issue as to this element in this case, because every litigant who had a Covered Case as defined in PTO 70 has had the same percentage—7%—

deducted from his or her settlement. No Covered Case has been asked to bear more than any other, and no Covered Case has been asked to bear less.

### 2.    The Managerial Powers Doctrine

As noted above, the Court of Appeals in *Diet Drugs,* while recognizing this doctrine as a separate approach to common benefit fees, nonetheless held that this approach turned on the same two elements as the common benefit doctrine: substantial benefit and proportionate—i.e., fair—distribution of burden. *Diet Drugs*, 582 F.3d at 547. The common benefit fee requested in this case satisfies these two elements, as discussed above, and thus satisfies this doctrine as well.

### 3.    Judge Bartle's Modified *Gunter* Analysis

As noted above, Judge Bartle's modified *Gunter* analysis looks at the following factors:

> the benefits conferred by the PMC, including the risks faced at the inception of the litigation and the skill of the attorneys involved; the size of the fund created; and assessments in similar cases.

*Diet Drugs*, 553 F. Supp. 2d at 492. The fee requested meets all of these elements.

#### a.    The Benefits Conferred

See above, under the discussion of the Common Benefit Doctrine.

#### b.    The Risks Faced at Inception

The risks in this case were substantial. At the outset, counsel had one medical article from which to build their case and faced an international corporate giant with seemingly unlimited resources and an equally unlimited will to fight,

64

and which was represented by able, diligent, and well-prepared counsel.  In addition, at the time of inception, *Wyeth v. Levine*, 555 U.S. 555 (2009) had yet to be decided.  Had the Supreme Court decided differently in that case, there was a very real chance that all of the time and funds expended in the early years of the litigation would have been for naught.

The balance of this case also involved a variety of difficult legal issues, some of which could have brought this case to an immediate halt had GSK prevailed on them.  These included, for example, the Motions to Dismiss, Motions for Summary Judgment, the privilege log issues, and *Daubert* hearings discussed above.  Had GSK prevailed on just one of them, the case for plaintiffs would have been over.

This substantial risk of nonpayment that counsel performing the common benefit work faced throughout this litigation further supports the requested fee award.

### c.  The Skill of the Attorneys Involved

This Court has seen firsthand the skill of Common Benefit Counsel, in years of managing this case and working with the PSC and other CBC one-on-one.  The CBC knew how to manage a large case and were ready on every substantive and procedural issue that the case presented.  (Attached as Exhibit 6 are the biographies of the PSC members.)

"The skill and efficiency of Plaintiffs' Counsel is 'measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism

65

with which counsel prosecuted the case and the performance and quality of opposing counsel." *Meijer, Inc. v. 3M*, Civ. A. 04-5871, 2006 WL 2382718, at *21 (E.D. Pa. Aug. 14, 2006) (Padova, J.) (quoting *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (Katz, J.)).

As their work in this case showed, the attorneys who performed common benefit work in this MDL are skilled in product liability and personal injury litigation, and in cases involving pharmaceutical drug products in particular.

Many of these counsel, and particularly those on the PSC, are experienced in handling multi-district cases, which involve (as here) the coordination of thousands of cases throughout the country for pretrial purposes. The scale on which such litigation occurs requires extraordinary organizational skills and the ability to keep numerous matters (discovery, motions practice, etc.) moving forward on behalf of each of those thousands of cases at the same time. All of this must be done as efficiently as possible, and thus requires an immense commitment of time and money, often involving long hours and extensive overnight travel.

Because the litigants in an MDL hail from states throughout the country, counsel must be or become familiar with the laws of each of those states on a variety of topics, including the causes of action at issue, permissible damages, and evidentiary matters. Although coordination allows certain matters to be addressed collectively and uniformly, a substantial amount of state-by-state analysis is nonetheless required, given both choice of law issues and the fact that 28 U.S.C.A. §

66

1407 contemplates that each of the coordinated cases ultimately be remanded for an individual trial.

The results obtained in this case are perhaps the best evidence of the skill of the counsel involved.  *See In re Linerboard Antitrust Litig.*, MDL 1261, 2004 WL 1221350, at *5 (E.D. Pa. June 2, 2004) (DuBois, J.) ("The result achieved is the clearest reflection of petitioners' skill and expertise.").

