# EXHIBIT 1

```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                           - - -

IN RE:                      : MDL-07-1871
                            :
                            :
                            :
                            :
                            :
                            :
                            :
                            :
                            :
                            :
AVANDIA MARKETING,          :
SALES PRACTICES AND         : Philadelphia, Pennsylvania
PRODUCTS LIABILITY          : March 26, 2014
LITIGATION                  : 12:32 a.m.

                           - - -

                    TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE CYNTHIA M. RUFE
              UNITED STATES DISTRICT JUDGE

                           - - -

APPEARANCES:


For the Petitioner:  DIANNE M. NAST, ESQUIRE
                     NastLaw, LLC
                     1101 Market Street
                     Suite 2801
                     Philadelphia, PA   19107


                     JOSEPH ZONIES, ESQUIRE
                     Reilly Pozner, LLP
                     1900 Sixteenth Street
                     Suite 1700
                     Denver, CO   80202


                     VANCE R. ANDRUS, ESQUIRE
                     Andrus Wagstaff, PC
                     7171 West Alaska Drive
                     Suite 200
                     Lakewood, CO   80226
```

```
APPEARANCES:   (continued)



For the Petitioner:  BRYAN F. AYLSTOCK, ESQUIRE
                     Aylstock, Witkin, Kreis &
                     Overholtz, PLLC
                     17 East Main Street
                     Suite 200
                     Pensacola, FL   32502


                     STEVEN J. CORR, ESQUIRE
                     Jones Day
                     555 South Flower Street
                     Fiftieth Floor
                     Los Angeles, CA   90071


For the Respondent:  THOMAS V. GIRARDI, ESQUIRE
(Appearing by Video) KEITH D. GRIFFIN, ESQUIRE
                     Girardi/Keese
                     1126 Wilshire Boulevard
                     Los Angeles, CA   90017


For GlaxoSmithKline: NINA M. GUSSACK, ESQUIRE
                     Pepper Hamilton, LLP
                     3000 Two Logan Square
                     18th and Arch Streets
                     Philadelphia, PA   19103-2799

                          - - -

Audio Operator:      Erica Pratt

Transcribed by:      Donna Anders

                          - - -

          Proceedings recorded by electronic sound
recording, transcript produced by computer-aided
transcription service.

                          - - -
```

1    conditions of the MDL from the standpoint of what the

2    people got, et cetera.  I personally negotiated the

3    settlement.  I criss-crossed the country five times, had

4    specific meetings with respect to the settlement.

5              And quite frankly, Your Honor, I believe the

6    evidence is we got four times as much money for heart

7    attacks as the MDL, because of the preparation and work

8    that we did, along with investing $14 million of the

9    firm's own money for the proper cost of preparing the

10   case.

11             THE COURT:  Well, as I understand it ---

12             MR. GIRARDI:  Now --

13             THE COURT:  -- Mr. Girardi, as I understand

14   the process over the last seven years in this MDL, the

15   PSC did not direct any particular firm's settlement

16   agreements, did not intervene or interfere even when

17   requested in other firms' negotiations with GSK.  So

18   you're not in any different position than any other one

19   of them who had their firms and their firms' cases

20   settled with GSK.

21             Those are separate.  So I just want to clarify

22   here that that will never be a ground in this proceeding

23   upon which you can prevail.

24             So why don't you go back to whether or not you

25   used the material and the discovery that was amassed in

1    Number 1871, is admitted into evidence.)

2              MR. ZONIES:  Thank you, Your Honor.

3    BY MR. ZONIES:

4    Q    Mr. Andrus, what's the date of the order appointing

5    Mr. Sizemore of the Girardi Keese firm to the PSC?

6    A    The date was April 9th, 2008.

7    Q    Prior to that appointment to the PSC, Mr. Andrus,

8    did indeed the PSC, who ultimately became the PSC

9    members, perform any work to further the Avandia

10   litigation prior to this appointment?

11   A    They did.  If I may explain, in May of 2007, the

12   Nissen article which first discussed the relationship

13   between Avandia and an increased risk of heart attacks

14   was published.

