**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **IN RE: AVANDIA MARKETING,** : | **MDL NO. 1871** |
| **SALES PRACTICES, AND PRODUCTS** : | **07-MD-1871** |
| **LIABILITY LITIGATION** : | |
| : | |
| : | |
| **THIS DOCUMENT APPLIES TO:** : | |
| **ALL ACTIONS** : | |
| : | |

## MEMORANDUM OPINION

**Rufe, J.**                                                      **July 21, 2015**

In February 2015, the Plaintiff's Advisory Committee ("PAC") in the federal Avandia

Multi-District Litigation ("MDL") filed a motion for an order to show cause why claims settled

in the Illinois state court Avandia action captioned *Gabel v. GlaxoSmithKline* should not be

considered "covered claims" subject to the Avandia MDL common benefit assessment, pursuant

to Pre-Trial Order Number 70 ("PTO 70"). The Court issued the requested order to show cause.

Lead counsel for the *Gabel* plaintiffs, the Law Offices of Steven M. Johnson, P.C. ("Johnson

Firm"), contests the MDL Court's jurisdiction to enter or enforce any orders reaching it or its

clients. The parties briefed the relevant issues, and the Court held a hearing on April 22, 2015, at

which attorneys Michael Baum and Erick Rosemond testified as fact witnesses.

I.     Background

The Avandia MDL was created in 2007 to consolidate, for pretrial proceedings, all

product liability cases against GlaxoSmithKline, the maker of Avandia, filed in or properly

removed to federal court. This Court, which oversees the Avandia MDL, created a Plaintiff's

Steering Committee ("PSC"), which spent years conducting fact and expert discovery and

briefing pretrial motions.[1] On August 26, 2009, the Court entered Pretrial Order 70 ("PTO 70"), establishing the Avandia common benefit fund. This is a funding mechanism to reimburse plaintiffs' lawyers (including but not limited to PSC members) for expenses and time spent conducting discovery and litigating legal issues for the common benefit of all MDL plaintiffs.

Although all federal cases were consolidated in the MDL, thousands of Avandia cases were litigated in state courts. In some state court cases, plaintiffs' counsel entered into voluntary Attorney Participation Agreements with the PSC, agreeing to pay an assessment to the Fund, as outlined in PTO 70, in exchange for access to the MDL common benefit work product.[2] By its express terms, once counsel signs on to the Attorney Participation Agreement, all Avandia claims in which counsel has a financial interest (including filed state and federal claims, as well as tolled and unfiled claims) are "covered claims," subject to a common benefit fund assessment. PTO 70 further provides that a total assessment of 7% of gross monetary recovery applies to all covered claims, with 4% deducted from attorneys' fees and 3% from the clients' shares of the recovery.

In 2009, the Johnson Firm filed a multi-plaintiff lawsuit, *Gabel v. GlaxoSmithKline*, in Illinois state court. The Complaint alleged that the claimants had been injured by the ingestion of Avandia. The *Gabel* case was litigated exclusively in state court; neither the individual plaintiffs nor the Johnson Firm litigated any Avandia claims in federal court.

In Spring 2012, Johnson attended an Avandia litigation meeting led by Paul Kiesel, who had been appointed by this Court as coordinating counsel for the MDL.[3] The meeting was

---

[1] After thousands of claims were settled in early 2012, the Court terminated the PSC. The Court created the PAC to ensure that a small number of PSC members with valuable historical knowledge about the MDL would remain available to serve the litigation, in a limited, advisory capacity, after settling their claims.

[2] *See* PTO 70 and its attachments.

[3] April 22, 2015 Hearing Tr. at 28-30.

2

convened after thousands of MDL cases and claims had been settled, for the purpose of

distributing the MDL's work product, dubbed "trial in a box," to attorneys still litigating Avandia

cases in state courts.[4] Kiesel announced that he would be circulating paperwork (the PTO 70

Participation Agreement and the PTO 10 Confidentiality Agreement), which the attorneys

present should sign as a prerequisite to obtaining the MDL "trial in a box" flash drives being

distributed at the meeting.[5]

During that conference, Johnson met with Michael Baum of the law firm Baum, Hedlund,

Aristel & Goldman ("Baum") and Erick Rosemond of Rosemond Law Group, P.C.

