**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

<table>
<tr><td>

IN RE: AVANDIA MARKETING,
SALES PRACTICES AND PRODUCTS
LIABILITY LITIGATION

---

THIS DOCUMENT APPLIES TO:
ALL THIRD-PARTY PAYOR ACTIONS

</td><td>

MDL NO. 1871
07-md-1871

</td></tr>
</table>

<u>OPINION</u>

**Rufe, J.**                                                           **May 22, 2025**

Plaintiffs, Third Party Payors United Food and Commercial Workers Local 1776 and

Participating Employers Health and Welfare Fund and J.B. Hunt Transport Services, Inc.

(collectively, "the Plans"), filed suits against Defendant GlaxoSmithKline LLC ("GSK") alleging

violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and various

state consumer protection laws in connection with the marketing of the diabetes drug Avandia.[1]

These actions were incorporated into the *In re Avandia Marketing, Sales Practices and Products*

*Liability* Multi-District Litigation ("MDL").[2] The Court now addresses the Plans' motion for

class certification.[3]

**I.      BACKGROUND**

GSK produces, markets, and distributes oral medications to treat Type II diabetes

mellitus under the brand names Avandia, Avandamet, and Avandaryl (collectively, "Avandia").[4]

---

[1] There were originally four relevant third-party payor actions brought by: (1) Allied Services Division Welfare
Fund ("Allied") (No. 09-730); (2) United Benefit Fund ("UBF") (No. 10-5419); (3) UFCW Local 1776 and
Participating Employers Health and Welfare Fund ("UFCW") (No. 10-2475); and (4) J.B. Hunt Transport Services,
Inc. ("J.B. Hunt") (No. 11-4013). The claims asserted by Allied and UBF have been voluntarily dismissed with
prejudice. *See* Nov. 10, 2016 Order [Doc. No. 5033]; Nov. 22, 2016 Order [Doc. No. 5041].

[2] *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 07-md-1871 (E.D. Pa.).

[3] TPPs' Mot. Class Cert. [Doc. No. 5501].

[4] The Court has written at length on this matter and assumes the parties' familiarity with the facts. *See, e.g.*, *In re
Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 07-md-1871, 2017 WL 11619528, at *1–2 (E.D. Pa. Dec. 7,

The Plans allege that GSK engaged in deceptive marketing practices by failing to disclose information contradicting the purported cardiovascular benefits of Avandia as compared to other available medications. The Plans further allege that, had they been given this information prior to 2007, they would not have included Avandia on their formularies and would not have paid a higher premium for Avandia prescriptions over other diabetes drugs.

The Plans moved for class certification to certify the following class of third-party payers ("TPPs") who allege injury arising from the alleged fraudulent marketing by GSK:

> All entities in the United States and its territories, which indirectly purchased, and/or provided reimbursement for some or all of the purchase price for the drugs Avandia, Avandamet, and/or Avandaryl from May 25, 1999 until August 14, 2007.

> Included in the Class are self-insured non-government entities and third-party payers that offer insured plans to private individuals and groups. Likewise third-party payers that offer insured plans to government entities including the Federal Employee Program, Managed Medicaid, and Medicare Part D are class members.[5]

The Plans further clarified that the following are excluded from the proposed class:

> (i) governmental entities other than municipalities and/or local governments with self-funded prescription drug plans; (ii) fully insured health plans, i.e., plans for which the insurer bears 100% of the risk for the reimbursement obligations to members; (iii) pharmacy benefit managers; (iv) natural person consumers; and (v) employees of Defendant, including its officers or directors, and subsidiaries and affiliates.[6]

The Plans propose UFCW Local 1776 & Participating Employers Health & Welfare Fund and J.B. Hunt Transport Services Inc. serve as class representatives.

---

2017); *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 07-1871, 2024 WL 4582876, at *1-3 (E.D. Pa. Oct. 25, 2024). However, facts dispositive to resolving these motions have been restated for clarity.

[5] TPPs' Mot. for Class Cert. at 1 [Doc. No. 5501].

[6] TPPs' Mot. for Class Cert. at 1 n.1 [Doc. No. 5501].

As a necessary prelude to class certification, the Court ruled on GSK's motions to exclude the opinions of experts whose opinions have bearing on class certification. The Court granted GSK's motion to exclude the opinion and proposed testimony of Dr. Meredith Rosenthal and granted, in part, GSK's motion to exclude the opinion and proposed testimony of Dr. Thomas McGuire.[7] On March 12, 2025, the Court heard argument on the Plans' motion for class certification. At oral argument, the Plans conceded that the class should be redefined to only include claims from January 1, 2005 through August 14, 2007.

## II.  LEGAL STANDARD

For class certification to be granted, The Plans must first demonstrate that the four elements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy—have been met.[8] In addition, the elements of Rule 23(b)(1), (2), or (3) must be satisfied before a class can be certified.[9] In the Third Circuit, this includes demonstrating that the class is "currently and readily ascertainable based on objective criteria."[10]

The party seeking class certification bears the burden as to all elements,[11] and the Court must conduct "a 'rigorous analysis' of the evidence and arguments put forth."[12] The Court may be required to resolve factual or legal disputes relevant to class certification, and factual determinations must be made by a preponderance of the evidence.[13] The Court may consider

---

[7] *Avandia*, 2024 WL 4582876, at *15 (E.D. Pa. Oct. 25, 2024).

[8] Fed. R. Civ. P. 23(a); *see also Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590-91 (3d Cir. 2012).

[9] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011) (citations omitted).

[10] *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 129-30 (3d Cir. 2023).

[11] *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 248 (3d Cir. 2016), *as amended* (Sept. 29, 2016) (quoting *Marcus*, 687 F.3d at 591).

[12] *Marcus*, 687 F.3d at 591 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008), *as amended* (Jan. 16, 2009)).

[13] *Hydrogen Peroxide*, 552 F.3d at 307.

questions related to the merits of the claim to an extent, but only to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[14]

## III.  DISCUSSION

The Plans must meet the requirements of both Rule 23(a) and Rule 23(b) for the class to be certified. GSK opposes The Plans' motion for class certification on the ground that they cannot satisfy Rule 23(b), specifically because the Plans cannot demonstrate reliance on the alleged fraud with common evidence, and thus individual issues will predominate, and the Plans have not demonstrated that the class is ascertainable.

### A.    Rule 23(a)

The Plans must first demonstrate that the four elements of Federal Rule of Civil Procedure 23(a) have been met. These elements are: 1) numerosity—the class is so numerous that joinder of all members is impracticable; 2) commonality—there are questions of law or fact common to the class; 3) typicality—the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) adequate representation—the representative parties will fairly and adequately protect the interests of the class.[15]

The Plans argue that the proposed class readily satisfies the requirements under Rule 23(a). GSK does not dispute that the proposed class meets the requirements of Rule 23(a).