Counsel also faced formidable challenges from the attorneys defending this litigation, whose firm is recognized as one of the best in the country, and who fought this case with skill and tenacity throughout.  *See McDonough v. Toys "R" Us, Inc.*, 834 F. Supp. 2d 329, 342 (E.D. Pa. 2011) (Brody, J.) ("[T]he fact that plaintiffs' counsel obtained this settlement in the face of formidable legal opposition further evidences the quality of . . . [counsel's] work.").

This factor thus also supports awarding the requested percentage fee.  *See In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 244 (E.D. Pa. 2009) (McLaughlin, J.) (where plaintiffs' counsel were highly skilled in litigating class actions against insurance companies, the defendants were represented by a leading law firm, and the case was vigorously litigated by both sides, this supported plaintiffs' counsel's fee request); *Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, 513 F. Supp. 2d 322, 338 (E.D. Pa. 2007) (Padova, J.) (where counsel were experienced in complex class litigation and obtained a significant settlement for the class, despite the complexity and challenges of the case, this supported their fee request); *In re Corel Corp. Inc. Sec.*

67

*Litig.*, 293 F. Supp. 2d 484, 496 (E.D. Pa. 2003) (Brody, J.) (where counsel primarily practiced in the field of shareholder securities litigation, had considerable experience, and faced formidable legal opposition, this supported awarding the requested fees).

> **d.      The Size of the Fund Created**

As in the *Diet Drugs* litigation, there is in this case no one "fund" that Common Benefit Counsel's efforts have created, *see* 553 F. Supp. 2d at 493-94, but there is the practical equivalent:  the aggregate number comprised of the individual settlements of all Avandia litigants.  Just as in *Diet Drugs,* "individual litigants in the MDL have . . . received considerable payments" in settlement of their claims, *see id.* at 493, and those payments would not have existed but for Common Benefit Counsel's work.

The aggregate amount of the individual settlements is substantial.  The claims of many thousands of individuals have been settled, and it is estimated that thousands of additional claimants stand to benefit once all settlements have been finalized.  Both the ultimate amount of the settlement and the total number of plaintiffs whom it will ultimately benefit are thus significant by any measure.

Although Avandia cases are continuing to settle, and the aggregate amount of all settlements (past and future) is not presently known with exact certitude, the estimate prepared by Dr. Glenda Glover (*see* Exhibit 5, filed under seal), as discussed above, is based on both sound reasoning and the established record of those settlements that have occurred thus far.  In other contexts, the Third Circuit

has permitted district courts discretion to employ innovative methods of assessing and awarding attorneys' fees where uncertainties exist. *See Prudential*, 148 F.3d at 334.

### e.   Assessments in Similar Cases

The 7% assessment in this case is substantially similar to assessments that have been made in other cases. As reflected in the chart below, assessments in recent years have ranged between 3% and 12%, and the 7% assessment here thus falls comfortably in the middle of this range.

| CASE | ASSESSMENT |
| --- | --- |
| *In re Vioxx Prods. Liab. Litig.*, MDL 1657, 2012 U.S. Dist. LEXIS 58262 (E.D. La. Apr. 25, 2012); PTO 19 ¶ 2, (E.D. La. Aug. 8, 2005) (attached hereto as Exhibit 7) | **8%** maximum assessment for plaintiffs registering under the terms of the master settlement agreement, which settled Vioxx personal injury claims. (Previously, PTO 19 called for a 3% to 6% assessment in Federal and State cases, depending on the date the case was filed or the date of the coordination agreement.) |
| *In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on April 20, 2010,* MDL 2179, 2011 WL 6817982 (E.D. La. Dec. 28, 2011), amended 2012 WL 37373 (E.D. La. Jan. 4, 2012), and *amended and superseded on reconsideration,* 2012 WL 161194 (E.D. La. Jan. 18, 2012) | **6%** in MDL cases for private claimants and **4%** in MDL cases for State or local government claimants |