15              A substantial number of attorneys self-

16   organized under the leadership of myself and Mr.

17   Aylstock, and that included Mr. Sizemore, our working

18   group worked independently of but also directly with GSK

19   prior to the creation of the MDL by the JPML, subsequent

20   to the creation and actually negotiated with GSK certain

21   terms involving, for example, plaintiff fact sheets,

22   prior to the date of this order.

23              So we started working in approximately July or

24   August of 2007.

25   Q    And during the period of time where there was work

1    right?

2    A    Yes, sir, on the left-hand side in the middle of the

3    column.

4    Q    Would it have been your habit and practice in your

5    business then to have forwarded this to Girardi Keese to

6    see if they had objection to their being listed as

7    someone who was obligated to pay the assessment on their

8    cases?

9    A    Yes, sir.

10   Q    Do you believe you did so?

11   A    I know I did so.

12   Q    Did you ever receive any objection from Mr. Girardi?

13   A    No.

14   Q    Until recently?

15   A    Not until these proceedings.

16             MR. ZONIES:  May I approach, Your Honor?

17             THE COURT:  Yes.

18   BY MR. ZONIES:

19   Q    Mr. Andrus, I've handed you what's been marked as

20   Exhibit 4.  Could you describe that document, please?

21   A    Exhibit 4 is another letter, virtually identical to

22   Exhibit 3.  Exhibit 3 was dated August 31st, 2009.

23   Exhibit 4 is yet another letter I sent to GSK, care of

24   Ms. Gussack, dated September 21st, 2009, to -- I mean,

25   it may be -- yes, it's exactly the same, and it has a

1    different Exhibit A because it may have additional or

2    different PSC members or counsel that we think their

3    cases were covered.

4    Q   And is Girardi Keese listed indeed on Exhibit A for

5    that document, that letter as well?

6    A   Let me look.  Yes.  And you can see Exhibit A on

7    Number -- Exhibit Number 4 is laid out differently -- in

8    a different manner column-wise than Exhibit 3, but, yes,

9    they are listed.

10   Q   And to your knowledge, did you ever receive any

11   notice or objection from Mr. Girardi or the Girardi

12   Keese firm about whether or not they believed they owed

13   the assessment at that time?

14   A   I did not receive any such objection.

15   Q   And, Mr. Andrus, because you didn't receive any

16   objection, did the PSC continue to share information to

17   your knowledge with the Girardi Keese firm?

18   A    Indeed they did, both before and after Mr. Sizemore

19   departed.  While Mr. Sizemore was an employee of Girardi

20   Keese, he was Chair of our Science Committee.  He was

21   our head science guy at that time and was involved in

22   all discovery at -- and had access to all documents and

23   all work product.

24            MR. ZONIES:  May I approach, Your Honor?

25            THE COURT:  Yes.

1    date.  So they're being suspended pursuant to a Master

2    Settlement Agreement Girardi Keese entered into with

3    GSK.

4    Q   And do you see the numbers on some of these cases,

5    2:08 --

6    A   Yes.

7    Q   -- 2:11 or 11.  What do you understand those 08 and

8    11 to mean?

9    A   The Court allocates docket numbers by the date on

10   which they were filed, and so those cases were filed in

11   2008 through 2011.  That's my understanding of the

12   Court's numbering system.

13   Q   And then it's signed on the second page, the

14   stipulation and order to place in administrative

15   suspense, is that right?

16   A   That -- yes.

17   Q   And what's the -- what is the -- is the Girardi

18   Keese firm listed on that signature block?

19   A   It is.

20   Q   And what's the date of that signature of either Mr.

21   Girardi or Mr. Griffin in this stipulation filed in this

22   MDL for the 20-plus cases that were active in this MDL

23   from 2008 through 2011 while these PSC members were

24   working?

25   A   It's 10-4-12, October 4th, 1912 -- I mean, 2012.

1          MR. GIRARDI:  Well, I'll object -- I'll object

2     to that.  He's answered the question.