("Rosemond"), both of whom had cases in the MDL, had signed the PTO 10 Confidentiality

Agreement and the PTO 70 Attorney Participation Agreement in the course of litigating those

cases, and had performed common benefit work for the MDL. As signatories to the Participation

Agreement, Baum and Rosemond agreed to pay "the assessment amount provided in paragraph 4

of [PTO 70] on all filed and unfiled cases or claims in state or federal court in which they share a

fee interest."

Knowing of Baum and Rosemond's connection to the MDL, and "hopeful that by having

a trial team, it would enable him to get the type of settlements he thought his cases ought to

receive,"[6] Johnson asked Baum and Rosemond to serve as trial counsel in *Gabel*. Rosemond

testified that Johnson understood that Rosemond "had worked extensively with the PSC, knew

the PSC's work product and was well positioned to go get his cases ready for trial."[7] Baum

---

[4] Baum and Rosemond testified that the "trial in a box" included expert reports on general causation and liability and access to those experts, transcripts and demonstratives from *Daubert* hearings, a database of documents that was sorted and indexed, deposition transcripts, the deposition "cuts" the PSC had made, model motions *in limine* and model responses to defense motions *in limine*, and other MDL work product.

[5] Hearing Tr. at 30.

[6] Hearing Tr. at 35 (testimony of Baum); see also Hearing Tr. at 62-63 (testimony of Rosemond).

[7] Hearing Tr. at 63.

3

testified that Johnson understood that if he retained Baum and Rosemond as trial counsel, they would use the MDL work product in *Gabel* and a common benefit assessment would be owed from any recovery or settlement.[8] Baum and Rosemond agreed to assist as trial counsel, and they filed *pro hac vice* motions and entered appearances in the *Gabel* case.

Baum testified that he proposed a fee split of the Johnson Firm's contractual contingency fee agreements, based upon which Baum believed that he would receive 75% of fees obtained from bellwether trials, and 10% of fees from all other cases in the *Gabel* litigation.[9] Email communications between Baum and Johnson regarding fee sharing again made it clear that trial counsel were planning to use the MDL trial in a box and other work product, and indicated that trial counsel's fees would be calculated on the balance of the fees remaining after subtracting the debt owed to the PSC for the use of the MDL work product.[10] Although trial counsel believed they had reached a fee-sharing agreement with the Johnson Firm via email, and began conducting depositions and working up cases for the *Gabel* trials based upon this belief, the fee-sharing agreement was not formalized by the parties. Baum testified that he was reimbursed for expenses incurred litigating the *Gabel* case (nearly $200,000), and received 75% of the fees generated from the trial pick cases, but the division of fees for the other settled claims is currently being litigated in state court.[11]

The judge in the *Gabel* case had scheduled trials beginning in the fall of 2012, and so Baum and Rosemond immediately began to prepare for trial. Baum testified that he reviewed Johnson's entire inventory of cases, and identified cases which would make viable bellwether

---

[8] Hearing Tr. at 37.

[9] Hearing Tr. at 35-36.

[10] Hearing Tr. at 35-36.

[11] Hearing Tr. at 36, 41-42.

4

cases. Baum testified that "neither Mr. Johnson nor his local counsel knew enough about the science and mechanisms of liability in the cases to figure out which ones would be good bellwethers and they, in fact, had selected some that were not suitable."[12] Baum testified that because of the short time frame, counsel all agreed that trial counsel would be using the MDL "trial in a box," including the MDL's experts and their reports, and other MDL work product.[13] He further testified that he explained to Johnson, in an email, that because they were relying upon MDL work product, the cases in the *Gabel* case would be subject to the common benefit fund assessment, although they could discuss the possibility of a set-off or reduction of the assessment required by PTO 70 with the MDL PAC.[14] The relevant email chain was introduced into evidence at the hearing (PSC Exhibit 6). In preparing for the *Gabel* trials, Baum relied primarily upon the MDL database of discovery documents, which had been assembled, coded, and organized by the PSC, rather than the discovery produced directly to the Johnson Firm from GSK.[15] He worked with the MDL experts to provide updated reports, incorporating new research and regulatory findings.[16] And he and Rosemond used MDL work product to support successful motions to take the deposition of the CEO of GSK or a surrogate.[17] Rosemond also testified that he used the MDL work product extensively in his capacity as trial counsel for the *Gabel* cases.[18]

Late in 2012, before any trial began, but while Baum was "feverishly getting all of the last bits of trial prep done, all the last bits of motions, motions in limine, summary judgment

---

[12] Hearing Tr. at 39.