#### 1.    Numerosity

To meet Rule 23(a)'s numerosity requirement, The Plans must demonstrate that "the [proposed] class is so numerous that joinder of all members is impracticable."[16] There is no minimum number of plaintiffs required to maintain a class action suit. Generally, if the named

---

[14] *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

[15] *See* Fed. R. Civ. P. 23(a); *Marcus*, 687 F.3d at 590-91.

[16] Fed. R. Civ. P. 23(a)(1).

plaintiff can demonstrate that the potential number of plaintiffs exceeds forty, numerosity has been met.[17]

The Plans have obtained data from IQVIA and GSK itself that show that there are at least thousands of entities who indirectly purchased and/or provided reimbursement for some or all the purchase price of Avandia. Based on this evidence of the size of the class, joinder would be impracticable, and the Plans easily meet the numerosity requirement.

### 2.    Commonality

To meet the commonality requirement, the Plans are required to demonstrate that "there are questions of law or fact common to the class."[18] Commonality does not require an *identity* of claims or facts; instead, the "claims must depend on a common contention" that is "capable of classwide resolution."[19] "What matters to class certification  . . . [is] the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation."[20] The Third Circuit has indicated that the bar to satisfy the commonality requirement is low.[21]

The Plans argue that they have satisfied the commonality requirement because "the focus of the litigation centers on a defendant's conduct with respect to all class members."[22] The Plans allege that GSK and its enterprises planned and implemented a consistent marketing strategy that impacted all class members in the same manner, and this establishes commonality. The Plans

---

[17] *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).

[18] Fed. R. Civ. P. 23(a)(2).

[19] *Wal-Mart Stores*, 564 U.S. at 350.

[20] *Id.*

[21] *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182-83 (3d Cir. 2001), as amended (Oct. 16, 2001) (collecting cases).

[22] Mem. Supp. Mot. to Certify Class at 19 & n.91 [Doc. No. 5502] (citing *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 399 (3d Cir. 2015) and *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 299 (3d Cir. 2011)).

satisfy this requirement because they propose using common evidence to demonstrate that class members sustained injury resulting from the same alleged fraud by GSK.

3.     Typicality

The Third Circuit also sets a "low threshold" for satisfying typicality.[23] The typicality requirement ensures that the interests of named plaintiffs are aligned with the interests of the absent class members, and the Third Circuit recognizes that "typicality and adequacy of representation tend to merge."[24]

The Plans allege that GSK's marketing fraud was directed at the entire health care community and had market-wide impact, and that its national marketing messages were developed at the corporate level and consistent, standardized, and distributed throughout the healthcare community. Thus, the Plans argue that they satisfy typicality because the alleged market-wide fraud injured all TPPs in the same way.

4.     Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." The Plans must demonstrate that the class representative has "a minimal degree of knowledge about the case and [has] no conflict of interest with class counsel and the members of the class."[25] Further, the abilities of the class representatives and counsel to adequately represent the class are presumed and "[t]he burden is on the defendant to demonstrate that the representation will be inadequate."[26]

---

[23] *See In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 428 (3d Cir. 2016).

[24] *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, No. 19-2875, 2023 WL 1818922, at *9 (D.N.J. Feb. 8, 2023).

[25] *Duncan v. Governor of V.I.*, 48 F.4th 195, 209 (3d Cir. 2022).

[26] *In re Asbestos School Litig.*, 104 F.R.D. 422, 430 (E.D. Pa. 1984) (citing *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982) (abrogated on other grounds)).

The Plans argue that the class representatives here have demonstrated their knowledge of the claims and their commitment to the class objectives through their participation in extensive written discovery, robust document production, and attendance at multiple depositions. They further note that the class representatives do not have any conflicts of interest with class counsel or other class members.

In sum, the Plans have met their burden of satisfying the requirements for class certification under Rule 23(a).

**B.      Rule 23(b)(3)**

As the Plans meet the requirements under Rule 23(a) for class certification, the Court next turns to Rule 23(b). A class action must also satisfy at least one of the three requirements listed in Rule 23(b).[27] The Plans propose proceeding under Rule 23(b)(3), which provides that certification is appropriate if Rule 23(a) is satisfied and if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and effectively adjudication the controversy. The matters pertinent to these findings include:
>
> (A)      the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)      the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)      the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)      the likely difficulties in managing a class action.[28]

Finally, in the Third Circuit, Rule 23(b)(3) also requires that the class be "currently and readily ascertainable based on objective criteria."[29] The ascertainability requirement is two-fold:

---

[27] *Wal-Mart Stores*, 564 U.S. at 345 (citations omitted).

[28] Fed. R. Civ. P. 23(b)(3).

[29] *Marcus*, 687 F.3d at 593.

"(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"[30]

 1.   Predominance

To meet the predominance requirement of Rule 23(b)(3), "a district court must find that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'"[31] "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"[32] Class treatment is inefficient where each class member would need to offer individual evidence or testimony.[33] A plaintiff need not prove that each element of their claim is susceptible to class-wide proof, but rather that common questions "predominate over any questions affecting only individual [class] members."[34] The touchstone of the predominance inquiry is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[35] The mere presence of individual questions does not rule out a finding of predominance, especially when there are overwhelming common issues with

---

[30] *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015).

[31] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

[32] *Id*.

[33] *Niaspan*, 464 F. Supp. 3d 678, 708 (E.D. Pa. June 2, 2020).

[34] *Amgen*, 568 U.S. at 469.

[35] *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594 (1997).

respect to liability.[36] The Supreme Court has explained that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."[37]

When the proposed class alleges RICO violations,

[P]redominance and commonality are satisfied in *each element* of the alleged RICO violation involves common questions of law and fact capable of proof by evidence common to the class. This is true even if "establishing an injury is not as conducive to common proof," so long as a court is "satisfied that the plaintiffs have presented a plausible theory for proving class-wide injury as a result of racketeering activities of the alleged enterprises at issue."[38]

When conducting the predominance inquiry, courts must consider the elements of the underlying cause of action.[39] Thus, the Court moves element by element to conduct the "rigorous analysis" required at the class certification stage.[40] For a RICO claim, the Plans must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." [41] The Plans must also prove injury to the TPPs' business or property "by reason of" GSK's RICO violations.[42] The Supreme Court has interpreted the phrase "by reason of" to require both proximate and but-for causation.[43]

Predominance is the lynchpin of the class certification analysis in this action. The Plans argue that they meet their burden for predominance because "the key" to their allegations is that "GSK's conduct was identical as to all class members."[44] The Plans propose that trial will center

---

[36] *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 481 n.12 (3d Cir. 2015).

[37] *Amchem Prods.*, 521 U.S. at 625.

[38] *Reyes*, 802 F.3d at 489.

[39] *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 219 (E.D. Pa. 2012).

[40] *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

[41] *In re Ins. Brokerage Antitrust Litig*, 618 F.3d 300, 362 (3d Cir. 2010).