| | |
|---|---|
| ***In re DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig.,*** MDL 2197, CMO 13, II(B)(2) (N.D. Ohio, Nov. 28, 2011) (attached hereto as Exhibit 8) | **3%** for common benefit attorneys' fees and 1% for costs for MDL cases and State Court cases using MDL work product (subject to an increase to 6%—with 5% being allocated for fees and 1% for expenses—for counsel entering the Participation Agreement after sixty (60) days of the entry of the Order or ninety (90) days of their first case being docketed in any jurisdiction, whichever is later) |
| ***In re Fosamax Prods. Liab. Lit.,*** MDL 1789, CMO 17 ¶ 3(f)(3), (S.D.N.Y. Apr. 28, 2011) (attached hereto as Exhibit 9) | **9%** assessment for non-MDL cases utilizing MDL common benefit work product or participating in a PSC-coordinated resolution and in which an Assessment Option agreement was not signed |
| ***In re Oral Sodium Phosphate Solution-Based Prods. Liab. Action***, MDL 2066, Order Regarding Common Benefit Fees and Expenses, at 3 (N.D. Ohio, Aug. 2, 2010) (attached hereto as Exhibit 10) | **4%** assessment for MDL cases |
| ***In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,*** MDL 2011, 2010 U.S. Dist. LEXIS 22361, 9-10 (S.D. Ill. Mar. 8, 2010) | **6% to 10%** assessments for MDL cases, depending on timing of participation |
| ***In re Genetically Modified Rice Litig.,*** MDL 06-1811, 2010 WL 716190, at *6 (E.D. Mo. Feb. 24, 2010) | **6% to 8%** fee assessments (plus an additional 3% for costs), depending on the plaintiff's claims, in Federal cases, as well as State cases in which the parties agreed to such assessments or the State Court having jurisdiction ordered them |
| ***In re Phenylpropanolamine Prods. Liab. Litig.,*** MDL 1407, 2009 U.S. Dist. LEXIS 126729 (W.D. Wash. Sept. 18, 2009) | **4%** assessment for Federal MDL cases and **3%** assessment for State cases using common benefit work product |

| | |
|---|---|
| ***In re Bextra and Celebrex Marketing Sales Practices and Prods. Liab. Litig.,*** MDL 1699, PTO No. 8A (Amended), at 4-5 (July 7, 2008) (attached hereto as Exhibit 11) | **8% to 12%** assessments for MDL cases, depending on participation level |
| ***In re Diet Drugs Prods. Liab. Litig.,*** 553 F. Supp. 2d 442, 458, 491 (E.D. Pa. 2008) | **6%** in Federal cases and **4%** in State cases |
| ***In re Latex Gloves Prods. Liab. Litig.,*** MDL 1148, 2003 U.S. Dist. LEXIS 18118 (E.D. Pa. Sept. 5, 2003) (Ludwig, J.) | **3% to 5%** assessments, depending on the stage of the proceedings |
| ***In re St. Jude Med., Inc.,*** MDL 1396, 2002 WL 1774232, at *2 (D. Minn. Aug. 1, 2002) | **6%** assessment both for Federal and State cases |
| ***In re Baycol Prods. Litig.,*** MDL 1431, 2002 WL 32155266, at *4 (D. Minn. June 14, 2002) | **6%** assessment for Federal cases and qualifying State cases |
| ***In re Protegen Sling and Vesica System Prods. Liab. Litig.,*** MDL 1387, 2002 WL 31834446, at *1, 3 (D. Md. Apr. 12, 2002) | **9%** assessment for Federal cases and **6%** assessment for State cases |
| ***In re Rezulin Prods. Liab. Litig.,*** No. 00 CIV. 2843(LAK), 2002 WL 441342, at *1 (S.D.N.Y. March 20, 2002) | **6%** assessment for Federal cases and **4%** assessment for State cases |
| ***In re Propulsid Prods. Liab. Litig.,*** MDL 1355, PTO 16, at 3-4 (E.D. La. Dec. 26, 2001) (attached hereto as Exhibit 12) | **6%** assessment for Federal cases and **4%** assessment for State cases |

4.    **The *Gunter* and *Prudential* Factors**

The only *Gunter* factors not already addressed above are the complexity and duration of the litigation, the amount of time devoted to the case by counsel for whom the fee award is sought, fee awards in similar cases, and the presence or

absence of substantial objections to the fees requested by counsel.[10]  *See Gunter*, 223
F.3d at 195 n.1.  The only *Prudential* factors not addressed above are "innovative"
terms of settlement and the percentage fee that would have been negotiated had the
case been subject to a private contingent fee agreement at the time counsel was
retained.  *See Prudential*, 148 F.3d at 338-40.[11]  The fee requested in this case
meets all of these.