3          THE COURT:  Well, actually, you did ask him to

4     answer the question, and he's explaining his answer.

5     Overruled.  You may answer, Mr. Andrus.

6          MR. GIRARDI:  Okay.

7          THE WITNESS:  The reason for that, Your Honor,

8     is the bell -- just as the bell can't be unrung, once

9     one shares common benefit -- a common benefit work

10    product with another, the other then knows and

11    understands.  I disagree with Mr. Girardi that he didn't

12    use our stuff because I think he did and I think our

13    evidence can demonstrate that.

14          But the point is that Mr. Girardi himself, Mr.

15    Griffin himself, attended strategy conferences in which

16    there was a full explication of all the trial strategy,

17    tactics, documents.  They were provided copies of all of

18    our documents, and that enures to the benefit of every

19    client that he has, not only those in 2008 or 2009, but

20    every one to the very last one.  And that, Mr. Girardi,

21    is why I respectfully disagree with your interpretation.

22    BY MR. GIRARDI:

23    Q   Well, sir, the document says, by its terms, and the

24    only document that you have a signature on of Keith

25    Griffin says that -- it provides that there is an

1    and because of Pretrial Order Number 10.

2           I -- I'm sorry, Your Honor.  I don't want to

3    debate with Mr. Girardi about that.  We just have a

4    disagreement about what it means.

5    BY MR. GIRARDI:

6    Q    The $200,000 that apparently Sizemore was entitled

7    to, was never paid to our firm, isn't that correct?

8    A    That's incorrect.  Your firm rejected the payment.

9    Your firm submitted common benefit time, at least

10   through the time that Mr. Sizemore left.  That time,

11   ultimately, was adjudicated and was subject to an order

12   of this Court, awarding your firm a common benefit fee

13   of $200,000, the check for which you did return and said

14   words to the effect, we don't want this or this -- this

15   isn't ours or please, keep this money.  And you sent the

16   money back.

17   Q    And then, your common benefit fees were -- amounted

18   to $17,150,000?

19   A    I -- well, I don't --

20   Q    Did they or not?

21   A    No, I -- I don't recall it being that big, and I

22   wish it was.  I don't recall it being that big a number,

23   but the award -- no, I don't think my award was that

24   amount.  I think it was less than that.  I think it was

25   still much larger than the one you're talking about, and

Mr. Andrus - Redirect                    67

1     it's contingent in part on the ultimate collections,

2     which the Common Benefit Assessment Fee Fund acquires.

3     So the answer is, no, I haven't been paid $17 million.

4     Q   Did you put out 14 million in costs in the case?

5     A   Well, I don't know.  Did you -- our Plaintiffs'

6     Steering Committee, I believe --

7     Q   No, sir, you.

8     A   Me, personally?  No.

9     Q   Yes.

10    A   No.

11            MR. GIRARDI:  I have nothing further, Your

12    Honor.

13            THE COURT:  Thank you.  Any redirect?

14            MR. ZONIES:  Just one question, Your Honor.

15    I've made the mistake of saying that.

16                    REDIRECT EXAMINATION

17    BY MR. ZONIES:

18    Q   Mr. Andrus, to your knowledge, does the allocated

19    amount for the Girardi Keese firm remain in trust,

20    awaiting Girardi Keese's decision to -- whether or not

21    he would like to change his mind?

22    A   It does.  The fund administrator has placed that

23    money in suspense, and he does -- well, he -- he is

24    simply holding it until there is a resolution by this

25    Court as to whether or not -- I don't know -- as to the

Mr. Andrus - Redirect                              68

1    disposition of it, whatever that might be.

2              MR. ZONIES:  Nothing further for this witness,

3    Your Honor.

4              THE COURT:  Anything further, Mr. Girardi, for

5    this witness?

6              MR. GIRARDI:  Nothing -- nothing further, Your

7    Honor.

8              THE COURT:  Thank you.  You may step down.

9              THE WITNESS:  Thank you.

10             (Witness excused.)