[13] Hearing Tr. at 35.

[14] Hearing Tr. at 36-38.

[15] Hearing Tr. at 40-41.

[16] Hearing Tr. at 39-40.

[17] Hearing Tr. at 64-65.

[18] Hearing Tr. at 64.

oppositions, the depo designations . . . ,"[19] the Johnson Firm was, unbeknownst to Baum, negotiating a master settlement agreement with GSK. By December 10, 2012, the Johnson Firm had reached an agreement in principle with GSK to settle the claims asserted on behalf of the *Gabel* plaintiffs, although the details of that agreement were not worked out for some time. Rosemond testified that because they had been getting a case ready for trial, the *Gabel* plaintiffs received a more favorable settlement than any they had been offered prior to Baum and Rosemond's involvement.[20]

In January 2015, the Illinois state court entered an order requiring GSK to hold 7% of the *Gabel* settlement fund in reserve, pending disposition of any MDL common benefit fund obligations under the MDL's PTO 70. Pursuant to that order, the reserved funds are being held in an attorney trust account in Philadelphia. The Illinois court scheduled a hearing to determine whether Johnson and its clients were obligated to pay a common benefit assessment to the MDL's common benefit fund, pursuant to PTO 70. Before the Illinois court could hold that hearing, however, the PAC moved for an order to show cause why the MDL Court should not interpret its own order and determine whether a common benefit assessment is owed. The Court issued the order to show cause.

In response, trial counsel for the *Gabel* case, Baum and Rosemond, filed declarations stating that their firms did not dispute their obligations to pay an assessment on all state and federal claims in which they had a fee interest, including the *Gabel* claims. Local (Illinois) counsel[21] for the *Gabel* case, Robert G. Jones, The Jones Law Firm, P.C., and David R. Jones,

---

[19] Hearing Tr. at 43.

[20] Hearing Tr. at 68.

[21] The Johnson Firm is a Texas-based law firm.

6

also filed a declaration indicating that they did not oppose payment of the common benefit fees to the PAC.

The Johnson Firm responded by challenging the Court's jurisdiction over it and its clients. Specifically, the Johnson Firm challenges both the Court's power and jurisdiction to issue an MDL order which purports to reach purely state court actions, and the Court's jurisdiction to enforce PTO 70 with regard to the *Gabel* settlement. The Court held a hearing, at which evidence was presented on the issue of the Court's jurisdiction to issue and enforce PTO 70.

II.    Discussion

    A.    Jurisdiction

As stated above, the Johnson Firm argues that the Court lacked the power to issue PTO 70 to the extent that it purports to govern law firms and claimants not participating in the MDL.[22]

In a recently issued non-precedential opinion, the Third Circuit ruled that it was within this Court's power to issue PTO 70, and that the Court has jurisdiction to determine whether the terms of PTO 70 have been violated when a member of the law firm against whom the PAC is seeking an assessment has signed an Attorney Participation Agreement.[23] In that matter, the Girardi Keese law firm argued that its state court Avandia claims should not be subject to the MDL's Common Benefit Assessment, and that the Court lacked jurisdiction to order GSK to hold back the 7% assessment.[24] The Court disagreed, and the Third Circuit affirmed the Court's ruling on appeal.

---

[22] See Hearing Tr. at 22.

[23] *In re: Avandia Marketing, Sales Practices and Products Liability Litigation*, Case No. 14-2980, 2015 WL 4036209 (3d Cir. July 2, 2015).