[42] *Id.* at 373 n.72.

[43] *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

[44] Mem. Supp. Mot. to Certify Class at 26 [Doc. No. 5502].

on a common, fraudulent marketing scheme by GSK and its partner enterprise members,

predominated by common evidence that includes:[45]

- GSK's internal data showing that Avandia was associated with an increased risk of adverse cardiac events;

- GSK's internal data showing that Avandia increased the incidence of congestive heart failure, increased LDL and total cholesterol, increased triglycerides, increased weight gain, and lead to edema, among other negative outcomes;

- Internal emails, presentations, and documents authored by GSK employees and others discussing adverse results from GSK clinical trials and calling for such adverse results to be buried, spun, or downplayed;

- Publications of GSK clinical trial results—by GSK employees and respected diabetes thought leaders—that made unfavorable results appear neutral or favorable, and made neutral results appear positive;

- Standardized and consistent promotional materials, CME presentations, publications, and other speaker events touting Avandia's purported cardiovascular benefits, including materials that claimed and/or implied that Avandia had a favorable lipid profile, Avandia's treatment of insulin resistance would lead to improved cardiac outcomes, and Avandia's "durable" glycemic control would improve cardiac health;

- The results of GSK's ICT-37 and ICT-42 and presentations, emails, and documents discussing the adverse cardiac safety signals revealed by these analyses;

- Avandia's labels; and,

- GSK's internal emails, presentations, and documents planning how to discredit the Nissen meta-analysis despite GSK's confirmatory findings.

The Plans argue that the evidence of GSK's pattern of racketeering does not differ among class

members. All will rely on this same evidence, and the claims, whether pursued individually or as

a class, will "prevail or fail in unison."[46]

---

[45] Mem. Supp. Mot. to Certify Class at 26-27 [Doc. No. 5502].

[46] *Amgen*, 568 U.S. at 460.

Second, the Plans urge that evidence that GSK conducted its fraudulent marketing scheme via enterprises is common to all class members. Like above, evidence of internal communications, agreements, strategy documents, and deposition testimony establishes that the enterprises shared "a purpose" of marketing Avandia as cardioprotective, had "relationships among those associated with the enterprise," and possessed "longevity sufficient to permit those associates to pursue the enterprise's purpose."[47]

Next, the Plans argue that common evidence—namely, GSK's own analyses of the impact of its promotion on prescription volume, its marketing materials and strategic planning documents, and testimony from GSK employees regarding the success of its marketing—will show that GSK's alleged fraud caused class members' injuries and satisfies the RICO proximate cause requirement.[48] Finally, the Plans argue that class-wide evidence, by way of the expert opinion and testimony of Dr. Thomas McGuire, will demonstrate class-wide injury as well as damages.

GSK challenges, asserting that the Plans' proposed common evidence to satisfy the causation elements of the RICO claim. GSK asserts that the Plans' theory of causation requires individualized proof and fails to satisfy the predominance requirement for four reasons: 1) the Plans' theory of causation requires individualized proof of reliance and economic harm; 2) the Plans' use of oral statements; 3) the presence of uninjured TPPs in the class; and 4) Dr. Rosenthal's regression analysis. Because the Court has already excluded Dr. Rosenthal's regression analysis in its entirety, the Court only addresses GSK's remaining three arguments.

---

[47] *Boyle v. United States*, 556 U.S. 938, 946-47 (2009).

[48] Mem. Supp. Mot. to Certify Class at 27-28 [Doc. No. 5502]. TPPs had also argued that they would prove reliance through their expert, Dr. Meredith Rosenthal. However, Dr. Rosenthal's econometric analysis has been excluded under *Daubert. See Avandia*, 2024 WL 4582876 (E.D. Pa. Oct. 25, 2024).

*a.     Reliance and Economic Harm*

GSK first argues that the Plans' cause of action requires proof of reliance and economic harm, which necessarily require individualized proof, and that courts overwhelmingly reject class certification when causation requires this sort of proof.

According to GSK, the Plans must prove that: 1) the TPP paid for Avandia prescriptions; 2) at least some of the doctors who wrote those prescriptions did not in reliance on GSK's alleged fraud, and would not have prescribed Avandia if GSK had not committed the alleged fraud; and 3) those prescriptions would have been switched to other prescriptions that were, in aggregate, cheaper than the fraudulently-induced Avandia prescriptions. GSK urges that both require individualized proof. The Plans argue that they can prove reliance and economic harm with class-wide evidence and that GSK's defenses will not destroy predominance.

(1)     Reliance

The Plans offer common evidence in the form of GSK's own analyses of the impact of its promotion on prescription volume, its marketing materials and strategic planning documents, and testimony from GSK employees regarding the success of its marketing to demonstrate that prescribers relied on GSK's allegedly fraudulent marketing regarding Avandia's cardiovascular profile when prescribing Avandia. GSK argues that the Court cannot accept this common evidence of reliance. GSK's brief focuses on case law that indicates that in RICO cases, courts are reticent to certify a class because the reliance element is "nearly always an individualized question."[49] While RICO fraud cases often "requir[e] case-by-case determinations of what effect, if any, the misrepresentation had on plaintiffs' decision-making,"[50] the Third Circuit has

---

[49] *Harnish v. Widener Univ. Sch. Of Law*, 833 F.3d 298, 309-10 (3d Cir. 2016).

[50] *Id.*

affirmed class certification for RICO fraud claims before, explaining that "where proof of the RICO violation is demonstrated through common evidence of a common scheme, reliance may be inferred on a classwide basis."[51] Courts have accepted two forms of common evidence to demonstrate class-wide reliance. First, courts may infer class-wide reliance when a plaintiff presents evidence of a common scheme to deceive, like standardized written materials containing misrepresentations.[52] Second, plaintiffs can demonstrate class-wide reliance through statistical or econometric models that show the allegedly unlawful promotion caused an increase in prescriptions.[53] The Plans point to both types of evidence here.

Regarding the first type, GSK argues that in a case like this, because there are legitimate reasons for prescribing Avandia, the Court cannot infer reliance from evidence for a common scheme to deceive. The Plans have argued that their presentation of evidence of a common scheme to deceive— its marketing materials and strategic planning documents and testimony from GSK employees regarding the success of its marketing—entitle them to an inference of reliance because prescribers have "no reason to prescribe Avandia had GSK been honest about the drug's true cardiac profile."[54] The Court has already concluded that "[t]here is no factual basis for such an assumption."[55] GSK harps on this as reason to preclude class certification

---

[51] *Cmty. Bank of N. Va.*, 795 F.3d at 408.

[52] *Id.* at 408; *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528-29 (3d Cir. 2004); *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 962 F. Supp. 450, 514 (D.N.J. 1997) ("Another indication of a common scheme to deceive is the existence of uniform written materials on which the oral representations were based.").