### a.      The Complexity and Duration of the Litigation

This case, which began in late 2007, is approaching its fifth year of litigation,
and will continue to be litigated well into the foreseeable future.  It thus compares
in duration to, or exceeds in length, many other super-mega-fund cases.  *See Diet
Drugs*, 553 F. Supp. 2d at 478 (citing *In re Visa Check/Mastermoney Antitrust
Litig.*, 297 F. Supp. 2d 503, 523-24 (E.D.N.Y. 2003) (7 years); *In re NASDAQ
Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (4-year
duration); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 945 (E.D. Tex.
2000) (approximately 1-year duration); *In re Sulzer Hip Prosthesis & Knee
Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 915-18 (N.D. Ohio 2003) (2-year

---

[10]  While not identified in the headings above, certain of the *Gunter* factors—
including the number of persons benefited, the efficiency of the attorneys, and the
risk of nonpayment—are covered above, under the discussion of the modified
common fund analysis employed by Judge Bartle.

[11]  Similarly, while not identified in the headings above, one of the *Prudential*
factors—i.e., the value of benefits accruing to plaintiffs attributable to common
benefit counsel's efforts as opposed to others' efforts—is discussed above in the
section describing the substantial benefit conferred on the plaintiffs.

duration); *Deloach v. Philip Morris Cos.*, No. 1:00CV01235, 2003 WL 23094907, at *11 (M.D.N.C. Dec. 19, 2003) (3-year duration); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 353-54 (S.D.N.Y. 2005) (3-year duration); *In re AOL Time Warner, Inc. Sec. Litig.*, MDL 1500, 2006 WL 3057232, at *1, *18-19 (S.D.N.Y. Oct. 25, 2006) (4-year duration)).

### b. The Amount of Time Devoted to the Case by Counsel Who Performed Common Benefit Work

As noted above, this case required a substantial investment of time.  Counsel performing common benefit work, and other members of their firms, spent more than 130,000 hours over the course of approaching five years, to date, preparing and litigating this case for the common benefit of all plaintiffs.



The common benefits hours were billed by counsel between October 16, 2007, when this MDL was formed, and February 14, 2012, when the PSC was disbanded. The following chart depicts how Common Benefit Counsel's time was allocated by year.



The hours expended by Common Benefit Counsel in this case are comparable to the hours spent in other super-mega-fund cases in which requests for attorneys' fees have been approved.  *See, e.g.*:

- *NASDAQ*, 187 F.R.D. at 489-89 (awarding fees of 14% of $1.027 billion in a case in which counsel and paralegals spent 129,629 hours);

- *Sulzer*, 268 F. Supp. 2d at 919 n.19, 936 (awarding fees of 4.80% of $1.045 billion where more than 50,000 hours were spent litigating the case);

- *AOL Time Warner, 2006 WL 3057232*, at *1-2, 14 (awarding fees of 5.90% of $2.65 billion where 135,186 hours were spent by counsel);

- *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 384-86 (D. Md. 2006) (approving fee award of 12% of $1.1 billion where counsel devoted 147,896 hours to the case).



c.      **Fee Awards in Similar Cases**

As reflected in the chart below, the fee award in this case, $143,750,000, is squarely in line with awards that have been approved in comparable cases that involve, as does this case, an aggregate settlement in super-mega-fund range.