11             MR. ZONIES:  Your Honor, I call Mr. Justin

12   Kaufman from the Heard Robins law firm.

13             JUSTIN KAUFMAN, PETITIONER'S WITNESS, SWORN.

14             COURTROOM DEPUTY:  Please state your full name

15   for the record?

16             THE WITNESS:  Justin Kaufman.

17             THE COURT:  Would you please spell your last

18   name?

19             THE WITNESS:  K-A-U-F-M-A-N.

20                      DIRECT EXAMINATION

21   BY MR. ZONIES:

22   Q    Good afternoon, Mr. Kaufman.

23   A    Good afternoon.

24   Q    Could you please describe for the Court what you do

25   and with whom you do it?

1    A    Sure.  I am a partner with the law firm Heard Robins

2    Cloud.  I am out of the Santa Fe, New Mexico office.  My

3    partner, Bill Robins, was a member of the Plaintiffs'

4    Steering Committee in the Avandia litigation.  Bill and

5    I worked together on the Avandia litigation from 2011,

6    from the time Bill was appointed to the PSC, through the

7    time that we settled our Avandia cases in January of

8    2012.

9              That settlement came about shortly before we

10   were ready to try our first bellwether case in the

11   California JCCP.

12   Q    So, you -- Heard Robins and you, personally, worked

13   on cases that were, indeed, in the California JCCP,

14   along with some of Mr. Girardi's cases, is that right?

15   A    That's right.

16   Q    Were you actively involved in that California

17   litigation?

18   A    We were.

19   Q    You heard testimony perhaps today from Mr. Girardi,

20   under oath, that he did not use or utilize any of the

21   MDL work product or experts or documents, other than

22   receiving those documents that were generated, and the

23   work done here in the MDL, have you heard that testimony

24   today?

25   A    I have.

Mr. Kaufman - Direct                                    70

1    Q    Do you agree with that?

2    A    I don't.

3    Q    Why not?

4    A    Starting in the middle of 2011, there were a number

5    of cases that were chosen as trial pool cases in the

6    California JCCP.  Our firm represented clients in that

7    trial pool, as did Mr. Girardi's firm.  When the cases

8    were chosen as trial picks, all of those cases, and all

9    of those plaintiffs' firms worked together on all of

10   those cases.

11        All of those cases faced summary judgment

12   motions from the defendant, and together, all of the

13   plaintiffs' lawyers worked together to oppose those

14   summary judgment motions.  In opposition to those

15   summary judgment motions, all of the plaintiffs' lawyers

16   utilized MDL work product that had been developed since

17   you and Mr. Andrus and Mr. Aylstock and everyone else

18   had begun the MDL shortly in the middle of 2007 and all

19   of the work product that had been developed up until

20   that point.

21        And so when the summary judgment motions came

22   up in California, the pleadings very much relied upon

23   the evidence that was developed by the MDL, and our

24   firms collectively filed pleadings relying upon that

25   work product.

Mr. Kaufman - Direct                                71

1    Q    And by our firms, who do you mean?

2    A    The Heard Robins firm, the Girardi firm, as well as

3    other firms that had represented clients in the

4    California JCCP, as well as clients in the MDL.

5    Q    And you were personally involved in these

6    litigations in California?

7    A    We were, yes.

8    Q    Do you know, for example, whether or not the Girardi

9    Keese firm relied upon experts that had been developed

10   completely in the MDL?

11   A    Yes.  We relied upon a handful of experts, in

12   particular, in order to oppose the summary judgment

13   motions that were filed by GSK.  There were three

14   experts who we used to file declarations in California

15   in support of our summary judgment oppositions.

16           Those experts were Dr. Suzanne Parisian, Dr.

17   Elliot Brinton and Dr. Nicholas Jewell.  They filed

18   declarations in our cases in California, and we, in

19   opposition to the summary judgment motion, cited and

20   relied upon those declarations in support of our

21   oppositions.