[24] PTO 70 provides that a law firm and its clients owe a common benefit assessment if: 1) the law firm has any cases in the MDL; 2) the law firm signed the Endorsement of Protective Order attached to PTO 10; 3) the law firm signed the voluntary Attorney Participation Agreement associated with PTO 70. In the Girardi Keese matter,

The Third Circuit recognized that 28 U.S.C. § 1407 does not expand the jurisdiction of a
district court overseeing multi-district litigation, but noted that, when supervising an MDL, a
district court is expected to craft a plaintiff's leadership organization to assist with case
management, and to fashion some way of compensating attorneys who provide a common
benefit to all plaintiffs.[25] The Third Circuit went on to say:

> Here, the District Court issued an order—Pretrial Order 70—
> dictating how it would allow the leadership organization—the
> Steering Committee—to be compensated. One way was to assess a
> percentage of recovery of the cases before the MDL. The District
> Court also permitted the Steering Committee to, essentially, trade
> work product for a share in the recovery in cases *not* before the
> MDL. The District Court identified a form agreement that the
> Steering Committee and interested counsel must use to participate
> in the common benefit scheme and "incorporated" the agreement
> into the Order.
>
> When a district court incorporates the terms of an
> agreement into a court order, a breach of the agreement would be a
> violation of the order. Because a district court has jurisdiction to
> determine whether one of its orders has been violated, it may
> adjudicate whether an agreement incorporated into a court order
> has been breached.[26]

The Third Circuit explained that:

> the [Attorney Participation A]greement itself is not the source of
> the District Court's authority. Rather, the District Court's authority
> over this dispute arose from its responsibilities to appoint and
> supervise a coordinating committee of counsel. The agreement was
> simply incorporated into an order the District Court was
> empowered to issue.
>
> Because it was within the District Court's power to issue an
> order governing how to compensate the Steering Committee for its
> work, and because Girardi Keese's Attorney Participation
> Agreement was incorporated into the order, the District Court had
> jurisdiction to adjudicate whether Girardi Keese breached the

---

the law firm had cases in the MDL and signed an Attorney Participation Agreement which was later associated with
PTO 70.

[25] See 2015 WL 4036209, at *4, citing *In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 547 (3d Cir.
2009).

[26] 2015 WL 4036209, at *4-5 (internal quotations and citations omitted).

Attorney Participation Agreement and thereby violated Pretrial
Order 70.[27]

This ruling from the Third Circuit affirms the Court's power to issue PTO 70, an order
which applies to both MDL claims and certain state court claims.

Whether the Court has the jurisdiction to enforce PTO 70 against the Johnson Firm,
which may not have signed the Attorney Participation Agreement, and the *Gabel* plaintiffs,
presents a close question even in light of the Third Circuit's recent decision. At the April 22,
2015 hearing, the PAC put forth no evidence that a member of the Johnson firm signed the
Attorney Participation Agreement. However, the PAC has argued that, regardless of whether a
member of the Johnson Firm personally signed the Attorney Participation Agreement, the firm in
effect agreed to be bound by that agreement and by PTO 70. The Johnson Firm knew that
signing the agreement was a prerequisite to receipt of MDL work product, and it chose to have
Baum and Rosemond enter appearances as trial counsel in the *Gabel* case, knowing they were
signatories to the Attorney Participation Agreement, for the express purpose of benefitting from
their experience with the MDL and their access to and familiarity with MDL work product.
Thus, the PAC argues, the MDL court has jurisdiction to adjudicate whether the Johnson Firm
owes a common benefit assessment.

The Court finds the PAC's evidence and argument persuasive. At the April 22, 2105
hearing, the Court heard credible evidence that the Johnson Firm was advised that the MDL
leadership would only release MDL work product to state court counsel who signed the Attorney
Participation Agreement, which is incorporated into PTO 70. The Court also heard credible
evidence that the Johnson Firm, which voluntarily retained Baum and Rosemond as trial counsel
for the *Gabel* case, knew that: 1) both the Baum and Rosemond firms were signatories to and

---

[27] 2015 WL 4036209, at *6.