[53] *Tyson Foods*, 577 U.S. at 455; *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co.*, 674 F. Supp. 3d 799, 828 (C.D. Cal. 2023) (holding that "academic papers, internal corporate studies, and emails from [the pharmaceutical companies'] employees . . . can be used to establish but-for causation under a quantity-effect theory for a single TPP or even for a class of them").

[54] Opp'n Mot. Summ. J. at 7 [Doc. No. 5544].

[55] *Avandia*, 2024 WL 4582876, at *14 (E.D. Pa. Oct. 25, 2024).

altogether: because there are so many reasons a doctor may prescribe Avandia,[56] there can be no class-wide evidence of reliance.

It is along these lines that GSK attempts to liken this case to *Harnish v. Widener University School of Law*,[57] where the class could not be certified. In *Harnish*, alumni alleged the Widener University lied about the value of the law degree it offered, inflating tuition prices in violation of New Jersey's and Delaware's Consumer Fraud Acts.[58] GSK urges that because there are many factors that go into a provider's decision to prescribe Avandia, like there are in a student's choice among law schools, plaintiffs cannot present class-wide proof of reliance, as reliance is a case-by-case determination into "what effect, if any, the misrepresentation had on plaintiffs' decision-making."[59] The Court is unconvinced by this argument, which obscures the reasons for denying class certification in *Harnish*. The case before us now is different.

First, the class in *Harnish* could not be certified because the plaintiffs had not proceeded on a cognizable theory of damages.[60] The plaintiffs' case was based on a "price inflation"—or excess price—theory of liability, alleging that the misrepresentations "empowered Widener to charge more across the entire market."[61] The Third Circuit discussed the challenges of proving reliance with class-wide evidence, but ultimately affirmed denial of class certification because New Jersey and Delaware courts had already rejected plaintiffs' price inflation theory in the

---

[56] In this way, the facts here are different from those in *Community Bank of Northern Virginia*, 795 F.3d 380, where the class members' decisionmaking was "one-dimensional . . . such that the alleged misrepresentation would have been 'essentially determinative' for each plaintiff." *Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 88 (2d Cir. 2015).

[57] 833 F.3d 298 (3d Cir. 2016).

[58] *Id.* at 309.

[59] *Id.* at 309-310.

[60] *Id.* at 313.

[61] *Id.* at 311-12.

consumer fraud context and thus had not proposed a cognizable theory of damages.[62] The Plans'
case here is not so foreclosed. As an initial point, the Plans pursue a "quantity effect" theory,
alleging that GSK's alleged misrepresentations caused providers to prescribe and the Plans to
reimburse more prescriptions than they would have absent the misrepresentations, under the
federal civil RICO statute. Unlike *Harnish*, there is no indication in the courts that the Plans'
claim is non-cognizable.

Second, there is a fundamental and obvious difference between the subjectivity involved
in choosing a law school and in prescribing a drug to a patient. Indeed, there are many factors
that impact a provider's decision to prescribe one medication over another, just as there are many
factors that impact a student's decision to choose one law school over another. However, the
factors that a provider considers lead to an objective and more binary determination than those a
student considers. For one, every provider's goal when considering whether to prescribe Avandia
is largely the same—to treat a patient's diabetes without otherwise causing harm to their health,
whereas student goals vary. Moreover, providers generally consider the same set of factors (with
some necessary distinctions based on patient differences), whereas the set of factors any one
student considers will be different from every other student. It is simply inaccurate to say that the
processes taken to reach these decisions are equivalent.[63] For this reason, even though the
decision to prescribe Avandia is not "one-dimensional," it is not so subjective that a provider's
reliance cannot be inferred.

---

[62] *Id.* at 312-13.

[63] The same is true of non-binding decisions of Courts in this Circuit that GSK has cited. In *Rosenstein v. CPC International*, the allegedly fraudulent marketing concerned a cooking oil and margarine, for which consumers' decision-making processes and reasons for purchase varied broadly. 1991 WL 1783 (E.D. Pa. Jan. 8, 1991).

Regarding the second type of class-wide evidence, GSK argues that because its own internal statistical analyses do not isolate the effect of their marketing regarding Avandia's cardiovascular profile specifically, they cannot be used to demonstrate class-wide reliance on that marketing. This is even more true now, they urge, as the Court has excluded Dr. Rosenthal's opinion and testimony. Without Dr. Rosenthal's regression analysis, the Plans offer GSK's own analyses of the impact of its promotion on prescription volume as statistical analysis to prove reliance.[64] The Plans insist that the regressions performed by GSK are sufficient to carry their case in the absence of Dr. Rosenthal's analysis.[65]

The Plans cite to several cases to argue that statistical regression, like Dr. Rosenthal's *or* like GSK's own regression analyses, can establish class-wide reliance. In *Neurontin*, for example, the First Circuit explained that "plaintiffs need not prove causation through the testimony of individual doctors" given the "combination of the aggregate evidence and the circumstantial evidence."[66] The First Circuit reaffirmed its approach in *In re Celexa*, explaining that plaintiffs' "clinical and statistical evidence, if believed, could establish causation and injury at least for any TPP who paid for more than a handful of different patients' prescriptions."[67] The Second Circuit has contemplated the same in *dicta*, theorizing that "it may be possible for a class of plaintiffs to prove the causation element of a pharmaceutical fraud claim such as this one with

---

[64] The Plans seem to suggest that Dr. McGuire's step-down analysis can be used as evidence of reliance, now that Dr. Rosenthal's analysis has been excluded. Because Dr. McGuire was not offered for that purpose, and because the Court has not determined that his analysis is admissible under *Daubert* for that purpose, the Court will decline to consider his analysis for that purpose now.

[65] The Plans point out that GSK used these regressions to prove exactly what the Plans intend to use them to prove: that GSK's marketing was a driving force for increasing Avandia's prescriptions.

[66] *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 60, 68 (1st Cir. 2013).

[67] *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 14 (1st Cir. 2019).

16

generalized proof."[68] Moreover, the Third Circuit has not—as GSK seems to argue—foreclosed the possibility that the combination of statistical and circumstantial common evidence offered by the Plans here can establish reliance for a class of TPPs. The Court is confident that under a quantity-effect theory such as the one the Plans pursue here, common evidence like regression models, papers, internal corporate studies, and communications can establish reliance for a class of TPPs.

Finally, GSK argues that even if the Court finds that the Plans can prove class-wide reliance with common evidence, it intends to put on individualized defenses that prescribing doctors did not rely on GSK's representations about Avandia's cardiac profile when prescribing Avandia.[69] GSK argues that this intent to rebut the Plans' reliance evidence with TPP-by-TPP defenses will create mini-trials and thus destroy predominance. Indeed, the Court must consider any affirmative defenses during its predominance analysis.[70] However, the "mere existence" of an affirmative defense cannot destroy predominance.[71] Here, the vast majority of the evidence related to reliance put forth by either party is common to the class. In challenging class certification, GSK points to four pieces of individualized evidence: deposition testimony of two Key Opinion Leaders (one of whom never prescribed Avandia), one GSK expert, and one GSK witness.[72] These are the only individualized evidence—accumulated over nearly two decades of

---

[68] *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 74-75 (2d Cir. 2015).