Indeed, the requested percentage is lower than the percent awarded in multiple

cases.

| Case | Fund Value | Percent Award | Total Award |
|------|-----------|---------------|-------------|
| *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) | $1 to $1.1 billion | 15% | $147,500,000 |
| *In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249 (D. N.H. 2007) | $3.2 billion | 14.50% | $464,000,000 |
| *In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) | $1.027 billion | 14% | $143,780,000 |
| *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006) | $1.1 billion | 12% | $130,647,869 |
| *In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008) | $6.44 billion | 6.75% | $434,511,777 |
| *In re Vioxx Products Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010) | $4.85 billion | 6.50% | $315,250,000 |
| *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) | $3.383 billion | 6.50% | $220,290,160 |
| *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, MDL 1500, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) | $2.65 billion | 5.90% | $156,350,000 |
| *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | $6.133 billion | 5.50% | $336,100,000 |
| *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003) | $1.045 billion | 4.80% | $50,000,000 |

### d.    The Presence or Absence of Substantial Objections to the Requested Fees

To date, there have been no objections to the Fee Committee's request for attorneys' fees, however, the deadline for objections has not yet run, and it is thus premature to address this point.[12]

### e.    Innovative Terms of Settlement

"In the absence of any innovative terms, this factor neither weighs in favor [n]or against the proposed fee request." *McDonough*, 834 F. Supp. 2d at 345.

### f.    The Percentage Fee that Would Have Been Privately Negotiated

Courts recognize that in private contingency fee tort cases, "plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery." *Ikon Office Solutions*, 194 F.R.D. at 194. While the Third Circuit

---

[12] Generally, an absence of objections weighs in favor of awarding the requested fees. *See In re Sterling Fin. Corp. Sec. Class Action*, MDL 1879, 2009 WL 2914363, at *2 (E.D. Pa. Sept. 10, 2009) (Stengel, J.) (where there were only two objections to the fee request, this factor weighed strongly in favor of approving the requested fee award); *Boone v. City of Philadelphia*, 668 F. Supp. 2d 693, 713 (E.D. Pa. 2009) (McLaughlin, J.) (where there was just one objection to the proposed attorneys' fees, this weighed in favor of approving the requested fees); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *4 (E.D. Pa. Jan. 3, 2008) (Surrick, J.) ("A lack of objections demonstrates that the Class views the settlement as a success and finds the request for counsel fees to be reasonable."); *Linerboard*, 2004 WL 1221350, at *5 ("The absence of objections supports approval of the Fee Petition.").

Even if objections are made, however, that does not necessarily mean that the requested fee should be reduced in response. Unsubstantiated objections, for example, would not warrant a reduction in counsel's fee request. *See Am. Investors*, 263 F.R.D. at 244. *See also Corel Corp.*, 293 F. Supp. 2d at 496 (refusing to "infer too much" from the fact that some class members objected).

has recognized that normal contingency percentages may not apply in super-mega-fund cases, and that a lower percentage may be appropriate in such cases,[13] this case easily complies:  the 6.25% fee requested here is far below privately negotiated contingency fee arrangements.

## III.   A Lodestar Cross-check Confirms the Reasonableness of the Requested Fee.

In a traditional common fund case, the Third Circuit has encouraged an abbreviated lodestar cross-check to assess the reasonableness of the percentage-based fee award.  *Rite Aid,* 396 F. 3d at 305-06 (holding that it is "sensible" for district courts to perform a lodestar cross-check to ensure that application of the percentage method does not result in a recovery that is too great); *Boone,* 668 F. Supp. 2d at 713 (observing that courts in the Third Circuit "use the alternative method of fee calculation, the lodestar method, as a cross-check in order to ensure that the fee amount is reasonable.").[14]

---

[13]  In the context of super-mega-fund class actions, the Third Circuit has questioned the significance of this factor.  *See Prudential,* 148 F.3d at 340 ("We question the significance of this inquiry to class action lawsuits of this magnitude. While such private fee arrangements might be appropriate in smaller class actions or litigation involving individual plaintiffs, we do not believe they provide much guidance in cases involving the aggregation of over 8 million plaintiffs and a potential recovery exceeding $1 billion.").

[14]  The lodestar is calculated by multiplying the number of hours reasonably worked on a case by the reasonable hourly billing rates for those services.  *See Rite Aid,* 396 F. 3d at 305.  The billing rates to be used in calculating the lodestar should be "blended" ones, of all who worked on the case, and not the billing rates of just the most senior attorneys.  *Id.* at 306.  When used as a cross-check, the lodestar analysis may be abridged and requires "neither mathematical precision nor bean

Judge Bartle, however, did not expressly address the lodestar in making his common benefit fee award in *Diet Drugs, see* 553 F. Supp. 2d at 496 n.90 ("[W]e do not believe a lodestar cross-check is necessary"), nor did the Third Circuit in its decision affirming his award.