22   Q    And Dr. Jewell is a biostatistician, is that right?

23   A    He is, yes.

24   Q    And Dr. Jewell was the biostatistician that this

25   Court held Daubert hearings on, and he came and he

1    testified.  And he was able to get past <u>Daubert</u>

2    challenges in the MDL?

3    A   Yes, that's correct.

4    Q   The same with Dr. Elliot Brinton?

5    A   Yes.

6    Q   Dr. Elliot Brinton testified before this Court in

7    the <u>Daubert</u> hearings?

8    A   That's right.

9    Q   And the same with Dr. Parisian, as well, correct?

10   A   Yes.

11              MR. ZONIES:  May I approach, Your Honor?

12              THE COURT:  You may.

13              (Pause in proceedings.)

14   BY MR. ZONIES:

15   Q   Mr. Kaufman, I have handed you what's been marked as

16   Exhibit 6 -- 7?

17              MS. NAST:  7.

18              THE COURT:  7.

19   BY MR. ZONIES:

20   Q   Exhibit 7.  Do you see that document?

21   A   Yes.

22   Q   And Exhibit 7, actually, the lead page on it says,

23   Exhibit C, is that right?

24   A   Yes.

25   Q   And what do you -- can you describe, please, what

1    Exhibit 7 is?

2    A   Exhibit 7 is the plaintiffs' exhibit list that was

3    filed in a case captioned Nancy LeVoise (ph) -- I don't

4    know if I'm pronouncing that correctly -- versus GSK.

5    Q   And can you describe, please, what that document is?

6    A   This is an exhibit list that was filed by the

7    plaintiffs in the LeVoise versus GSK case.  It lists

8    some 2,300 or 2,400 documents as exhibits in that case.

9    Q   Do you know who counsel was on the LeVoise case?

10   A   It was the counsel for the Girardi Keese firm.

11   Q   This is the Girardi Keese client in the JCCP?

12   A   It's one of their clients, yes.

13   Q   And there -- as you pointed out, there are over

14   2,395 exhibits listed on this -- on this exhibit list

15   for that trial, is that right?

16   A   Yes.

17   Q   And the -- did you have any role in creating this

18   exhibit list?

19   A   Yes.  This document took some years off of my life.

20   This was an exhibit list that began in the MDL.  At the

21   time when the MDL prepared it, it had some 1,000

22   exhibits on it.  And in the time that Bill Robins and I

23   were working in the MDL, as well as in California, we

24   added approximately another 1,000 documents to this list

25   in preparation for the California trial settings.

1    Q    Okay.  And to your knowledge, did Mr. Girardi or his

2    firm have any input into this exhibit list?

3    A    This exhibit list was provided to the Girardi firm,

4    as it was prepared by our firm, leading up to our trial.

5    There may be documents on this that Mr. Girardi's firm

6    added to.  I don't see them, but for the most part,

7    given the MDL numbers on this document, I know that

8    these are documents from the MDL that we provided in the

9    list itself.

10   Q    And when you say, from the MDL numbers on the

11   document, what do you mean?

12   A    The documents are listed by Bates number, and the AV

13   MDL Bates numbers are Bates numbers that were applied by

14   GSK when GSK produced the documents to the Plaintiffs'

15   Steering Committee in the Avandia MDL.  That's how they

16   designated their documents.

17   Q    And do you see any documents on here that say AV-CA-

18   JCCP?

19   A    I don't.

20           MR. ZONIES:  May I approach, Your Honor?

21           THE COURT:  You may.

22   BY MR. ZONIES:

23   Q    Mr. Kaufman, I have handed you --

24           MR. ZONIES:  Your Honor, I move for admission

25   of Exhibit 7.

1      THE COURT:  Any objection?

2      MR. GIRARDI:  We have no objection.  No

3  objection.

4      THE COURT:  Thank you.  It is admitted.

5      (Petitioner's Exhibit 7, trial exhibit list,

6  is admitted into evidence.)

7  BY MR. ZONIES:

8  Q   Mr. Kaufman, I have handed you Exhibit 8.  Do you

9  have that in front of you?