9

bound by an Attorney Participation Agreement and PTO 70; 2) PSC work product, including the
"trial in a box" disseminated to those who signed an Attorney Participation Agreement at a
meeting Johnson attended, would be used in *Gabel* if the Johnson Firm retained Baum and
Rosemond as trial counsel; and 3) that each of the state court claims would be subject to a
common benefit assessment pursuant to PTO 70.[28] The Court finds that the Johnson Firm
intentionally sought out and then relied upon the MDL work product to advance the *Gabel*
litigation, knowing that, in doing so, it was obligating itself to pay a common benefit assessment.
The availability of the Avandia MDL PSC's work product, which has been offered to state court
counsel with restrictions and conditions established by the MDL parties and adopted by Order of
the MDL Court, does not, and should not, allow windfall opportunities to state court litigators to
benefit from this work product without fair consideration. In light of the evidence, the Court
holds that the Johnson Firm agreed to be bound by the Attorney Participation Agreement and
PTO 70 through its voluntary association with Attorney Participation Agreement signatories
Baum and Rosemond in the *Gabel* litigation. Therefore, the Court holds that it has jurisdiction
over the Johnson Firm, for the purpose of determining whether it owes a Common Benefit
Assessment pursuant to the Attorney Participation Agreement and PTO 70.

 The Johnson Firm also argues that the Court does not have jurisdiction over its clients,
the plaintiffs in the *Gabel* case, and therefore it cannot order the clients to pay their 3% share of
the common benefit assessment. The Johnson Firm correctly points out that the Court has heard
no evidence that the individual claimants in the *Gabel* case agreed to be bound by the Attorney
Participation Agreements that Baum and Rosemond entered into prior to being retained in the
*Gabel* case. However, the Court need not determine whether it has jurisdiction over the

---

[28] The Court is unable to determine, from the record before it, whether the Johnson Firm informed the
*Gabel* plaintiffs that it had retained Baum and Rosemond as trial counsel.

10

individual *Gabel* plaintiffs. Consistent with the guidance provided by the Third Circuit in its recent opinion, the Court holds that it has jurisdiction to order GSK to withhold from the *Gabel* settlement funds the full 7% assessment contemplated by PTO 70, as Third Circuit held that counsel for the settling state court claimants "promised to contribute the entire [common benefit] assessment, and the District Court could ensure that it complied with the agreement and Pretrial Order 70. Whether [counsel] must reimburse its clients for that share of the assessment is a question governed by the representation agreement between [counsel] and its clients."[29]

B.      Applicability of PTO 70 to the *Gabel* Claims

Although the Johnson Firm appeared before the Court for the sole purpose of challenging the Court's jurisdiction, in this case, the facts upon which the Court relied in concluding that PTO 70 can validly apply to the *Gabel* case also support the conclusion that a common benefit assessment is owed. Indeed, at the hearing, counsel for the Johnson Firm stated: "I am not presenting any question of the interpretation of PTO 70. . . . My question is exclusively whether or not PTO 70 can validly apply to a state court case over which there is no subject matter jurisdiction. . . . I have assumed all along that the drafters and Your Honor intend PTO 70 to apply to these cases."[30] The Court having found that PTO 70 can validly apply to the Johnson Firm and the *Gabel* case, and there being no other dispute as to the obligation to pay the common benefit assessment, and given that trial counsel Baum and Rosemond signed the Attorney Participation Agreement, the Johnson Firm retained Baum and Rosemond to serve as trial counsel in the *Gabel* litigation, and the PSC's work product was used for the benefit of the *Gabel* plaintiffs, the Court will order the payment of the common benefit assessment on all cases in which any of these counsel had a fee interest, pursuant to PTO 70.

---

[29] 2015 WL 4036209, at *6, n. 5.

[30] Hearing Tr. at 91.

11

III.    Conclusion

    For the reasons set forth above, the Court holds that it has jurisdiction over the Johnson Firm for the purpose of interpreting PTO 70 and determining whether an assessment is owed to the Common Benefit Fund, pursuant to PTO 70, for the settled *Gabel* claims. The Court further holds that, pursuant to PTO 70, a 7% assessment to the Common Benefit Fund is owed on all settled claims in the *Gabel* case. An appropriate Order follows.