[69] Def.'s Opp'n Mot. to Certify Class at 28-29 [Doc. No. 5515] (citing *In re Asacol Antitrust Litig.*, 907 F.3d 42, 55 (1st Cir. 2018) and *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 221 (5th Cir. 2003)).

[70] *Dukes*, 564 U.S. at 367.

[71] *Painters*, 674 F. Supp. 3d at 830-31 ("[T]he question of predominance did not hinge on what evidence was *theoretically* available, but instead on what evidence was *actually* adduced to support the parties' claims and defenses.") (citing *Tyson*, 577 U.S. at 456-57).

[72] Def.'s Opp'n Mot. to Certify Class at 9-10 [Doc. No. 5515]. Dr. Nesto testified that he never prescribed Avandia. Nesto Dep., Def.'s Opp'n Mot. to Certify Class Ex. 18, at 211 [Doc. No. 5515-19]. For Dr. Nesto's purposes, then, whether his prescribing practices would have been different but-for GSK's marketing of Avandia is a purely

litigation—that GSK submitted in relation to the reliance element. In contrast, the Plans supply significant evidence common to the class to demonstrate reliance: as noted above, GSK's own analyses of the impact of its promotion on prescription volume, its marketing materials and strategic planning documents, and testimony from GSK employees regarding the success of its marketing. GSK argues that it will present physicians for every class member at trial if the class is certified. "While the Court could speculate whether [GSK] will depose (or even can depose) many prescribing physicians, it is not this Court's role to make decisions on conjecture."[73]

As discussed above, the Court concludes that the Plans have shown, by the preponderance of the evidence, that common questions of fact predominate over the reliance element.

(2)     Economic Harm

Next, the Court must determine whether a RICO cause of action requires aggregate economic loss to satisfy the injury element. GSK argues yes—and because there are so many scenarios where even if a TPP prescribed Avandia, it would not have suffered an aggregate loss, the Plans cannot satisfy predominance. The Plans disagree and argue that any TPP who paid for even one Avandia prescription due to GSK's fraud—even if it did not suffer an aggregate loss— is injured.

---

theoretical question. Moreover, the majority of this testimony is ineffective in challenging the reliance of providers on GSK's marketing regarding Avandia. For example, Dr. Wright, to whom GSK points as raising an individualized question and destroying predominance, admitted that he stopped prescribing Avandia *because of* the cardiovascular safety concerns that Nissen raised. *See* Wright Dep., Def.'s Opp'n Mot. to Certify Class Ex. 35, at 87-88 [Doc. No. 5515-36].

[73] *Painters*, 674 F. Supp. 3d at 831.

The Third Circuit has held—in this matter—that plaintiffs must prove "a concrete financial loss, and not mere injury to a valuable intangible property interest."[74] This proof "can be satisfied by allegations and proof of actual monetary loss, i.e., an out-of-pocket loss."[75] GSK cites to this language to support its argument that to prove injury in this RICO case, the Plans must prove aggregate loss.[76] However, the Third Circuit has explained that the holding in *In re Warfarin Sodium Antitrust Litigation*, that "TPPs, like individual consumers, suffer[] direct harm when, as a result of [a pharmaceutical company's] alleged misrepresentations, they pa[y] supracompetitive prices from [brand drugs] instead of purchasing lower-priced generic [drugs]," "offers the closest analogy to the facts of this case" and is applicable here.[77] Accordingly, the Third Circuit has—in no uncertain terms—explained that here, direct economic harm occurred at the time of Avandia purchase.[78]

The Plans have offered the opinion and testimony of Dr. McGuire for purposes of proving injury and damages, and the Court has deemed his step-down calculations under Scenario 1 (the remaining class period) admissible. Dr. McGuire opines that over 99% of TPPs with 12 or more patients prescribed Avandia at least once.[79] This determination is sufficient class-wide evidence of economic loss.

---

[74] *In re Avandia Marketing, Sales Practices & Product Liability Litig.*, 804 F.3d 633, 638 (3d Cir. 2015) (quotation marks and citation omitted).

[75] *Id.* (quotation marks and citation omitted).

[76] GSK's argument can also be interpreted as a requirement that offset calculations be required at the injury stage. This confuses the injury element and the damages element of the RICO cause of action: whether providers who prescribe more affordable or more expensive medicine in lieu of Avandia is an issue of damages, not injury. *Avandia*, 804 F.3d at 644. And as it pertains to damages, it does not destroy predominance if certain TPPs cannot prove damages. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014). Indeed, the Court followed the Third Circuit's guidance when it determined that Dr. McGuire's step-down calculations for Scenario 1 were admissible with or without offsets. *Avandia*, 2024 WL 4582876, at *14 (E.D. Pa. Oct. 25, 2024).

[77] *Avandia*, 804 F.3d at 639-40 (quoting *Warfarin*, 391 F.3d at 531) (alterations in *Avandia*).

[78] *Id.* at 640.

[79] McGuire Rebuttal Report at 33 n.65 [Doc. No. 5535-6].

b.      *Use of Oral Statements*

Next, GSK argues that the Plans' extensive use of oral statements to prove the alleged fraud here precludes class certification. "[A]s a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action."[80] However, oral misrepresentations *can* be used as common evidence when they are "uniform," and uniformity does *not* require "absolute conformity."[81] Indeed, "[a]llegations of a common scheme of deception may indicate predominance, even where the scheme is implemented through oral misrepresentations by sales agents."[82] This is true particularly when the oral representations were substantially similar[83] and based on uniform written materials.[84]

The Plans' allegations and the evidence presented to the Court demonstrate that GSK's sales representatives were trained to make pitches as close to identical as possible when marketing Avandia. The Plans have presented significant evidence from GSK marketing executives that confirms that GSK's marketing messages and tactics did not vary by region.[85] GSK's instructions for sales trainers indicated that "[r]egardless of whether we're talking to an Endo or a PCP the message has got to be the same."[86] The Plans' marketing expert Dr. Russell opines that GSK's sales representatives were taught to deliver "highly scripted messages" about

---

[80] *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 190 (3d Cir. 2001).

[81] *Reyes v. NetDeposit, LLC*, 802 F.3d 469, 490, 491 (3d Cir. 2014).

[82] *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 962 F. Supp. 450, 513 (D.N.J. 1997) (collecting cases).

[83] *See, e.g.*, *McMahon Books, Inc. v. Willow Grove Assocs.*, 108 F.R.D. 32, 37-38 (E.D. Pa. 1985) (explaining that oral representations that appear similar or derived from the same "sales pitch" would support a predominance finding).