Even if a lodestar cross-check should be made in a case like the present one, however, that is no problem for this case:  the lodestars of Common Benefit Counsel for their common benefit work show that the common benefit fee award that the Fee Committee requests for them is reasonable.

Common Benefit Counsel collectively submitted to the Fee Committee 144,000 hours of time.  Of this amount, the Fee Committee has recommended for approval just over 134,000 hours as compensable common benefit work, representing a lodestar of $55,279,440.  (This includes all time through February 14, 2012, the date the PSC was dissolved.)

"After a court determines the lodestar amount, it may increase or decrease that amount by applying a lodestar multiplier." *Diet Drugs,* 582 F.3d at 540 n.33. "Multipliers may reflect the risks of non[-]recovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for an extraordinary result.  By nature they are discretionary and not susceptible to objective calculation." *Prudential,* 148 F.3d at 340.

---

counting." *Id.* at 305-06.  District courts may rely on summaries from counsel and need not review actual billing records.  *Id.* at 306-07.  In the end, the lodestar cross-check is just that—a safeguard; it "does not trump the primary reliance on the percentage of common fund method." *Id.* at 307.

A fee of $143,750,000 million in this case would amount to a lodestar multiplier of 2.6, which is consistent with Third Circuit jurisprudence, and lower than multipliers that have been approved in other cases.  The Third Circuit has recognized that "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Id.* at 341 (quoting Herbert Newberg & Alba Conte, *3 Newberg on Class Actions* § 14.03, at 14-5 (3d ed. 1992).  It has also concluded that a multiplier of roughly 3.4 is "either below or near the average multiplier in . . . 'super-mega-fund' cases," *Diet Drugs, 582 F.3d at 545 n.42*, as demonstrated by the cases in the following chart.

| Case | Lodestar Multiplier |
|------|---------------------|
| *Deloach v. Philip Morris Cos.*, No. 1:00CV01235, 2003 WL 23094907 (M.D.N.C. Dec. 19, 2003) | 4.45 |
| *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | 4 |
| *In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) | 3.97 |
| *In re AOL Time Warner, Inc. Sec. Litig.*, MDL 1500, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) | 3.69 |
| *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) | 3.5 |
| *In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249 (D. N.H. 2007) | 2.697 |
| *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006) | 2.57 |
| *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003) | 2.4 |

The hourly rates applied in this case are also reasonable.  The Fee Committee determined that there would be six categories of hourly rates, depending on a number of factors, including the individual's professional experience, the type of

80

work performed, and the overall contribution of the professional to the litigation.

*See AT&T Corp.*, 455 F.3d at 164.

The lowest hourly rate was set at $185 per hour for all non-lawyer professionals, such as paralegals and technology support professionals. The next category, consisting primarily of attorneys engaged in document review, was assigned a rate of $225 per hour. The next category, consisting primarily of younger attorneys or more senior attorneys performing document review or investigative projects, was assigned a rate of $285 per hour. The next category, consisting primarily of mid- to high-level attorneys performing focused litigation support and briefing, was assigned a rate of $380 per hour. A rate of $475 per hour was assigned to the next group of attorneys, generally high-level attorneys who took a very active role in supporting Lead Counsel in the case in briefing, preparing for hearings and trials, and actively participating in depositions throughout the litigation. The highest category, including all Lead Counsel and partners in their firms who were actively involved in the litigation, was assigned a rate of $595 per hour.

Based on the lodestar ($55,279,440) for the hours approved (roughly 134,000), Common Benefit Counsel have an overall blended hourly rate of $413 for all timekeepers, which is consistent with (indeed, lower than) the rates recently approved in a similar pharmaceutical product liability MDL action. *See Vioxx*, 760 F. Supp. 2d at 660 (finding appropriate a combined average hourly rate of $443.29 for all common benefit timekeepers).