10  A   Yes, I do.

11  Q   And what is Exhibit 8?  What is your appreciation of

12  what Exhibit 8 represents?

13  A   Exhibit 8 is a joint witness list for trial that was

14  filed in the California JCCP, relating to the case,

15  Nancy LeVoise versus SmithKlineBeecham/GlaxoSmithKline.

16  Q   And again, what is your understanding of who the

17  counsel is for Ms. LeVoise?

18  A   My understanding is that, counsel for Ms. LeVoise

19  was the Girardi Keese firm.  And this -- this document,

20  witness lists for trial, has a complaint filed date.

21  What is that date that that was filed in California?  Do

22  you see that on the first page, under the caption,

23  Witness Lists for Trial?

24  A   The complaint file date is May 19th, 2009.

25  Q   Okay.  And than what is the trial date?

1    A    April 11th, 2012.

2    Q    All right.  And let's take a look at some of the

3    plaintiffs -- well if you turn to the second page,

4    actually, there is a signature block.  Do you see that

5    signature block, the second one down?

6    A    Yes.

7    Q    And who does it purport to be the signature of on

8    the document?

9    A    It looks like Keith Griffin.

10   Q    At what law firm?

11   A    At Girardi Keese firm.

12   Q    And listed as attorneys for the plaintiff in the

13   case?

14   A    Yes, Nancy LeVoise.

15   Q    Exhibit A is the plaintiff's trial witness list, do

16   you see that?

17   A    Yes.

18   Q    All right.  Now, there are a number of -- in column

19   three, there appear to be, like, time numbers.  Do you

20   know what those are?

21   A    Yes.  Those are the deposition cut times for each of

22   these witnesses, so when we were preparing for trial and

23   did deposition cuts for each of these witnesses, when we

24   were preparing to play their videos during trial, those

25   are the time lengths for those videos.

1    Q    Okay.  And did you actually participate in the

2    creation of this document and, also, the cutting of

3    those depositions?

4    A    Yes.

5    Q    And I just want to go through a few of these, if we

6    can, Mr. Kaufman.  The first one that says, Susan

7    Abelson, R.N., plaintiff's treating physician, do you

8    see that?

9    A    Yes.

10   Q    You understand that that's Ms. LeVoise's doctor in

11   the case?

12   A    That's my understanding, yes.

13   Q    Okay.  So I am going to call things like that case

14   specific, and then, if we talk about somebody like

15   Allaster Benbot (ph), that's a GSK employee.  Do you see

16   that second one?

17            Yes, and Dr. Benbot was a witness whose

18   deposition I took in the UK.  Do you recognize -- do you

19   know if Girardi Keese had any role, whatsoever, in the

20   deposition of Mr. Benbot, that GSK employee?

21   A    I don't believe they did, no.

22   Q    Okay.  So, I'll call things like that, sort of the,

23   general liability witnesses.  Does that make sense to

24   you, the distinction?

25   A    Yes.

Mr. Kaufman - Direct                           78

1    Q    Okay.  So, Joanna Bulsreck (ph), do you know whether

2    the MDL or Mr. Girardi and Girardi Keese took that

3    deposition?

4    A    Counsel for the MDL took that deposition.

5    Q    Okay.  Mr. Cardinale (ph), in particular?

6    A    Yes.

7    Q    Okay.  And these are -- these are plaintiff's trial

8    witnesses, the witnesses that, apparently, Girardi Keese

9    intends to call at his trial in California, correct?

10   A    That's my understanding, yes.

11   Q    All right.  The next GSK employee is David Brand

12   (ph).  Do you know if the MDL took that deposition or

13   was it Girardi Keese?

14   A    The plaintiffs' lawyers and the MDL took the

15   deposition of David Brand.

16   Q    Elliot Brinton, it says, plaintiffs' expert.  We

17   discussed Dr. Brinton a little earlier.  Do you know if

18   Dr. Brinton was, indeed, found by, worked up and

19   presented by the MDL at a Daubert hearing in the MDL or

20   did Mr. Girardi and Girardi Keese do that?