[84] *See, e.g.*, *Sharp v. Coopers & Lybrand*, 70 F.R.D. 544, 548 (E.D. Pa. 1976) (finding that the oral representations on which plaintiff's suit was based were originally written, satisfying predominance).

[85] Kuhn Dep., Mem. Supp. Mot. to Certify Class Ex. 24, at 50, 83 [Doc. No. 5502-19]; Mem. Supp. Mot. to Certify Class Ex. 55, at 010 [Doc. No. 5502-19].

[86] Mem. Supp. Mot. to Certify Class Ex. 121, at 031[Doc. No. 5518-13]; Mem. Supp. Mot. to Certify Class Ex. 61 [Doc. No. 5502-52].

Avandia's benefits and were given *exact* language to use when answering providers questions about Avandia's lipid issues.[87] Finally, sales representatives were provided with audiotape scripts to memorize to aid in standardizing the sales messaging.[88]

Here, like in *In re Prudential*, "the oral component of the fraudulent sales presentations did not vary appreciably" from provider to provider.[89] The cases GSK cites to challenge predominance on the basis of these oral statements—*Johnston v. HBO Film Management* and *In re Life USA Holding*—did not have the same evidentiary background demonstrating the uniformity or scripted nature of the oral representations that was present in *In re Prudential* and is present here. In *Johnston*, the Third Circuit noted that the distinguishing factor between *In re Prudential*, where the oral statements did not predominate, and *In re Life USA Holding*, where they did, was the "depositions, affidavits, and declarations" demonstrating "standard, uniform, scripted sales presentations."[90] So too here. At bottom, it is undisputed that GSK took great pains to standardize its marketing messaging from sales representative to sales representative.[91]

GSK also attempts to distinguish this case from *Reyes*. In *Reyes*, the Third Circuit reversed the District Court's denial of class certification because the business was a "complete sham," rendering all oral statements from the telemarketers necessarily fraudulent. Thus, even though the oral statements were not uniform, such individual distinctions between how

---

[87] Russell Report ¶¶ 192-94 [Doc. No. 5502-9].

[88] Perry Report ¶¶ 615-16 [Doc. No. 5502-10].

[89] *In re Prudential*, 962 F. Supp. at 514.

[90] *Johnston*, 265 F.3d at 188 (comparing *In re Prudential*, 962 F. Supp. at 514, with *In re LifeUSA Holding*, 242 F.3d 136, 146 (3d Cir. 2021)).

[91] Moreover, Dr. Russell notes that sales call notes are used—at least in part—to ensure uniformity and consistency by confirming that representatives are staying on script. Russell Report ¶ 199 [Doc. No. 5502-9]; *see also* Russell Rebuttal Report ¶ 22 [Doc. No. 5518-14].

telemarketers interacted with consumers did not destroy predominance.[92] Conversely, then, individual oral statements do not destroy predominance so long as they are uniform. Here, the Court is satisfied that, based on the allegations and evidence presented, the oral statements made by GSK's sales representatives were materially similar and do not destroy predominance.

*c.*      *Presence of Uninjured TPPs*

Lastly, GSK argues that the likely significant number of uninjured TPPs precludes class certification. For this argument, GSK cites to its expert, Dr. Hughes, who concludes that "26-33% of TPPs in the Optum dataset had 'zero or negative damages.'"[93] The Plans respond that "Dr. Hughes' *damages* calculations do not speak to the fact of *injury* . . . As a legal matter, any TPP who paid for one Avandia prescription due to GSK's fraud was injured," and that Dr. McGuire's data show that all or nearly all TPPs were injured.[94] The presence of these allegedly uninjured class members is a predominance issue, GSK urges, because presenting individualized evidence to exclude anywhere from one quarter to one third of TPPs overwhelms common evidence and questions.

The issue here, as above, turns on whether a RICO cause of action requires aggregate loss to satisfy the injury element. Again, GSK argues yes—and because some 26-33% of TPPs had zero or negative damages, the individualized inquiry needed to identify and exclude these uninjured TPPs destroys predominance. The Plans disagree and argue that because TPPs are injured at the time of purchase, and less than 1% of TPPs never made an Avandia purchase, any individual question presented by uninjured TPPs would not predominate over the common questions.

---

[92] *Reyes*, 802 F.3d at 489-90.

[93] Def.'s Opp'n Mot. to Certify Class at 33 [Doc. No. 5515].

[94] Plans' Reply Br. at 13 [Doc. No. 5518].

22

The Court has already determined that under Third Circuit precedent, the Plans can allege injury at the time of purchase. The mere presence of individual questions does not destroy predominance, so long as they do not overwhelm common questions and common evidence.[95] Here, Dr. McGuire's analysis confirms that less than 1% of class members with 12 members purchasing Avandia would be uninjured and thus subject to potential individual defenses.[96] This small portion of class members that would require individualized defenses does not destroy predominance. "That the defendant might attempt to pick off the occasional member here or there through individualized rebuttal does not cause individual questions to predominate."[97] Thus, GSK's argument that individual questions will overwhelm common questions when it comes to proving injury fails.

The Court finds that Rule 23's predominance requirement is satisfied because the Plans' allegations and evidentiary submissions establish that common issues overwhelm and dramatically outweigh the potential individual issues here, and the majority of the questions raised by the Plans' civil RICO claims would be resolved with common evidence.

2.    Superiority

The Plans are required to show under Rule 23(b)(3) that class treatment is superior to other methods for achieving a "fair and efficient" adjudication of the controversy. For the superiority inquiry, Rule 23(b)(3) provides four factors for the Court to consider: a) the class members' interests in individually controlling the prosecution or defense of separate actions; b) the extent and nature of any litigation concerning the controversy already begun by or against

---

[95] *Reyes*, 802 F.3d at 481 n.12.

[96] McGuire Rebuttal Report ¶ 62 & n.65 [Doc. No. 5535-6]; *see also* McGuire Report ¶ 31 n.59 [Doc. No. 5502-8].

[97] *Halliburton Co.*, 573 U.S. at 276.

class members; c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and d) the likely difficulties in managing a class action.[98]

The Plans argue that the number of potential class members, the common issues predominating the litigation, and the lack of individual lawsuits currently pending against the defendant "strongly suggests the use of the class action device as the most efficient way to resolve the asserted claims."[99] GSK does not dispute that the Plans meet the requirements for superiority. The Court agrees that the number of potential class members, the number of common issues and evidence that would be presented at trial, and the lack of individual lawsuits render class treatment the superior method here and satisfy the superiority requirement of Rule 23(b)(3).