81

As described above, the hourly rates approved by the Fee Committee for attorneys in this case range from $225 to $595 (and average $449), and paralegal rates were approved at $185 per hour.  These rates are consistent with rates that have been approved in this jurisdiction in other cases.[15]  *See, e.g., Jama v. Esmor Corr. Services, Inc.*, 577 F.3d 169, 181 (3d Cir. 2009) (holding that the district court did not err in approving rates of $600 for a partner, $205 for a first-year associate, and $400 for a law school clinic attorney); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 195 Fed. Appx. 93, 97 (3d Cir. 2006) (holding, in 2006, that hourly rates up to $550 were reasonable for attorneys); *In re Budeprion XL Mktg. & Sales Litig.*, MDL 2107, 2012 WL 2527021, at *22 (E.D. Pa. July 2, 2012) (Schiller, J.) (approving hourly rates of $225 to $700 for lead counsel and partners and $200 to $400 per hour for associates); *Ripley v. Sunoco, Inc.*, CIV.A. 10-1194, 2012 WL 2402632 (E.D. Pa. June 26, 2012) (Robreno, J.) (approving hourly rates of $600 per hour for partners and $300 per hour for associates); *Chakejian v. Equifax Info. Services, LLC*, 275 F.R.D. 201, 216 (E.D. Pa. 2011) (Brody, J.) (approving hourly rates of $485 to $700 for partners and $125 to $175 for paralegals); *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 422 & n.13 (E.D. Pa. 2010) (Pratter, J.) (holding that hourly rates of $290 to $650 for attorneys and $125 to $225 for paralegals were reasonable); *In re Diet Drugs Prods Liab. Litig.*, MDL 1203, 2003

---

[15] As the Third Circuit has held, in most cases, the relevant rate is the prevailing rate in the forum of the litigation, unless there is a need for the special expertise of counsel from a distant district or local counsel are unwilling to handle the case, *see Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 705 (3d Cir. 2005), neither of which exception exists here.

WL 21641958, at *5 (E.D. Pa. May 15, 2003) (discussing fee committee's application, in 2003, of a maximum hourly rate of $525, before application of multipliers).

The approved billing rates are also reasonable when one considers those charged by other firms according to media reports. *See E. Aaron Enters., Inc. v. Carolina Classified.com*, CIV. A 10-1087, 2010 WL 2991739, at *3 (E.D. Pa. July 27, 2010) (O'Neill, J.) ("The prevailing market rate is ordinarily reflected in a law firm's normal billing rate."). According to a 2011 sampling of nationwide billing rates, partners at defense counsel's Philadelphia firm (Pepper Hamilton) bill as high as $825 per hour, and partners at other Philadelphia law firms have similar top hourly rates ($900 at Cozen O'Connor, $875 at Duane Morris, $750 at Saul Ewing, and $725 at Fox Rothschild). *See* Exhibit 13 (2011 nationwide billing rate lists organized from highest to lowest partner rate and by location of firms' principal or largest offices, as well as a series of bar graphs).[16] Here, the highest applied billing rate, $595, is thus particularly reasonable in comparison.

At the other end of the spectrum on attorney rates, the lowest associate hourly billing rates charged by Philadelphia firms in 2011, according to the same survey, were $225 at Cozen O'Connor and Duane Morris, $235 at Pepper Hamilton, $245 at Saul Ewing, and $190 at Fox Rothschild. *See* Exhibit 13. The lowest associate hourly billing rate applied here, $225, is thus on par with associate rates charged by Philadelphia firms. (A number of similar comparisons can be drawn

---

[16] *See also* Exhibit 14, a survey of billing rates in bankruptcy litigation.

from the information in Exhibit 13, reflecting the reasonableness of the rates applied here.)

In further support of this petition, the Fee Committee submits the Declaration of Dianne M. Nast (Exhibit 15), which provides details about the Fee Committee process.

## IV.    Requested Schedule

The Fee Committee respectfully requests that the Court establish a schedule for objections (if any) to this motion, responses to objections, and a hearing.  Subject to the Court's approval, the Fee Committee proposes the following:

| | |
|---|---|
| Objections to the Fee Committee's Petition for an Award of Attorneys' Fees | August 28, 2012 |
| Fee Committee's Responses to Objections | September 11, 2012 |
| Hearing | September 18, 2012 at 2:00 p.m. |

It is contemplated that, after the Court determines the appropriate Common Benefit fee, and in accordance with the Court's prior direction, the Fee Committee will propose for consideration by the Court an equitable allocation of that fee, and since payments will be made into common fund many months to come, will also propose a distribution schedule.