21   A    No.  Dr. Brinton's work on this case was worked up

22   through the MDL and was subject to Daubert hearings,

23   here, in this Court, and he survived those hearings.

24   Q    And, then, if we look at -- I'll just summarize --

25   Buckingham, Caponie, Carr, all the ones that say GSK

1    employee, Kollitz, Kekettle, Kolier, Rahl, even these

2    third-party witnesses like, Marty Fried, Jeffery Fried,

3    Dr. Garnier, the CEO at one point in time, Dr. Gavin,

4    GSK's expert, Dr. Gibbs, do you know who prepared and

5    took the depositions of all of those people that I just

6    listed?  Was it MDL lawyers or was it Mr. Girardi and

7    Girardi Keese?

8    A    These would all be MDL lawyers.

9    Q    And if we turn to the next page, would that same

10   thing be true for every witness on that next page, other

11   than the case specific witnesses, as far as you know?

12   A    That's true.  As far as I know, that's true.

13   Q    So, Dr. Hefner, David Harrison, Mark Hiese, Dr.

14   Holme, were the MDL -- do you know, whether or not --

15   indeed, you may know this.  Do you know whether or not

16   the MDL flew to the UK to take the deposition of Dr.

17   Holme?

18   A    I do know that the MDL flew to the UK to take the

19   deposition of Dr. Holme.

20   Q    Do you know, did Girardi Keese pay any of the

21   expenses associated with that trip?

22   A    I don't know if they did.

23   Q    Dr. Jewell is an MDL expert, is that right?

24   A    Yes.

25   Q    And I could go on through this list.  I don't want

1   Q   And you had nothing to do with the settlement

2   negotiations of our cases with the defendant, isn't that

3   correct?

4   A   That's correct.

5   Q   And as a matter of fact, we had our own -- we made

6   our own demands for documents, of which the defendant

7   said, please just get those from the MDL.  You know

8   that, don't you?

9   A   I didn't know that.  I know that our firm made those

10  documents available to you.  The MDL documents, we made

11  them available to you and your firm.

12  Q   Right.  And that is because, the defendant said, we

13  don't want to do this again.  We've done it.  We

14  appreciate the fact that you're entitled to it, but

15  we've already done it, so please, get a copy of these

16  documents.  That's what happened, isn't it?

17  A   I don't know that.

18  Q   Okay.  And, then, of the major witnesses that are

19  going to put the case together, for example, Dr.

20  Maracangus (ph), he was the key guy for the plaintiffs'

21  case, wasn't he?

22  A   I'm sorry, could you say that name again?

23  Q   Maracangus.

24  A   I don't know who that is.

25  Q   Okay.  And the fact of the matter is, that we've

1                          I N D E X

2

3   PETITIONER'S OPENING STATEMENT            PAGE NUMBER

4      By Mr. Zonies                               7

5

6   RESPONDENT'S OPENING STATEMENT            PAGE NUMBER

7      By Mr. Girardi                              11

8

9   PETITIONER'S WITNESSES      DIRECT CROSS REDIRECT RECROSS

10  Vance R. Andrus

11     By Mr. Zonies              43            67

12     By Mr. Girardi                  61

13  Justin Kaufman

14     By Mr. Zonies              68

15     By Mr. Girardi                  81

16

17  PETITIONER'S EXHIBITS             ADMITTED INTO EVIDENCE

18  1   Document 108 from MDL Number 1871        45

19  2   Attorney Participation Agreement         48

20  3   Letter dated 8-31-09 from Vance Andrus   50

21  4   Letter dated 9-21-09 from Vance Andrus   55

22  5   PTO 70 of MDL 1871                        58

23  6   Document 2740 of MDL 1871                 60

24  7   Trial exhibit list                       78

25  8   Joint witness list                       80

## CERTIFICATION

I, Donna M. Anders, do hereby certify that the foregoing is a true and correct transcript from the electronic sound recordings of the proceedings in the above-captioned matter.

4/2/14
Date

Donna M. Anders