### 3.    Ascertainability

The Plans must prove by a preponderance of the evidence that the class is ascertainable.[100] This requires the Plans to demonstrate that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"[101] Ascertainability does not require a plaintiff to identify all class members at the class certification stage, but rather to make a showing that class members *can* be identified.[102] The purpose of the Third Circuit's ascertainability requirement is to avoid extensive, individual fact-finding or

---

[98] Fed. R. Civ. P. 23(b)(3); *see also In re Modafinil Antitrust Litig.*, 837 F.3d at 253 n.11.

[99] Mem. Supp. Mot. to Certify Class at 39 [Doc. No. 5502] (quoting *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 251 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004)).

[100] *Niaspan*, 67 F.4th at 130.

[101] *Byrd*, 784 F.3d at 163 (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)).

[102] *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.2 (3d Cir. 2013).

"mini-trials" to determine whether prospective members are properly included in a class.[103] Ascertainability differs from predominance "because the ascertainability requirement focuses on whether individuals fitting the class definition may be identified without resort to mini-trials, whereas the predominance requirement focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence."[104]

The methodology the Plans propose is as follows: the Plans will create "a robust list of potential class members for the purpose of receiving notice. The starting point for this list will be a proprietary database of TPP information provided by a claims administrator, such as Rust or A.B. Data."[105] The Plans also plan to use objective data collected by IQVIA, "a leading publisher of pharmaceutical data in the United States (which shows entities that purchased and/or provided reimbursement for Avandia during the class period)" and GSK's own rebate records, "which show[] entities that received rebates for their purchase of Avandia during the class period."[106] Then, following judgment, putative TPP class members will submit claims forms verifying they are part of the class and not subject to a class exclusion, accompanied by proof of payment of Avandia and/or the other covered drugs.

In support of its motion for class certification, the Plans submitted the declaration of Mr. Mark Fischer, the president of pharmacy and medical claims analytics firm responsible for submitting claims in lawsuits like this one on behalf of large TPPs.[107] In it, Mr. Fischer explained that his firm has already identified thousands of TPPs fitting the class definition "with

---

[103] *Marcus*, 687 F.3d at 592-94.

[104] *Byrd*, 784 F.3d at 164 (quotation marks and citation omitted).

[105] Mem. Supp. Mot. to Certify Class at 44 [Doc. No. 5502].

[106] Mem. Supp. Mot. to Certify Class at 44 [Doc. No. 5502].

[107] *See* Fischer Decl., Mem. Supp. Mot. to Certify Class Ex. 4, at ¶ 10 [Doc. No. 5502-4].

transactions that hold an aggregate value in excess of $200 million between January 1, 2004 through August 14, 2007."[108] Further, the Plans point to court orders approving settlements with similarly-defined TPP classes.[109] The Plans argue that the proposed class easily meets the ascertainability argument.

### a. The Objective Criteria Requirement

Ascertainability first requires that the class is defined with reference to objective criteria. The Plans argue that "[w]hether an entity 'indirectly purchased and/or provided reimbursement for Avandia' is an objective question with a binary answer."[110] This is sufficient to meet the first prong of ascertainability.

### b. The Reliable and Administratively Feasible Mechanism Requirement

Second, ascertainability requires that the Plans demonstrate that there is a reliable and administratively feasible mechanism for identifying class members. The Plans argue that the method they propose is the same as that accepted by the Third Circuit in *Hargrove v. Sleepy's LLC*: using databases to identify potential class members and using sworn affidavits as claims forms following judgment.[111] The Plans urge that this methodology requires only a "straightforward 'yes-or-no' review of [these] records" and is thus administratively feasible regardless of the volume or need to review individual records.[112]

---

[108] Fischer Decl., Mem. Supp. Mot. to Certify Class Ex. 4, at ¶ 8 [Doc. No. 5502-4].

[109] *See, e.g.*, *In re Loestrin 24 FE Antitrust Litig.*, No.13-md-2472, ECF No. 1460 (D.R.I. Sept. 1, 2020); *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, ECF No. 766 (D. Conn. Mar. 6, 2018 ); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-2503, ECF No. 806 (D. Mass. Nov. 27, 2017 ); *Mahoney v. Endo Health Solutions, Inc.*, No. 15-9841, ECF No. 104 (S.D.N.Y. June 23, 2017); *In re Pharm. Average Whole Price Litig.*, MDL No. 1456, No. 01-12257, ECF No. 7432 (D. Mass. Feb. 11, 2011); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-11148, ECF No. 722 (D. Mass. Mar. 30, 2009); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 64 (D. Mass. 2005).

[110] Mem. Supp. Mot. to Certify Class at 39 [Doc. No. 5502].

[111] *See* Mem. Supp. Mot. to Certify Class at 44 [Doc. No. 5502] (quoting *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 480 (3d Cir. 2020)).

[112] *Kelly v. RealPage, Inc.*, 47 F.4th 202, 224 (3d Cir. 2022).

GSK argues that the objective data the Plans intend to use—lists of purchases maintained by claims administrators, IQVIA, and GSK itself—provide no meaningful information to identify class members. Rather, "their only use of records would be to identify potential parties to *notify* of the class and ask them to self-identify."[113] GSK attempts to distinguish the ascertainment method in *Hargrove* from that proposed by the Plans here: the objective records in *Hargrove* were sufficient on their own to identify the entire class, there was no significant overbreadth issue, and any gaps in the objective record were the fault of the defendant. Moreover, GSK argues that the Plans' proposal to use affidavits to confirm class membership is unprecedented, unreliable, unworkable, and would require "extensive and individualized fact-finding or 'mini-trials.'"[114]

GSK's argument is misguided, however, as the Third Circuit permits some level of verification during the claims administration process as inherent in determining whether a class member has a legitimate claim: "Such a process of identification does not require a mini-trial, nor does it amount to individualized fact-finding, and indeed must be done in most successful class actions."[115] Indeed, this is so "even if it requires review of individual records with cross-referencing of voluminous data from multiple sources."[116] GSK urges that the level of verification required here goes too far, because the Plans propose using overbroad datasets and do not have a feasible method to identify and exclude non-class members. While the case here is complex, the question at hand as it pertains to ascertainability is not. The question here is akin to the straightforward yes-or-no questions proposed in the Third Circuit cases that found the classes

[113] Def.'s Opp'n Mot. to Certify Class at 37 [Doc. No. 5515].

[114] *Marcus*, 687 F.3d at 593.

[115] *Byrd*, 784 F.3d at 170-71 (quotation marks and citation omitted).

[116] *Kelly*, 47 F.4th at 224.

ascertainable: did TPPs indirectly purchase or provide reimbursement for Avandia, Avandamet, and/or Avandaryl during the relevant time period? As in any class certification, this will require a degree of inquiry. The Court is not persuaded that answering this question to identify class members will require substantial, individualized "mini-trials."