<u>**CONCLUSION**</u>

Without any guarantee of success or repayment for their efforts, the attorneys who performed common benefit work in this MDL case did so at substantial risk, devoting their time and skill to this case at the expense of pursuing other matters.  In return, the Fee Committee seeks, on their behalf,

84

reasonable fees 6.25% (or $143,750,000 million) of the common fund created by the

assessments collected in accordance with PTO 70 (subject to the reserve for

expenses and administrative costs noted above).  The Fee Committee also requests

the Court to establish a schedule for filing objections to this motion and responses to

objections and set a hearing date.


Dated:  August 7, 2012                          Respectfully submitted,

                                                /s/ Dianne M. Nast                          
Vance R. Andrus, Esq.                           Dianne M. Nast, Esq.
Andrus, Hood & Wagstaff, PC                     Joseph F. Roda, Esq.
1999 Broadway, Suite 4150                       Jennifer S. Snyder, Esq.
Denver, Colorado  80202                         RodaNast, P.C.
(303) 376-6360                                  801 Estelle Drive
                                                Lancaster, Pennsylvania  17601
                                                (717) 892-3000


Bryan F. Aylstock, Esq.                         Paul R. Kiesel, Esq.
Aylstock, Witkin, Kreis & Overholtz             Kiesel Boucher Larson LLP
PLLC                                            8648 Wilshire Blvd.
17 East Main Street, Suite 200                  Beverly Hills, California  90211
Pensacola, Florida  32502                       (310) 854-4444
(850) 916-7450


Thomas P. Cartmell, Esq.                        Bill Robins III, Esq.
Wagstaff & Cartmell LLP                         Heard Robins Cloud & Black LLP
4740 Grand Avenue, Suite 300                    300 Paseo de Peralta, Suite 200
Kansas City, Missouri  64112                    Santa Fe, New Mexico 87501
(816) 701-1102                                  (505) 986-0600


Stephen A. Corr, Esq.                           Joseph J. Zonies, Esq.
The Corr Law Firm                               Reilly Pozner LLP
509 Starflower Street                           1900 Sixteenth Street, Ste. 1700
Warrington, Pennsylvania 18976                  Denver, Colorado  80202
(215) 450-5320                                  (303) 893-6100

*Plaintiffs' Fee Committee*

85

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

<table>
<tr><td>─────────────────────────────</td><td>:</td><td></td></tr>
<tr><td>**IN RE: AVANDIA MARKETING, SALES**</td><td>:</td><td></td></tr>
<tr><td>**PRACTICES AND PRODUCTS**</td><td>:</td><td>**MDL No. 1871**</td></tr>
<tr><td>**LIABILITY LITIGATION**</td><td>:</td><td>**07-md-01871**</td></tr>
<tr><td>─────────────────────────────</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>**THIS DOCUMENT APPLIES TO:**</td><td>:</td><td></td></tr>
<tr><td>**ALL ACTIONS**</td><td>:</td><td></td></tr>
<tr><td>─────────────────────────────</td><td>:</td><td></td></tr>
</table>

[proposed] **ORDER**

**AND NOW**, this          day of                  2012, upon consideration of the

Avandia Fee Committee's Petition for an Award of Attorneys' Fees, it is hereby

**ORDERED** that the following scheduled is established:

- Deadline for filing objections to the Avandia Fee Committee's Petition

  for an Award of Attorneys' Fees:  **August 28, 2012**

- Deadline for the Fee Committee to file responses to any such

  objections:  **September 11, 2012**

- Hearing:  **September 18, 2012 at 2:00 p.m.**

It is so **ORDERED**.

**BY THE COURT:**

_____
**CYNTHIA M. RUFE, J.**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2012, a copy of the Avandia Fee

Committee's Petition for an Award of Common Benefit Attorneys' Fees,

supporting memorandum, and Exhibits 1-4 and 6-15 were served upon all

counsel of record via ECF and via overnight delivery upon the following:

Nina M. Gussack, Esq.
PEPPER HAMILTON LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103


/s/ Dianne M. Nast