GSK seems to urge that the objective datasets the Plans propose to use to identify potential class members must *on their own* identify class members. The Third Circuit, however, has explicitly rejected this approach: "Plaintiff need not, at the class certification stage, demonstrate that a single record, or set of records, conclusively establishes class membership."[117] In *City Select*, for example, the Court reiterated that "[a]ffidavits, in combination with records or other reliable and administratively feasible means, can met the ascertainability standard."[118] Here, like in *City Select*, the Plans have identified databases that create a set of potential claimants, whose class membership will be determined using affidavits and purchase records provided by the potential claimants.

The cases Defendants cite do not defeat ascertainability here. In *Carrera* and *Marcus*, for example, plaintiffs could not establish ascertainability by relying on *only* affidavits and declarations of class members to show retail purchases of a supplement and replacement of a third-party's tires on a foreign vehicle, respectively.[119] This is fundamentally distinct from the use of affidavits proposed here, where class members—originally identified by objective, third-party data—will corroborate their class membership via commercial purchase history based on

---

[117] *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 441 (3d Cir. 2017).

[118] *Id.*

[119] *Carrera*, 727 F.3d at 311; *Marcus*, 687 F.3d at 594.

their ordinary business records. And unlike in *Bennett*,[120] *Espinal*,[121] and *Niaspan*, the Plans in this matter do not propose to use objective data alone to identify class members and apply class exclusions. In *Niaspan*, the court did not indicate that a class of TPPs could never satisfy the ascertainability requirement. Instead, the Third Circuit affirmed that "an affidavit, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard," but held that plaintiffs had forfeited that proposed method.[122] That is what the Plans propose here, and it is sufficient under Third Circuit precedent.[123]

Finally, *In re Lipitor*, in which the District of New Jersey held that a class of TPPs did not satisfy the ascertainability requirement, does not preclude ascertainability here.[124] The court in *Lipitor* took issue with the fact that "[t]he only evidence provided to the Court [was] the Declarations presented by these two PBM executives. This does not hold up against the rigorous analysis required of the class certification process . . . ."[125] The Plans here similarly present a declaration from Mr. Miller regarding the ascertainability of the class. Additionally, the Plans have gone further and already produced the necessary customer data. "[T]he fact that [the Plans] have already demonstrated the existence and availability of that information differentiates it from *Lipitor*, wherein plaintiffs were only able to produce declarations that data existed without actual

---

[120] *Bennett v. Quest Diagnostics, Inc.*, No. 17-1590, 2023 WL 3884117, at *14 (D.N.J. June 8, 2023) (finding class was not ascertainable because "Plaintiffs have not outlined any straightforward 'yes-or-no' review of existing records that would allow the classes to be ascertained").

[121] *Espinal v. Bob's Discount Furniture, LLC*, No. 17-2854, 2021 WL 5002650, at *8-9 (D.N.J. Oct. 28, 2021) (finding class was not ascertainable because "Plaintiffs have not met their burden of demonstrating that it is administratively feasible to piece together the records to identify which individuals worked over 40 hours per week for Defendants").

[122] *Niaspan*, 67 F.4th at 131, 135 (quotation marks, alterations, and citation omitted).

[123] Moreover, *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 06-1833, 2015 WL 3623005 (E.D. Pa. June 10, 2015), was decided before the court had the guidance of *City Select*, *Hargrove*, and *RealPage*. And further, it faulted the plaintiffs for failing to propose a methodology at all, which the Plans have done here. *Id.* at *9-10.

[124] *In re Lipitor Antitrust Litig.*, No. 12-2389, 2024 WL 2865074 (D.N.J. June 6, 2024).

[125] *Id.* at *17.

evidence that it could be obtained."[126] Here, the Plans have established that TPPs will be able to obtain relevant purchase records because multiple Plaintiffs have already done so.

The Plans have demonstrated that the class is ascertainable. Ascertainability is guided by three principles: "First, ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class. Second, it ensures that a defendant's rights are protected by the class action mechanism, and that those persons who will be bound by the final judgment are clearly identifiable. Finally, it ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action."[127] The Plans' proposed method satisfies these principles: class members can identify themselves; it is clear who will or will not be bound by a final judgment; and, importantly, the Plans have demonstrated that previous class actions of this nature have proceeded efficiently.

The Plans have satisfied the Third Circuit's ascertainability requirement.

* * *

The Court is satisfied that the Plans have satisfied the requirements of Rule 23(a) and Rule 23(b)(3). Thus, the Plans' motion for class certification is granted for the class period of January 1, 2005, until August 14, 2007.

## C.    Rule 23(g)

"[A] court that certifies a class must appoint class counsel."[128] Where, as here, an applicant seeks appointment as class counsel, the court may only appoint the applicant if they are adequate under Rule 23(g)(1) and (4).[129] Rule 23(g)(1) requires the court to consider: "(i) the

---

[126] *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-md-2724, 2025 WL 754567, at *23 (E.D. Pa. March 7, 2025).

[127] *City Select*, 867 F.3d at 439 (quotation marks and citations omitted).

[128] Fed. R. Civ. P. 23(g)(1).

[129] Fed. R. Civ. P. 23(g)(2).

work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."[130] A court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."[131] Rule 23(g)(4) requires that class counsel "fairly and adequately represent the interests of the class."[132]

The Plans seek appointment of Thomas M. Sobol, Erin C. Burns, and James R. Dugan as class counsel.[133] GSK does not dispute their appointment. The Court has already appointed Mr. Sobol, Ms. Burns, and Mr. Dugan as "interim co-lead counsel."[134] As to the Rule 23(g)(1)(A) factors, proposed class counsel has performed extensive, thorough work on behalf of the Plans and the proposed class; Mr. Sobol and Mr. Dugan have successfully tried similar cases, including *In re Neurontin*;[135] and proposed class counsel has already devoted significant resources to this matter. The Court is confident that proposed class counsel will fairly and adequately represent the interests of the class, as required by Rule 23(g)(4).

Having certified the Plans' proposed class, the Court accordingly appoints Thomas M. Sobol and Erin C. Burns of Hagens Berman Sobol Shapiro and James R. Dugan II of the Dugan Law Firm as class counsel.

---

[130] Fed. R. Civ. P. 23(g)(1)(A).

[131] Fed. R. Civ. P. 23(g)(1)(B).

[132] Fed. R. Civ. P. 23(g)(4).

[133] Mem. Supp. Mot. Class Cert. at 49 [Doc. No. 5502].

[134] *See* Doc. Nos. 4803, 5468.

[135] MDL No. 1629, 04-10981 (D. Mass.). Mr. Sobol and Mr. Dugan also recently served as co-lead counsel in *In re Ranbaxy Generic Drug Application Antitrust Litigation*, another TPP case that alleged antitrust and RICO violations. No. 19-md-2878 (D. Mass.).

**IV.    CONCLUSION**

For the reasons stated above, the Plans' motion for class certification is **GRANTED** in part as to claims beginning January 1, 2005, until August 14, 2007, and **DENIED** in part as to claims before January 1, 2005.

An order will be entered.